UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Leslie Stephen THOMPSON<br>Ontario, Canada | ) | |
| | ) | |
| Plaintiff | ) | Civ. No. |
| v. | ) | |
| | ) | |
| W. Ralph BASHAM. Commissioner<br>U.S. Customs and Border Protection<br>1300 Pennsylvania Avenue, NW<br>Washington, DC 20229 | ) | |
| | ) | |
| EMILIO T. GONZALEZ, Director<br>U.S. Citizenship and Immigration Services<br>20 Massachusetts Avenue, N.W.<br>Washington, DC 20529 | ) | |
| | ) | |
| MICHAEL CHERTOFF, Secretary<br>U.S. Department of Homeland Security<br>425 Murray Drive, Building 410<br>Washington, DC 20528 | ) | |
| | ) | |
| ROBERT S. MUELLER, Director<br>Federal Bureau of Investigation<br>J. Edgar Hoover Building<br>935 Pennsylvania Avenue, N.W.<br>Washington, DC 20535 | ) | |
| | ) | |
| Defendants | ) | |

## VERIFIED COMPLAINT FOR MANDAMUS

The Plaintiff, Leslie Stephen THOMPSON, by counsel, complains of the Defendants, W.

Ralph BASHAM, Commissioner, U.S. Customs and Border Protection; Emilio T. GONZALEZ,

Director, U.S. Citizenship and Immigration Services; Michael CHERTOFF, Secretary, U.S.

Department of Homeland Security; and, Robert S. MUELLER, Director, Federal Bureau of Investigation, as follows:

## I.     PREFATORY STATEMENT

1. This is an action to compel Defendants to take all appropriate action to adjudicate Plaintiff's application for a waiver of inadmissibility under section 212(d)(3) of the Immigration and Nationality Act ("INA") 8 U.S.C. §1182(d)(3), which was filed with U.S. Customs and Border Protection ("CBP") at International Bridge Plaza, Sault Ste. Marie, Michigan, on January 7, 2005 and which Defendants have failed to take timely action on for more than three years.

## II.     JURISDICTION

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal subject matter jurisdiction), in conjunction with 28 U.S.C. §1361 (mandamus), the Administrative Procedure Act ("APA") at 5 U.S.C. §§555(b) and 702, and the INA and its related regulations.

3. Under 28 U.S.C. §1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Section 242 of the INA, as amended by section 106 the Emergency Supplemental Appropriations Act for Defense, the Global War of Terror, and Tsunami Relief, Pub. L. 109-13 (May 11, 2005), 8 U.S.C. §1252, does not deprive this Court of jurisdiction. Section 242(b)(5) of the INA states that "a petition for review filed with an appropriate court of appeals in accordance with this section, shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this Act." As the

present action is not an action to review a removal order but simply an action to compel CBP to adjudicate an unreasonably delayed application, this Court retains original mandamus jurisdiction under 28 U.S.C. §1361.

4. Section 242(a)(2)(B) of the INA, 8 U.S.C. §1252(a)(2)(B), as amended by the REAL ID Act of 2005, Pub. L. No. 109-13 (May 11, 2005), eliminated the authority of the federal courts to review decisions by the government to grant or deny discretionary relief. Specifically, subsection (ii) of §242(a)(2)(B) provides that "no court shall have jurisdiction to review . . . (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . ." 8 U.S.C. §1252(a)(2)(B)(ii).[1] Notwithstanding this jurisdiction-stripping provision, however, this Court *may* exercise jurisdiction in the instant case because the Plaintiff challenges only the government's failure to *adjudicate* his application for a waiver of inadmissibility in the first instance. Section 1252(a)(2)(B)(ii) does not strip federal courts of jurisdiction where – as in this case – the government has a nondiscretionary duty to act. *See, e.g., Liu v. Novak*, 509 F.Supp. 2d 1, 4 (D.D.C. 2007) ("[T]here is … significant district court authority holding that §1252(a)(2)(B)(ii) does *not* bar judicial review of the pace of application processing or the failure to take an action"); *Duan v. Zamberry*, Slip Copy, 2007 WL 626116, at *3 (W.D.Pa. Feb. 23, 2007) ("The weight of authority … supports a finding that Defendants have a non-discretionary duty to process or adjudicate an adjustment

---

[1] "[T]his subchapter" refers to Subchapter II of Chapter 12 of Title 8 of the U.S. Code, which includes INA § 245, 8 U.S.C. § 1255.

application; that duty supports a mandamus action.") (and cases cited therein).  The Defendants owe the Plaintiff a duty to process and adjudicate his application for a waiver of inadmissibility, and they have unreasonably failed to perform that nondiscretionary duty. *See* 8 U.S.C. §1103; 8 C.F.R. §212.4(b).

6.  This Court is also not deprived of jurisdiction by 8 U.S.C. §1252(a)(2)(C), which divests courts of jurisdiction to "review any final order of removal" against foreign nationals who have committed certain criminal offenses.  Although Plaintiff pled guilty to two financial crimes, this provision of the INA does not bar judicial review over the present claim as Plaintiff does not seek review of a final order of removal, but only of the Defendant's failure to act on his meritorious application for a waiver of inadmissibility.

7.  The APA requires CBP to carry out its duties within a reasonable time.  5 U.S.C. §555(b) provides that "[w]ith due regard for the convenience and necessity of the parties or their representatives and <u>within a reasonable time</u>, each agency shall proceed to conclude a matter presented to it."  (Emphasis added).  *See Song v. Klapakas*, No. CIV. A. 06-05589, 2007 WL 1101283, at *3 n.4 (E.D.Pa. Apr. 12, 2007) (noting that even though the actual decision to grant or deny an application is discretionary, the agency "has a *non-discretionary* duty to act on applications within a reasonable time"); *see also Aslam v. Mukasey*, 531 F.Supp.2d 736, 742-43 (E.D.Va. 2008) ("[A]s an agency of the Executive Branch, the Department of Homeland Security is subject to the catchall time requirement of the APA. ... Absent this timeliness requirement, the Secretary [of Homeland Security] could defeat the clear intent of Congress simply by withholding performance of his statutory duty indefinitely.").

8.  CBP is subject to 5 U.S.C. §555(b), as CBP is an operational arm of the Department of Homeland Security and is specifically charged with the adjudication of waivers under INA §212(d)(3). *See* U.S. Customs & Border Protection, *Frequently Asked Questions, available at* http://help.cbp.gov/cgi-bin/customs.cfg/php/enduser/std_adp.php?p_faqid=760&p_created=1078950609&p_si d=gKKXtJ3j&p_accessibility=0&p_redirect=&p_lva=&p_sp=cF9zcmNoPTEmcF9zb3 J0X2J5PSZwX2dyaWRzb3J0PSZwX3Jvd19jbnQ9MjMmMjMmcF9wcm9kcz0wJnBfY 2F0cz0wJnBfcHY9JnBfY3Y9JnBfc2VhcmNoX3R5cGU9YW5zd2VyJnBfc2VhcmY2hf bmwmcF9wYWdlPTEmcF9zZWFyY2hfdGV4dD13YWl2ZXJJz&p_li=&p_topview=1 (*last modified* Apr. 21, 2008), [*hereinafter* "CBP, Frequently Asked Questions"]. According to CBP, "[d]epending on the reason for your inadmissibility into the U.S., and if you are a class of nonimmigrant where a visa is not required, e.g., most citizens of Canada, you may be eligible to apply directly to Customs and Border Protection (CBP) for a waiver of inadmissibility." *Id.* As the courts have recognized, "a suit to compel agency action under the APA is conceptually similar to a petition for mandamus based on agency delay," and "[t]he duty to act is no duty at all if the deadline is eternity." *Aslam,* 531 F.Supp.2d at 742-43 (*quoting Tang v. Chertoff,* 493 F.Supp.2d 148, 150 (D.Mass. 2007)).

### III.    VENUE

9.  Venue is proper in this Court pursuant to 28 U.S.C. §1391, as the Defendants are located in this district and a substantial part of the events or omissions giving rise to the present claims occurred in this district. Venue is proper in the district because national policy concerning adjudication of applications for immigration benefits is formulated

by the DHS and implemented by CBP and U.S. Citizenship and Immigration Services (CIS), which are both federal agencies that are resident in the district. Venue is also proper in this Court because the delay in adjudication of Plaintiff's application purportedly stems, at least in part, from pending FBI background checks; the FBI is also a federal agency located in the District. National policy concerning adjudication of applications for immigration benefits, such as for waivers under INA §212(d)(3) and imposition of required background and security checks, is formulated by the DHS and implemented by CIS, CBP, and the FBI. *See Aslam,* 531 F.Supp.2d at 742 ("[T]he Secretary of Homeland Security has a non-discretionary duty to act on" an applicant's application for an immigration benefit, and "the FBI is involved in the process [of processing name check requests] only because the CIS has adopted a *policy* of requesting a name check before final adjudication of an application and the FBI has acceded to those requests."). Accordingly, venue is proper in this Court.

## IV.   PARTIES

10. The Plaintiff, Mr. Leslie Stephen THOMPSON is a 60-year-old citizen of Canada and formerly a lawful permanent resident of the United States.

11. The Defendants, W. RALPH BASHAM, Commissioner, U.S. Customs and Border Protection ("CBP"); Emilio T. GONZALEZ, Director, U.S. Citizenship and Immigration Services ("CIS"); MICHAEL CHERTOFF, Secretary, U.S. Department of Homeland Security ("DHS"); and ROBERT S. MUELLER, Director, Federal Bureau of Investigation ("FBI"), are made party defendants pursuant to 8 U.S.C. §1182(d)(3). CIS is the agency of DHS responsible for adjudicating applications for waivers of inadmissibility under the INA. *See* 8 C.F.R. §212.4(b) ("An application for the exercise

of discretion under section 212(d)(3)(B) of the Act shall be submitted on Form I-192 to the district director in charge of the applicant's intended port of entry prior to the applicant's arrival in the United States.") Operationally, CBP is the DHS agency charged with accepting and adjudicating waivers of inadmissibility under 8 U.S.C. 1182(d)(3)(B). *See* CBP, Frequently Asked Questions, *cited supra*, ¶8. As a matter of policy, the FBI is the agency responsible for completing security checks, including name and fingerprint checks, for applicants for immigration benefits. *See Aslam*, 531 F.Supp.2d at 742.

V.    <strong><u>CAUSE OF ACTION</u></strong>

12. The Plaintiff, a Canadian citizen, and former U.S. lawful permanent resident, resides in Canada with his U.S. citizen wife, Kathleen Thompson. Their only child, Michael, is also a U.S. citizen and resides in Charlotte, North Carolina with his wife and the Plaintiff's U.S. citizen grandchild.

13. On January 7, 2005, the Plaintiff applied for a waiver of inadmissibility pursuant to 8 U.S.C. §1182(d)(3)(B) (the "waiver application") before CBP at International Bridge Plaza, Sault Ste. Marie, Michigan. Plaintiff paid the required application fee and submitted Form I-192 with extensive supporting evidence. *See* Exh. 1. This evidence included letters in support of the Plaintiff's temporary admission into the United States from Daniel J. French (by Gregory West), U.S. Attorney's Office for the Northern District of New York; from Albert Fitchett Jr., Resident Agent in Charge for U.S. Immigrations and Customs Enforcement (ICE) in Wilmington, N.C.; from James H. Johnston, Director, Windsor/St. Clair Intelligence & Contraband of the Canada Border

Services Agency; and from Gordon Bourgard, Senior General Counsel for Canada's Department of Justice, among many others. *See id.*

14. The Plaintiff, through previous counsel Dorothy Hanigan Basmaji, has communicated with CBP officials in Michigan numerous times over the past three years to inquire into the status of Plaintiff's application. *See* Exh. 2. Since August 24, 2005, previous counsel has called CBP on "at least 18 different occasions." *Id.*

15. CBP informed Attorney Basmaji, nearly every time that she called, "that CBP was waiting for name checks to be returned." *Id.*

16. On March 28, 2007, previous counsel was advised by CBP that the agency had not yet received any information regarding the name check and that they would resubmit a request to the FBI. *Id.* This was confirmed by CBP on January 7, 2008. *Id.*

17. On April 17, 2008, Attorney Basmaji sent an email correspondence to CBP requesting another status update. *Id.* As of the date of this Complaint, neither Attorney Basmaji nor undersigned counsel has received any additional information about the status of Plaintiff's pending waiver application.

18. The Plaintiff has suffered extensive harm by the Defendants' unreasonable delay in adjudicating his meritorious application for a waiver of inadmissibility, for more than three years. The Plaintiff's sole reason for wishing to enter the United States is to visit his U.S. citizen immediate family members. When the Plaintiff first filed his waiver application more than three years ago, he wished to visit his newborn granddaughter, the only daughter of his only child, Michael, who is a U.S. citizen now living in North Carolina. He also wished to occasionally visit with his granddaughter as she was growing up. Thus far, the Plaintiff has been denied these opportunities.

19. The Plaintiff also wished to visit his mother-in-law, who lives in Kansas and cannot travel because she suffers from colon cancer. The Plaintiff has likewise been denied this opportunity.

20. The Plaintiff seeks to have his meritorious waiver application adjudicated without further delay, so that he may take brief trips to the United States in the future and make up for lost time with his U.S. citizen family members.

## VI.    CLAIMS

21. The Plaintiff has fully complied with all of the requirements for seeking a waiver of inadmissibility under INA §212(d)(3).

22. The Defendants have unreasonably failed to adjudicate the Plaintiff's meritorious waiver application for more than three years.

23. The Defendants owe the Plaintiff a duty to act upon his properly filed request for a waiver of inadmissibility. *See Donovan v. United States*, 580 F.2d 1203, 1208 (3d Cir. 1978) (holding that mandamus is an appropriate remedy whenever a party demonstrates a clear right to have an action performed by a government official who refuses to act); *see also Aslam*, 531 F.Supp.2d at 742 (holding that "the Secretary of Homeland Security has a non discretionary duty to act" on a properly filed application); *Duan*, 2007 WL 626116, at *3 (finding that CIS has "a non-discretionary duty to process or adjudicate an adjustment application" and "that duty supports a mandamus action"). The Plaintiff has no alternative means to obtain adjudication of his waiver application and his right to issuance of the writ is "clear and indisputable." *See Allied Chemical Corp. v. Daiflon Inc.*, 449 U.S. 33, 35 (1980).

24. Adjudicating the Plaintiff's application for a waiver of inadmissibility is a ministerial and non-discretionary act which the Defendants are under obligation to perform in a timely manner. *See* 5 U.S.C. §555(b); 8 C.F.R. §212.4(b).

25. Pending FBI name checks are not a valid reason to delay adjudication of the Plaintiff's application for a waiver under INA §212(d)(3). On February 4, 2008, Defendant CIS issued a memorandum providing "revised guidance" on FBI name checks involving Applications for Adjustment of Status (I-485), Applications for Waiver of Ground of Inadmissibility (I-601), Applications for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act (I-697), or Applications to Adjust Status from Temporary Permanent Resident under Section 245A of Public Law 99-603 (I-689). *See* Michael Aytes, *USCIS Interoffice Memorandum: Revised National Security Adjudication and Reporting Requirements* (Feb. 4, 2008), *available at* http://www.uscis.gov/files/pressrelease/DOC017.PDF.        [*hereinafter* "Aytes Memorandum"]. CIS stated that "[w]here the application is otherwise approvable and the FBI name check request has been pending for more than 180 days, the adjudicator shall approve" the above-stated applications and "proceed with card issuance." *Id.* Although applications for naturalization are explicitly excluded from the revised policy regarding pending name checks, no other applications for any type of immigration benefit are specifically excluded. *Id.* Although INA §212(d)(3) waiver applications are not specifically addressed in the CIS Memorandum, other waivers, including waivers of inadmissibility submitted on Form I-601, are subject to the memorandum. The reasoning of the revised guidelines applies with equal force to the Plaintiff's pending application for a waiver under INA §212(d)(3).

26. The FBI name check program is not specifically authorized by statute or by regulations and its continued use as an excuse in the delay of adjudication of the Plaintiff's application is unfounded. *See Aslam,* 531 F.Supp.2d at 742 (noting that the INA "does not...impose any nondiscretionary legal obligation on the FBI to process name check requests for adjustment of status applicants"); *Mocanu v. Mueller,* 2008 WL 372459, at 10 (E.D.Pa. Feb. 8, 2008) (concluding that "USCIS has required FBI name checks under the mistaken impression that it has authority, based on its own regulations, to require such checks" and finding that "USCIS's name check requirement has (1) never been authorized by Congress; [and] (2) is not mentioned or contemplated by any fair reading of the current USCIS regulations..."); *Konchitsky v. Chertoff,* No. 07-294, 2007 WL 2070325, at *6 (N.D.Cal. July 13, 2007) ("[T]he FBI's involvement in adjudicating I-485 applications arises not by statute or duty otherwise imposed by law, but by contract between the USCIS and the FBI."). The Plaintiff has a right to adjudication of his pending waiver application notwithstanding that FBI name checks may not yet have cleared.

27. USCIS has decided that it will no longer wait for FBI name check results before adjudicating various applications for immigration benefits. *See* Aytes Memorandum. However, if derogatory or adverse information is later obtained about an application, USCIS may "determine if rescission or removal proceedings are appropriate and warranted." *Id.* If derogatory or adverse information has been obtained regarding the Plaintiff that disqualifies him for the requested benefit, the Defendants should act within their authority to deny the Plaintiff's application. But if, after more than three years, the Defendants have *not* obtained derogatory or adverse information that

provides a basis to deny the Plaintiff's application, his application should be approved without further delay.

28. The delay of more than three years to adjudicate the Plaintiff's waiver application is *per se* unreasonable and is arbitrary and capricious, as estimated processing times published b the agency itself clearly demonstrate. The Defendant CPB warns waiver applicants on its own website that "[t]he waiver application can be lengthy (*up to a year*)." CBP, Frequently Asked Questions, *cited supra*, ¶8 (emphasis added). Plaintiff's waiver application has been pending well beyond even CBP's own admittedly lengthy adjudication period.

29. The Defendants' delay and inaction are without justification and have forced the Plaintiff to resort to this Court for relief, and the Plaintiff is entitled to attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. §2412(d)(2).

WHEREFORE, the Plaintiff prays that this Court:

    A.    Compel the Defendants and those acting under them to perform their legal duty to adjudicate the Plaintiff's application for a waiver of inadmissibility without further unreasonable delay;

    B.    Grant reasonable attorneys' fees and costs of court under EAJA;

    C.    Grant such other and further relief as this Court deems proper.

Respectfully submitted this __ day of May, 2008,

LESLIE STEPHEN THOMPSON,

*By counsel,*

Thomas K. Ragland
DC Bar Number: 501021

MAGGIO & KATTAR
11 Dupont Circle, NW, Suite 775
Washington, DC 20036
Phone:  (202) 483-0053
Fax:  (202) 483-6801
tragland@maggio-kattar.com

*Counsel for Plaintiff*

<u>VERIFICATION</u>

I, Leslie Stephen Thompson, under penalty of perjury, state the following:

I affirm the truth of the factual contents of the foregoing Complaint for

Mandamus, upon information and belief.

Dated: _May 18, 2008_

Place: _Tecumseh, Ontario_

_____

Leslie Stephen Thompson

# VERCRUYSSE MURRAY & CALZONE

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS

Robert M. Vercruysse
Gregory V. Murray
David B. Calzone
Diane M. Soubly
Bernice McReynolds
Daniel J. Bernard
Dorothy Hanigan Basmaji
Susan Hartmus Hiser
Debra Auerbach Clephane
James E. Roach
Patricia Bordman
Ann M. Nicklas
William E. Altman
Gary S. Fealk
Louis B. Eble
Priscilla J. Krebs
Jesse Goldstein
Amy E. Metz

SUITE 200, 31780 TELEGRAPH ROAD
BINGHAM FARMS, MI 48025-3469

Telephone
248-540-8019

Facsimile
248-540-8059

Website
www.vmclaw.com

Retired:
Virginia F. Metz

January 6, 2005

**Via Federal Express**

Officer R. Koistinen
Department of Homeland Security
U.S. Department of Justice
International Bridge Plaza
Sault Ste. Marie, MI 49783

Re:    **Application: Temporary Admission to the United States Pursuant to §212(d)(3)(B),
Immigration and Nationality Act
Leslie Stephen Thompson
A044-149-056**

Dear Officer Koistinen:

Enclosed please find Form I-192, Application for Advance Permission to Enter as Nonimmigrant, and supporting documents filed in duplicate, Notice of Appearance forms, and appropriate filing fees.

Should you require any further information, please do not hesitate to contact me for a prompt response. Thank you in advance for your assistance in this matter.

Very truly yours,

VERCRUYSSE MURRAY & CALZONE

Dorothy Hanigan Basmaji

DBH/ap
Enclosures
cc:    Mr. Leslie Thompson (w/enc.)
86540-001

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Entry of Appearance
as Attorney or Representative**

Appearance - An appearance shall be filed on this form by the attorney or representative appearing in each case. Thereafter, substitution may be permitted upon the written withdrawal of the attorney or representative of record or upon notification of the new attorney or representative. When an appearance is made by a person acting in a representative capacity, his personal appearance or signature shall constitute a representation that under the provisions of this chapter he is authorized and qualified to represent. Further proof of authority to act in a representative capacity may be required. **Availability of Records** - During the time a case is pending, and except as otherwise provided in 8CFR 103.2(b), a party to a proceeding or his attorney or representative shall be permitted to examine the record of proceeding in a Service office. He may, in conformity with 8 CFR 103.10, obtain copies of Service records or information therefrom and copies of documents or transcripts of evidence furnished by him. Upon request, he/she may, in addition, be loaned a copy of the testimony and exhibits contained in the record of proceeding upon giving his/her receipt for such copies and pledging that it will be surrendered upon final disposition of the case or upon demand. If extra copies of exhibits do not exist, they shall not be furnished free on loan; however, they shall be made available for copying or purchase of copies as provided in 8 CFR 103.10.

| In re:                                    | Date        11   01/05/0 |
|-------------------------------------------|--------------------------|
| **Leslie Stephen THOMPSON**               | File No.    044-149-056  |

I hereby enter my appearance as attorney for (or representative of), and at the request of, the following named person(s):

| Name | | | ☐ Petitioner | ☒ Applicant |
|------|--|--|--------------|-------------|
| **Leslie**   **Stephen**   **THOMPSON** | | | ☐ Beneficiary | |

| Address (Apt. No.) | (Number & Street) | (City) | (State) | (ZIP Code) |
|--------------------|-------------------|--------|---------|------------|
| | 12905 Riverside Drive E. | Tecumseh | Ontario, Canada | N8N 1A9 |

| Name | | | ☐ Petitioner | ☐ Applicant |
|------|--|--|--------------|-------------|
| | | | ☐ Beneficiary | |

| Address (Apt. No.) | (Number & Street) | (City) | (State) | (ZIP Code) |
|--------------------|-------------------|--------|---------|------------|

*Check applicable item(s) below:*

☒ 1. I am an attorney and a member in good standing of the bar of the Supreme Court of the United States or of the highest court of the following State, territory, insular possession, or District of Columbia

Michigan                     Supreme Court                              and am not under a court or administrative agency
_____      _____
                             *Name of Court*
order suspending, enjoining, restraining, disbarring, or otherwise restricting me in practicing law.

☐ 2. I am an accredited representative of the following named religious, charitable, social service, or similar organization established in the United States and which is so recognized by the Board:

☐ 3. I am associated with
_____
the attorney of record who previously filed a notice of appearance in this case and my appearance is at his request.  *(If you check this item, also check item 1 or 2 whichever is appropriate.)*

☐ 4. Others (Explain fully.)

| SIGNATURE | COMPLETE ADDRESS |
|-----------|------------------|
| | Vercruysse Murray & Calzone, PC |
| | Suite 200, 31780 Telegraph Road |
| | Bingham Farms    MI    48025 |
| NAME (Type or Print) | TELEPHONE NUMBER |
| Dorothy Hanigan Basmaji/Debra A. Clephane | (248) 540-8019    248-540-8059 |

*PURSUANT TO THE PRIVACY ACT OF 1974, I HEREBY CONSENT TO THE DISCLOSURE TO THE FOLLOWING NAMED ATTORNEY OR REPRESENTATIVE OF ANY RECORD PERTAINING TO ME WHICH APPEARS IN ANY IMMIGRATION AND NATURALIZATION SERVICE SYSTEM OF RECORDS:*

**Dorothy H. Basmaji (P38712)/Debra A. Clephane (P45230)**

*(Name of Attorney or Representative)*

*THE ABOVE DISCLOSURE IS IN CONNECTION WITH THE FOLLOWING MATTER:*

**Form I-192, Application for Advance Permission to Enter as Nonimmigrant**

| Name of Person Consenting | Signature of Person Consenting | Date |
|---------------------------|--------------------------------|------|
| Leslie Stephen Thompson | | 11/11/04 |

(NOTE: Execution of this box is required under the Privacy Act of 1974 where the person being represented is a citizen of the United States or an alien lawfully admitted for permanent residence.)

This form may not be used to request records under the Freedom of information Act or the Privacy Act. The manner of requesting such records is contained in 8CFR 103.10 and 103.20 Et.SEQ.                                    Form G-28 (09-26-00)Y

OMB No. 1615-0017

**I-192, Application For Advance**
**Permission to Enter as Nonimmigrant**
**(Pursuant to Section 212(d)(3) of the Immigration and Nationality Act)**

U.S. Department of Homeland Security
Bureau of Citizaship and Immigration Services

(Please read instructions on Page 2.)

Fee Stamp

File No. _____ **044-149-056**

I hereby apply to the Secrtary of Homeland Security for permission to enter the United States temporarily under the provisions of section 212(d)(3) of the Immigration and Nationality Act.

| 1. FULL NAME *(Print)* | | | 2. DATE OF BIRTH |
|---|---|---|---|
| Leslie | Stephen | THOMPSON | 06/09/1947 |

| 3. PLACE OF BIRTH *(City-Town, State/Province, Country)* | | | 4. PRESENT CITIZENSHIP |
|---|---|---|---|
| Windsor | Ontario | Canada | Canadian |

| 5. PRESENT ADDRESS | | | |
|---|---|---|---|
| 12905 Riverside Drive E. | Tecumseh | Ontario, Canada | N8N 1A9 |

| 6. ALL ADDRESSES AT WHICH I HAVE RESIDED DURING THE PAST FIVE YEARS *(Use separate sheet of paper, if necessary.)* | | | |
|---|---|---|---|
| 12905 Riverside Drive E. | Tecumseh | Ontario | Canada |
| 916 Brookmeade Drive | Winston Salem | North Carolina | USA |
| | | | |

| 7. DESIRED PORT OF ENTRY INTO U.S. | 8. MEANS OF TRANSPORTATION |
|---|---|
| Detroit, Michigan | Automobile |

| 9. PROPOSED DATE OF ENTRY | 10. APPROXIMATE LENGTH OF STAY IN THE UNITED STATES: |
|---|---|
| Issuance of waiver | Please see attachment |

11. MY PURPOSE FOR ENTERING THE UNITED STATES IS: *(Explain fully)*
To visit my only child, Michael, and his wife in California. My son and his wife, both U.S. citizens, will have their first child in the spring and I would like to visit them with my U.S. citizen wife. I only have one child, Michael, and I want very much to be able to visit them occasionally. I do not intend to work in the U.S. or in any way violate U.S. laws. At the conclusion of each visit, I will promptly return to Canada, as I have in the past. I would also like to visit my mother-in-law who lives in Kansas and who has colon cancer. She and I have a wonderful relationship and she is too ill to travel to Canada. Please see attached letter at Exhibit B

12. I BELIEVE I MAY BE INADMISSIBLE TO THE UNITED STATES FOR THE FOLLOWING REASONS AND NO OTHER:

Please see attached statement. Exhibit B.

| 13.1 ☐ have | ☒ have not heretofore filed an application for advance permission to enter as a nonimmigrant |
|---|---|

on _____ , _____ , at _____

14. I understand that the information herein contained may be used in any proceedings (including civil or criminal judicial proceedings, or deportation or removal proceedings) hereafter instituted against me.

I certify that the statements above and all attachments hereto are correct to the best of my knowledge and belief.

_____    11/11/04
(Signature of Applicant)                (Date)

| 15. | Signature of person prearing form, if other than applicant. |
|---|---|

I declare that this document was prepared by me at the request of the applicant and is based on all information of which I have any knowledge.

Dorothy Hanigan Basmaji/Debra A. Clephane
Vercruysse Murray & Calzone, PC
Ste. 200, 31780 Telegraph Rd., Bingham Farms, MI 48025

01/05/05

_____    _____    _____
(Signature)                    (Address)                    (Date)

| | RECEIVED | TRANS. IN | RET'D TRANS. OUT | COMPLETED |
|---|---|---|---|---|
| | | | | |

Form I-192 (Rev.04/30/04)N (Prior versions may be used until 09/30/04)

| Action by the U.S. Department of Homeland Security | |
|---|---|
| ☐ Granted, subject to revocation at any time, upon the following terms and conditions: | |
| | DATE OF ACTION |
| | DD OR OIC |
| | OFFICE |

## Instructions

1.   This application must be executed in duplicate and filed with the U.S. Department of Homeland Security (DHS) field office having jurisdiction over the port of entry.

2.   A fee of **$250.00**  must be paid for filing this application. It cannot be refunded regardless of the action taken on the application. **Do not mail cash. All fees must be submitted in the exact amount.**  Payment by check of money order must be drawn on a bank or other institution located in the United States and be payable in United States currency. If applicant resides in Guam, the check or money order must be payable to the "Treasurer, Guam". If applicant resides in the U.S. Virgin Islands, the check or money order must be payable to the "Commissioner of Finance if the Virgin Islands". All other applicants must make the check or money order payable to the **U.S. Department of Homeland Security.**    When check is drawn on an account of a person other than the applicant, the name of the applicant must be entered on the face of the check. If application is submitted form outside the United States, remittance may be made by a bank international money order or foreign draft drawn on a financial institution in the United States and payable to the **U.S. Department of Homeland Security**  in United States currency. Personal checks are accepted subject to collectibility. An uncollectible check will render the application and any document issued pursuant thereto invalid. A charge of $30.00 will be imposed if a check in payment of fee is not honored by the bank on which it is drawn.

3.   If application is made because applicant may be inadmissible due to present or past membership in of affiliation with any Communist or other totalitarian party or organization, there shall be attached to the application a written statement of the history of any applicant's membership or affiliation including the period of such membership or affiliation, whether applicant held any office in the organization, and whether membership or affiliation was voluntary or involuntary. If involuntary membership or affiliation is alleged, there shall also be attached to the application a written statement to support said allegation.

4.   If application is made because applicant may be inadmissible due to disease, mental or physical defect of disability of any kind, the application shall describe the disease, defect or disability. If the purpose of seeking admission to the United States is for treatment, there shall be attached to the application in writing to establish --

   **(a)** That satisfactory treatment cannot be obtained outside the United States,
   **(b)** That arrangements have been completed for treatment, and  where and from whom treatment will be received,
   **(c)** What financial arrangements for payment of expenses incurred in connection with the treatment have been made, and
   **(d)** That a bond will be available if required by the Secretary of Homeland Security.

5.   If application is made because applicant may be inadmissible due to conviction of crime, the designation of the crime, the date and place of its commission and of conviction thereof, and sentence or other judgment of the court shall be stated in the application. In such case the application should be supplemented by an official record of conviction and any other documents relating to commutation of sentence, parole, probation or pardon.

**Paperwork Reduction Act Notice.**

Under the Paperwork reduction Act, an agency may not conduct or sponsor an information collection and a person is not required to respond an information collection unless it displays a currently valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. The estimate average time to complete and file this application is 15 minutes per application. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you may write to the Bureau of Citizenship and Immigration Services, HQRFS, 425 I Street, N.W., Room 4034, Washington, DC 20529.  (**Do not mail your completed application to this address.)**

**ATTACHMENT TO FORM I-192
APPLICATION FOR ADVANCE PERMISSION
TO ENTER AS NONIMMIGRANT**

**Leslie Stephen THOMPSON**


Item 10.        APPROXIMATE LENGTH OF STAY IN THE UNITED STATES.

Mr. Thompson would like multiple entry to allow him to enter the U.S. to visit family occasionally.  His visits would be from a few days to a week or two.

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0066

**BIOGRAPHIC INFORMATION**

| (Family name) | (First name) | (Middle name) | ☒ MALE ☐ FEMALE | BIRTHDATE (Mo.-Day-Yr.) | NATIONALITY | FILE NUMBER |
|---|---|---|---|---|---|---|
| THOMPSON | Leslie | Stephen | | 06/09/1947 | Canadian | A-044-149-056 |

| ALL OTHER NAMES USED (Including names by previous marriages) | CITY AND COUNTRY OF BIRTH | | SOCIAL SECURITY NO. (If any) |
|---|---|---|---|
| None | Windsor | Canada | 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 |

| | FAMILY NAME | FIRST NAME | DATE, CITY AND COUNTRY OF BIRTH (If known) | CITY AND COUNTRY OF RESIDENCE |
|---|---|---|---|---|
| FATHER | THOMPSON | Roy | 1926    Ontario, Canada | Unknown |
| MOTHER (Maiden name) | KROSKIE | Josephine | 1925    Saskatchewan, Canada | Tecumseh, Ontario    Canada |

| HUSBAND (If none, so state) OR WIFE | FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | CITY & COUNTRY OF BIRTH | DATE OF MARRIAGE | PLACE OF MARRIAGE |
|---|---|---|---|---|---|---|
| | BURKEEN | Kathleen | 04-14-1950 | Detroit, Michigan USA | 10-03-1969 | Tecumseh, On. Canada |

| FORMER HUSBANDS OR WIVES (If none, so state) FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | DATE & PLACE OF MARRIAGE | DATE AND PLACE OF TERMINATION OF MARRIAGE |
|---|---|---|---|---|
| None | | | | |

APPLICANT'S RESIDENCE LAST FIVE YEARS, LIST PRESENT ADDRESS FIRST

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 12905 Riverside Drive E. | Tecumseh | Ontario, Canada | Canada | 01 | 1999 | PRESENT TIME | |
| 916 Brookmeade Drive | Winston Salem | North Carolina | USA | 02 | 1993 | 01 | 1999 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

APPLICANT'S LAST ADDRESS OUTSIDE THE UNITED STATES OF MORE THAN ONE YEAR

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 12905 Riverside Drive E. | Tecumseh | Ontario | Canada | 01 | 1999 | present | |

APPLICANT'S EMPLOYMENT LAST FIVE YEARS. (IF NONE, SO STATE) LIST PRESENT EMPLOYMENT FIRST

| FULL NAME AND ADDRESS OF EMPLOYER | | OCCUPATION (SPECIFY) | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|
| Self Employed | Tecumseh, Ontario | Sales/Mktg/Consultant | 10 | 2003 | PRESENT TIME | |
| Windsor Food Equipment | Windsor, Ontario | Sales | 09 | 2002 | 10 | 2003 |
| | | | | | | |
| | | | | | | |

Show below last occupation abroad if not shown above. (Include all information requested above.)

| THIS FORM IS SUBMITTED IN CONNECTION WITH APPLICATION FOR: | SIGNATURE OF APPLICANT | DATE |
|---|---|---|
| ☐ NATURALIZATION    ☐ STATUS AS PERMANENT RESIDENT    ☒ OTHER (SPECIFY) Form I-192, Waiver | | 11/11/04 |
| **Submit all four pages of this form.** | If your native alphabet is other than roman letters, write your name in your native alphabet here: | |

PENALTIES: SEVERE PENALTIES ARE PROVIDED BY LAW FOR KNOWINGLY AND WILLFULLY FALSIFYING OR CONCEALING A MATERIAL FACT.

# APPLICANT: BE SURE TO PUT YOUR NAME AND ALIEN REGISTRATION NUMBER IN THE BOX OUTLINED BY HEAVY BORDER BELOW.

| COMPLETE THIS BOX (Family Name) | (Given name) | (Middle name) | (Alien registration number) |
|---|---|---|---|
| THOMPSON | Leslie | Stephen | 044-149-056 |

**(1) Ident.**

Form G-325 A (Rev. 09/11/00)Y

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0066

**BIOGRAPHIC INFORMATION**

| (Family name) THOMPSON | (First name) Leslie | (Middle name) Stephen | ☒ MALE ☐ FEMALE | BIRTHDATE (Mo.-Day-Yr.) 06/09/1947 | NATIONALITY Canadian | FILE NUMBER A-044-149-056 |
|---|---|---|---|---|---|---|

| ALL OTHER NAMES USED (Including names by previous marriages) None | CITY AND COUNTRY OF BIRTH Windsor        Canada | SOCIAL SECURITY NO. (If any) 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 |
|---|---|---|

| | FAMILY NAME | FIRST NAME | DATE, CITY AND COUNTRY OF BIRTH (If known) | CITY AND COUNTRY OF RESIDENCE |
|---|---|---|---|---|
| FATHER | THOMPSON | Roy 1926 | Ontario, Canada | Unknown |
| MOTHER (Maiden name) | KROSKIE | Josephine 1925 | Saskatchewan, Canada | Tecumseh, Ontario  Canada |

| HUSBAND (if none, so state) OR WIFE | FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | CITY & COUNTRY OF BIRTH | DATE OF MARRIAGE | PLACE OF MARRIAGE |
|---|---|---|---|---|---|---|
| | BURKEEN | Kathleen | 04-14-1950 | Detroit, Michigan USA | 10-03-1969 | Tecumseh, On. Canada |

| FORMER HUSBANDS OR WIVES (if none, so state) FAMILY NAME      (For wife, give maiden name) | FIRST NAME | BIRTHDATE | DATE & PLACE OF MARRIAGE | DATE AND PLACE OF TERMINATION OF MARRIAGE |
|---|---|---|---|---|
| None | | | | |

APPLICANT'S RESIDENCE LAST FIVE YEARS, LIST PRESENT ADDRESS FIRST

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 12905 Riverside Drive E. | Tecumseh | Ontario, Canada | Canada | 01 | 1999 | PRESENT TIME | |
| 916 Brookmeade Drive | Winston Salem | North Carolina | USA | 02 | 1993 | 01 | 1999 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

APPLICANT'S LAST ADDRESS OUTSIDE THE UNITED STATES OF MORE THAN ONE YEAR

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 12905 Riverside Drive E. | Tecumseh | Ontario | Canada | 01 | 1999 | present | |

APPLICANT'S EMPLOYMENT LAST FIVE YEARS. (IF NONE, SO STATE) LIST PRESENT EMPLOYMENT FIRST

| FULL NAME AND ADDRESS OF EMPLOYER | | OCCUPATION (SPECIFY) | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|
| Self Employed | Tecumseh, Ontario | Sales/Mktg/Consultant | 10 | 2003 | PRESENT TIME | |
| Windsor Food Equipment | Windsor, Ontario | Sales | 09 | 2002 | 10 | 2003 |
| | | | | | | |
| | | | | | | |

Show below last occupation abroad if not shown above. (Include all information requested above.)

| | | | | |
|---|---|---|---|---|

| THIS FORM IS SUBMITTED IN CONNECTION WITH APPLICATION FOR: ☐ NATURALIZATION  ☐ STATUS AS PERMANENT RESIDENT ☒ OTHER (SPECIFY) Form I-192, Waiver | SIGNATURE OF APPLICANT | DATE 11/11/04 |
|---|---|---|
| **Submit all four pages of this form.** | If your native alphabet is other than roman letters, write your name in your native alphabet here: | |

PENALTIES: SEVERE PENALTIES ARE PROVIDED BY LAW FOR KNOWINGLY AND WILLFULLY FALSIFYING OR CONCEALING A MATERIAL FACT.

# APPLICANT: BE SURE TO PUT YOUR NAME AND ALIEN REGISTRATION NUMBER IN THE BOX OUTLINED BY HEAVY BORDER BELOW.

| COMPLETE THIS BOX (Family Name) THOMPSON | (Given name) Leslie | (Middle name) Stephen | (Alien registration number) 044-149-056 |
|---|---|---|---|

| (OTHER AGENCY USE) | INS USE (Office of Origin) OFFICE CODE: TYPE OF CASE: DATE: |
|---|---|

(2) Rec.Br.

Form G-325 A (Rev. 09/11/00)Y Page 2

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0066

**BIOGRAPHIC INFORMATION**

| (Family name) | (First name) | (Middle name) | ☒ MALE ☐ FEMALE | BIRTHDATE (Mo.-Day-Yr.) | NATIONALITY | FILE NUMBER |
|---|---|---|---|---|---|---|
| THOMPSON | Leslie | Stephen | | 06/09/1947 | Canadian | A-044-149-056 |

| ALL OTHER NAMES USED  (including names by previous marriages) | CITY AND COUNTRY OF BIRTH | | SOCIAL SECURITY NO. (If any) |
|---|---|---|---|
| None | Windsor | Canada | 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 |

| | FAMILY NAME | FIRST NAME | DATE, CITY AND COUNTRY OF BIRTH (If known) | | CITY AND COUNTRY OF RESIDENCE |
|---|---|---|---|---|---|
| FATHER | THOMPSON | Roy | 1926 | Ontario, Canada | Unknown |
| MOTHER (Maiden name) | KROSKIE | Josephine | 1925 | Saskatchewan, Canada | Tecumseh, Ontario   Canada |

| HUSBAND (If none, so state) WIFE | FAMILY NAME (For wife, give maiden name) | FIRST NAME | BIRTHDATE | CITY & COUNTRY OF BIRTH | DATE OF MARRIAGE | PLACE OF MARRIAGE |
|---|---|---|---|---|---|---|
| | BURKEEN | Kathleen | 04-14-1950 | Detroit, Michigan USA | 10-03-1969 | Tecumseh, On. Canada |

| FORMER HUSBANDS OR WIVES (If none, so state) | | | | |
|---|---|---|---|---|
| FAMILY NAME    (For wife, give maiden name) | FIRST NAME | BIRTHDATE | DATE & PLACE OF MARRIAGE | DATE AND PLACE OF TERMINATION OF MARRIAGE |
| None | | | | |

APPLICANT'S RESIDENCE LAST FIVE YEARS, LIST PRESENT ADDRESS FIRST

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | YEAR | TO MONTH | YEAR |
|---|---|---|---|---|---|---|---|
| 12905 Riverside Drive E. | Tecumseh | Ontario, Canada | Canada | 01 | 1999 | PRESENT TIME | |
| 916 Brookmeade Drive | Winston Salem | North Carolina | USA | 02 | 1993 | 01 | 1999 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

APPLICANT'S LAST ADDRESS OUTSIDE THE UNITED STATES OF MORE THAN ONE YEAR

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | YEAR | TO MONTH | YEAR |
|---|---|---|---|---|---|---|---|
| 12905 Riverside Drive E. | Tecumseh | Ontario | Canada | 01 | 1999 | present | |

APPLICANT'S EMPLOYMENT LAST FIVE YEARS. (IF NONE, SO STATE) LIST PRESENT EMPLOYMENT FIRST

| FULL NAME AND ADDRESS OF EMPLOYER | | OCCUPATION (SPECIFY) | FROM MONTH | YEAR | TO MONTH | YEAR |
|---|---|---|---|---|---|---|
| Self Employed | Tecumseh, Ontario | Sales/Mktg/Consultant | 10 | 2003 | PRESENT TIME | |
| Windsor Food Equipment | Windsor, Ontario | Sales | 09 | 2002 | 10 | 2003 |
| | | | | | | |
| | | | | | | |

Show below last occupation abroad if not shown above. (Include all information requested above.)

| THIS FORM IS SUBMITTED IN CONNECTION WITH APPLICATION FOR: | SIGNATURE OF APPLICANT | DATE |
|---|---|---|
| ☐ NATURALIZATION   ☐ STATUS AS PERMANENT RESIDENT ☒ OTHER (SPECIFY) **Form I-192, Waiver** | | 15/11/04 |
| **Submit all four pages of this form.** | If your native alphabet is other than roman letters, write your name in your native alphabet here: | |

PENALTIES: SEVERE PENALTIES ARE PROVIDED BY LAW FOR KNOWINGLY AND WILLFULLY FALSIFYING OR CONCEALING A MATERIAL FACT.

# APPLICANT: BE SURE TO PUT YOUR NAME AND ALIEN REGISTRATION NUMBER IN THE BOX OUTLINED BY HEAVY BORDER BELOW.

| COMPLETE THIS BOX (Family Name) | (Given name) | (Middle name) | (Alien registration number) |
|---|---|---|---|
| THOMPSON | Leslie | Stephen | 044-149-056 |

**(OTHER AGENCY USE)**

**INS USE (Office of Origin)**

OFFICE CODE:

TYPE OF CASE:

DATE:

(3) C.

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0066

**BIOGRAPHIC INFORMATION**

| (Family name) THOMPSON | (First name) Leslie | (Middle name) Stephen | ☒ MALE ☐ FEMALE | BIRTHDATE (Mo.-Day-Yr.) 06/09/1947 | NATIONALITY Canadian | FILE NUMBER A-044-149-056 |
|---|---|---|---|---|---|---|

| ALL OTHER NAMES USED (Including names by previous marriages) None | CITY AND COUNTRY OF BIRTH Windsor        Canada | SOCIAL SECURITY NO. (If any) 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 |
|---|---|---|

| | FAMILY NAME | FIRST NAME | | DATE, CITY AND COUNTRY OF BIRTH (If known) | CITY AND COUNTRY OF RESIDENCE |
|---|---|---|---|---|---|
| FATHER | THOMPSON | Roy | 1926 | Ontario, Canada | Unknown |
| MOTHER (Maiden name) | KROSKIE | Josephine | 1925 | Saskatchewan, Canada | Tecumseh, Ontario  Canada |

| | FAMILY NAME (For wife, give maiden name) | FIRST NAME | CITY & COUNTRY OF BIRTH | DATE OF MARRIAGE | PLACE OF MARRIAGE |
|---|---|---|---|---|---|
| HUSBAND (If none, so state) OR WIFE | BURKEEN | Kathleen | 04-14-1950 | Detroit, Michigan USA | 10-03-1969 | Tecumseh, On. Canada |

| FORMER HUSBANDS OR WIVES (If none, so state) FAMILY NAME    (For wife, give maiden name) | FIRST NAME | BIRTHDATE | DATE & PLACE OF MARRIAGE | DATE AND PLACE OF TERMINATION OF MARRIAGE |
|---|---|---|---|---|
| None | | | | |

APPLICANT'S RESIDENCE LAST FIVE YEARS, LIST PRESENT ADDRESS FIRST

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 12905 Riverside Drive E. | Tecumseh | Ontario, Canada | Canada | 01 | 1999 | PRESENT TIME | |
| 916 Brookmeade Drive | Winston Salem | North Carolina | USA | 02 | 1993 | 01 | 1999 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

APPLICANT'S LAST ADDRESS OUTSIDE THE UNITED STATES OF MORE THAN ONE YEAR

| STREET AND NUMBER | CITY | PROVINCE OR STATE | COUNTRY | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|---|
| 12905 Riverside Drive E. | Tecumseh | Ontario | Canada | 01 | 1999 | present | |

APPLICANT'S EMPLOYMENT LAST FIVE YEARS. (IF NONE, SO STATE) LIST PRESENT EMPLOYMENT FIRST

| FULL NAME AND ADDRESS OF EMPLOYER | | OCCUPATION (SPECIFY) | FROM MONTH | FROM YEAR | TO MONTH | TO YEAR |
|---|---|---|---|---|---|---|
| Self Employed | Tecumseh, Ontario | Sales/Mktg/Consultant | 10 | 2003 | PRESENT TIME | |
| Windsor Food Equipment | Windsor, Ontario | Sales | 09 | 2002 | 10 | 2003 |
| | | | | | | |
| | | | | | | |

| Show below last occupation abroad if not shown above. (Include all information requested above.) |
|---|
| |

| THIS FORM IS SUBMITTED IN CONNECTION WITH APPLICATION FOR: ☐ NATURALIZATION  ☐ STATUS AS PERMANENT RESIDENT ☒ OTHER (SPECIFY) **Form I-192, Waiver** **Submit all four pages of this form.** | SIGNATURE OF APPLICANT | DATE 11/11/04 |
|---|---|---|
| | If your native alphabet is other than roman letters, write your name in your native alphabet here: | |

PENALTIES: SEVERE PENALTIES ARE PROVIDED BY LAW FOR KNOWINGLY AND WILLFULLY FALSIFYING OR CONCEALING A MATERIAL FACT.

# APPLICANT: BE SURE TO PUT YOUR NAME AND ALIEN REGISTRATION NUMBER IN THE BOX OUTLINED BY HEAVY BORDER BELOW.

| COMPLETE THIS BOX (Family Name) THOMPSON | (Given name) Leslie | (Middle name) Stephen | (Alien registration number) 044-149-056 |
|---|---|---|---|

| (OTHER AGENCY USE) | INS USE (Office of Origin) OFFICE CODE: TYPE OF CASE: DATE: |
|---|---|

(4) Consul

Form G-325 A (Rev. 09/11/00)Y Page 4

**EXHIBIT LIST**
**APPLICATION FOR TEMPORARY ADMISSION**
**TO THE UNITED STATES**
**MR. LESLIE STEPHEN THOMPSON**

Exhibit 1:   Letter Brief in Support of Mr. Thompson's Temporary Admission into the United States

    Exhibit A.   Matter of Hranka § 212(d)(3) Proceedings A-20925982

    Exhibit B:   Letter of Mr. Thompson re History of Events

    Exhibit C:   Letter of Gregory A. West, Assistant U.S. Attorney, in Support of Mr. Thompson's Temporary Admission into the United States and Letter Requesting Downward Departure of Sentencing

    Exhibit D:   Letter of Mr. Albert Fitchett, Jr., Resident Agent in Charge, U.S. Immigration and Customs Enforcement, in Support of Mr. Thompson's Temporary Admission into the United States

    Exhibit E.   Letter of James H. Johnston, Director, Windsor/St. Clair Intelligence & Contraband, Canada Border Services Agency, in Support of Mr. Thompson's Temporary Admission into the United States

    Exhibit F.   Letter of Gordon Bourgard, Senior General Counsel, Department of Justice Canada, in Support of Mr. Thompson's Temporary Admission into the United States

    Exhibit G.   Letter of Marian Costaris, Acting Area Director, Correctional Service of Canada, in Support of Mr. Thompson's Temporary admission into the United States

    Exhibit H.   Business Card of Sgt. Walter Spilkin, Royal Canadian Mounted Police

Exhibit I.  Letter of Robert J. Nieves, Member, BERG Associates LLC, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit J.  Letter of Mr. Ken Anderson, Howrey Simon Arnold & White, Special Counsel, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit K.  Letter of Mr. George J. Mager, Jr. Cox Hodgman & Giarmarco, P.C., in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit L.  Letter of Reverend Dwayne A. Adam in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit M.  Letter of Fred H. Bartlit, Jr., Bartlit Beck Herman Palenchar & Scott LLP, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit N.  Letter of Ms. Clara DeMatteis Mager, Butzel Long, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit O.  Letter of Mr. David H. Hill, C.M., Q.C. , in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit P.  Letter of David T. Sweanor, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit Q.  Letter of Jamie L. Kuhneman-Thompson, Mr. Thompson's Daughter-in-Law, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit R.  Letter of Patricia Ann Burkeen, Mr. Thompson's Mother-in-Law, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit S.  Letter of Michael J. Thompson, Mr. Thompson's Son, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit T.    Letter of Kathleen M. Thompson, Mr. Thompson's Wife, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit 2:    Identification Documents for Mr. Leslie Thompson

Exhibit 3:    RCMP Report with Fingerprints of Mr. Leslie Thompson

Exhibit 4:    United States v Leslie Thompson Indictment

Exhibit 5:    Plea Agreement

Exhibit 6:    Presentence Investigation Report

# VERCRUYSSE MURRAY & CALZONE

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS

Robert M. Vercruysse
Gregory V. Murray
David B. Calzone
Diane M. Soubly
Bernice McReynolds
Daniel J. Bernard
Dorothy Hanigan Basmaji
Susan Hartmus Hiser
Debra Auerbach Clephane
James E. Roach
Patricia Bordman
Ann M. Nicklas
William E. Altman
Gary S. Fealk
Louis B. Eble
Priscilla J. Krebs
Jesse Goldstein
Amy E. Metz

SUITE 200, 31780 TELEGRAPH ROAD
BINGHAM FARMS, MI 48025-3469

Telephone
248-540-8019

Facsimile
248-540-8059

Website
www.vmclaw.com

Retired:
Virginia F. Metz

January 6, 2005

Officer R. Koistinen
Department of Homeland Security
U.S. Department of Justice
International Bridge Plaza
Sault Ste. Marie, MI 49783

**Re:    Application: Temporary Admission to the United States Pursuant to §212(d)(3)(B),
Immigration and Nationality Act
Leslie Stephen Thompson
A044-149-056**

Dear Officer Koistinen:

We are attorneys who represent Mr. Thompson in the above-referenced matter. Enclosed for filing please find two completed original signed copies of the waiver application, an original copy of the Police Certificate from the Royal Canadian Mounted Police with attached fingerprint Form C-216C, G-325A Biographic forms, the appropriate filing fees and all supporting documents. Mr. Thompson respectfully requests a waiver for the sole purpose of occasionally visiting his U.S. citizen son, Michael, who is an only child, and his U.S. citizen daughter-in-law, Jamie, who reside together in California. Jamie and Michael are expecting their first child in March 2005. Mr. Thompson's wife, Kathleen, is a U.S. citizen having been born in Detroit, Michigan, and would like to be able to go with her husband to visit their only child and their grandchild when he or she is born. He would also like to visit Ms. Burkeen, his mother-in-law, a U.S. citizen residing in Kansas, who is too ill to travel. Mr. Thompson has been very close to Ms. Burkeen and the separation has been an undue hardship on all family members. We respectfully request approval of the waiver application for the following reasons and based upon the following facts.

## INADMISSIBILITY

Mr. Thompson is inadmissible by virtue of his conviction for fraud. Mr. Thompson has completed all aspects of sentencing and does not pose a threat to the security of the U.S. Importantly, his request for a waiver is supported by officials from the U.S. Department of Justice, U.S. Department of Homeland Security, officials of the Canadian government, professionals and personal friends. He is very remorseful and, if allowed to visit his family in the U.S., will abide by all our laws and depart timely.

Pursuant to USC INA §212(d)(3)(B)

"…an alien who is inadmissible under subsection (a) of this section…, but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted to the United States temporarily as a nonimmigrant in the discretion of the Attorney General."

The Secretary of Homeland Security has broad discretion to waive virtually all grounds of inadmissibility for nonimmigrants, including criminal convictions listed in INA §212(a). The only grounds of inadmissibility that cannot be waived are those under INA §§212(a)(3)(A), (C), and (E). However, even some security grounds of inadmissibility can be waived.

The immigration case law and the Department of State regulations indicate that §212(d)(3) waivers should be liberally granted. According to Matter of Hranka, 16 I & N Dec. 491 (BIA 1976), the BIA found that there is no requirement that the reasons for entering the United States be "compelling" and the BIA articulated a balancing test in granting a waiver. The Department State has followed suit following the Hranka decision. The BIA listed three criteria for determining whether to approve or deny a §212(d)(3) waiver application:

1. The risk of harm to society if the applicant is admitted;
2. Seriousness of the applicant's prior violations, if any; and
3. The reasons for wishing to enter the United States.

Please see Exhibit A

While not mandatory, District Directors, BIA or Consular decisions generally consider these criteria and balance the factors involved. The BIA has also determined in the Hranka decision that there is no need to show a compelling reason for wishing to enter the United States in order to have a waiver approved. The important factor is whether the alien has any improper purpose in desiring to enter. The Foreign Affairs Manual lists family visits as a legitimate purpose for granting a waiver. We understand that although the Foreign Affairs Manual provides guidance for State Department Officers, the CBP is not bound by it. However, we believe that the standard should serve as guidance and we request that the adjudication officer consider these factors in deciding whether to grant this waiver.

## FACTS

Mr. Leslie Thompson, a Canadian citizen, resides in Canada with his U.S. citizen spouse, Kathleen Thompson. Their only child, Michael, is also a U.S. citizen and resides in Santa Clara, California, with his U.S. citizen spouse, Jamie. Michael and Jamie expect their first child in March 2005.

Mr. Thompson worked for RJR MacDonald, a subsidiary of RJ Reynolds-Nabisco Company, where he was Director of Sales at the corporate office in Winston-Salem, North Carolina, starting in March 1993. In this position, he was responsible for the importation of Canadian cigarettes. According to Mr. Thompson, the product was subsequently sold to licensed native distributors who resold the product to non-licensed importers who, in turn, reentered Canada with these products thus avoiding high Canadian and provincial taxes and duties. Northern Brands was set up by RJ Reynolds-Nabisco solely for the purpose of circumventing the high Canadian tax system.

As stated in Mr. Thompson's letter, there was an investigation of Northern Brands activities starting in 1997. In December 1998, Northern Brands plead guilty to a procedural infraction and was fined $15 million. In March 1999, Mr. Thompson plead guilty, pursuant to a joint plea agreement between Canada and the U.S., to one count of money laundering in the U.S. and paid a fine an forfeiture of $125,000.00 and plead guilty to one count of fraud in Canada. There were further actions taken against RJ Reynolds, JTI Tobacco, and various other entities and seven of its tobacco executives.

Mr. Thompson indicates that he holds himself fully accountable for his actions. He also notes that during his tenure as Director of Sales for Northern Brands, he worked at the RJ Reynolds head office and met regularly with the company lawyers, both in the U.S. and Canada, who assured him that Northern Brands was not illegal but rather a "legal loophole". He learned later that the company was conducting illegal activities.

In March 1999, Mr. Thompson signed a joint plea agreement between the U.S. and Canada and was allowed by Judge McAvoy, Chief U.S. District Court Judge, Northern District of New York, Binghamton, NY, to return to Canada until sentencing on December 20, 1999. Mr. Thompson returned for sentencing and was again allowed by Judge McAvoy to return to Canada until February 15, 2000, the date of self-surrender. In January and February of 2000, Mr. Thompson met with U.S. Marshals based in North Carolina who were conducting a Grand Jury investigation of RJ Reynolds. Mr. Thompson cooperated fully with the U.S. Marshals in the investigation. In fact, he has continued working with the investigation giving complete cooperation in all aspects. This is verified by the attached letters of United States and Canadian officials as set forth below and which are attached. In December 2000, owing to his cooperation with the U.S. Attorneys Office in North Carolina, cooperation with the European Union, and the Department of Justice in Canada, the U.S. Attorneys Office in Syracuse, NY filed a downward motion reducing the sentence from 78 months to 57 months. Mr. Thompson later filed for a transfer to Canada under a U.S. Canada treaty, which transfer was granted in December 2001.

3

On December 6, 2001, Mr. Thompson returned to Canada on an international treaty transfer and was placed in Millhaven Institution in Kingston, Ontario, where he remained for only a few weeks, until January 11, 2002. On that date, he was released and he returned to Tecumseh, Ontario.

Mr. Thompson has and continues to be integrally involved the investigation giving U.S. and Canadian authorities his fullest cooperation. It is worthy to note that he has not asked for anything in exchange for his cooperation. He has completed all aspects of this sentence and Mr. Thompson accepts full responsibility for his actions and is very remorseful for his activities. His wife, a U.S. citizen, works in Detroit and the couple has reestablished their lives in Canada.

As a condition of his return to Canada, Mr. Thompson agreed not to return to the United States without a waiver. Please note that Mr. Thompson was a lawful permanent resident of the United States. He is not seeking entry as a permanent resident; rather, he seeking entry for the sole purpose of occasionally visiting his U.S. citizen son and daughter-in-law who are expecting their first child in the spring. See Mr. Thompson's letter at Exhibit B.

## MR. THOMPSON POSSESSES NO RISK OF HARM TO THE UNITED STATES

If admitted, Mr. Thompson does not pose any threat to the security of the United States nor will he violate our laws. Please note that none of the funds involved in Mr. Thompson's underlying activity were diverted to terrorist activities. See attached letter of Gregory A. West, Assistant U.S. Attorney, Northern District of New York, United States Department of Justice at Exhibit C.

In support of his application, Mr. Thompson submits numerous letters from officials of the United States and Canadian governments, including the Department of Homeland Security, professionals and personal friends and family. Importantly, United States government officials, who are fully aware of the conviction and surrounding facts, fully support granting a waiver and state unequivocally that Mr. Thompson does not pose a threat to the security of the United States.

## U.S. DEPARTMENT OF JUSTICE

## Mr. Gregory A. West, Assistant U.S. Attorney, Northern District of New York, United States Department of Justice

Mr. West was the Federal Prosecutor responsible for Mr. Thompson's conviction and is therefore intimately familiar with this case. Mr. West supports Mr. Thompson's application for temporary admission into the United States and states that none of the funds generated through cigarette trafficking have been diverted to "Hezbullah." Mr. Thompson has accepted full responsibility for his conduct and agreed to cooperate to ensure that others involved in the scheme are held accountable.

4

Mr. West also indicates that Mr. Thompson has served his sentence and returned to his home in Canada. He also indicates that there is nothing in the pre-sentence report suggesting that Mr. Thompson's travel to the United States would pose any threat to the U.S. national security. See Exhibit C.

## UNITED STATES DEPARTMENT OF HOMELAND SECURITY

### Albert Fitchett, Jr. , Resident Agent in Charge, United States Immigration and Customs Enforcement, United States Department of Homeland Security

Officer Fitchett fully supports approval of the waiver application. He indicates that Mr. Thompson cooperated as a witness in the federal investigation conducted by the Office of the Resident Agent in Charge, United States Customs Service, Wilmington, North Carolina. He further indicates that "prior to and during his incarceration within the federal prison system, Mr. Thompson displayed an <u>unprecedented</u> level of cooperation and provided substantial assistance in the investigation". (emphasis added) Mr. Thompson's cooperation and his continued dialog with federal investigators reflects positively upon his character and establishes that he <u>does not</u> pose a threat to the security of the United States. Officer Fitchett states that the Resident Agents Office would not object to the approval of Mr. Thompson's application for admission into the United States. See Exhibit D.

Significantly, this letter is from ICE, the Department responsible for customs, enforcement, and immigration issues in the United States. That office would never support an application for a waiver if there was any scintilla of a chance that Mr. Thompson would violate our laws and pose a risk to our country.

## CANADA BORDER SERVICES AGENCY

### James H. Johnston, Director, Windsor/St. Clair Intelligence and Contraband, Canada Border Services Agency

Mr. Johnston met Mr. Thompson at the request of the U.S. Department of Justice. Mr. Johnston states that Mr. Thompson has cooperated completely with the U.S., Canada, and European law enforcement agencies. He states, "Mr. Thompson was relentless in researching and double checking information he possessed or had knowledge of." Mr. Johnston further indicates that throughout the investigation, he got to know Mr. Thompson as a person and that Mr. Thompson never denied his role at R.J.R. and the duties he performed. Mr. Johnston has maintained contact with Mr. Thompson and is still working with Mr. Thompson to provide assistance to provincial agencies and the RCMP.

Mr. Johnston indicates that Mr. Thompson has finished his parole with absolutely no problems and he believes that Mr. Thompson deeply regrets his discretions and has gone the "extra mile" to cooperate with any law enforcement agency that required his assistance. As importantly, Mr. Johnston believes that Mr. Thompson poses absolutely no threat of re-offending. See Exhibit E.

5

## DEPARTMENT OF JUSTICE, CANADA

### Gordon Bourgard, Senior General Counsel, Department of Justice, Canada

Mr. Bourgard indicates that he has known Mr. Thompson for five years and "has <u>no</u> <u>hesitation</u> in supporting his application for a waiver". (emphasis added) Mr. Bourgard, a lawyer for the Canada Department of Justice, who was lead counsel for Canada's civil lawsuit against R.J. Reynolds, indicates that Mr. Thompson fully cooperated with authorities in Canada against a number of tobacco companies in the R.J.R. group. He further states that he is convinced that Mr. Thompson is remorseful about the past and determined to conduct himself in an exemplary way both now and in the future. Mr. Bourgard indicates in his letter that he has kept in contact with Mr. Thompson and his family and that <u>he does not believe</u> that Mr. Thompson would pose any risk to the United States by visiting in the United States. See Exhibit F.

## CORRECTIONAL SERVICE OF CANADA

### Marian Costaris, Acting Area Director, Correctional Service of Canada

Marian Costaris was the parole officer for Mr. Thompson in Canada. He indicates that throughout the supervision period, Mr. Thompson maintained a cooperative attitude and fulfilled all his obligations without difficulty. Mr. Thompson also made significant efforts toward reintegrating into the community, seeking employment and reestablishing family relationships. There have been no further criminal concerns and Mr. Costaris believes that Mr. Thompson remains committed to leading a law abiding lifestyle and desires to maintain close relationships with his son, Michael, and his daughter-in-law, Jamie, who live in California. Mr. Costaris <u>does not</u> believe Mr. Thompson poses any risk issues to the United States. See Exhibit G.

## ROYAL CANADIAN MOUNTED POLICE

### Sergeant Walter Spilkin, Customs and Excise Special Projects, Royal Canadian Mounted Police

Sergeant Spilkin has told to Mr. Thompson that due to an ongoing criminal action filed by the Government of Canada against RJ Reynolds Tobacco, Japan Tobacco International and seven of its executives with respect to tobacco smuggling, the RCMP is unable to supply a written letter of support on Mr. Thompson's behalf. Sergeant Spilkin <u>requested</u> that Mr. Thompson forward his business card to your office and encourages the adjudicating officer to follow-up with him personally by telephone. See Exhibit H.

6

## PROFESSIONAL PERSONNEL

### Robert J. Nieves, Member, BERG Associates LLC

Mr. Nieves, a Member of BERG Associates LLC which is a small consulting firm specializing in, among other things, the support of civil litigation services in the Federal Courts, writes this letter on behalf of the BERG firm to support Mr. Thompson's application for a waiver. The BERG form consists of a former CIA Analyst and former Deputy Director in the U.S. State Department's Office of Counter Terrorism. The firm is currently engaged in supporting a matter before Judge Nicholas Garaufis, U.S. D.C., Eastern District of New York, involving cigarette smuggling and money laundering. BERG Associates is working with and representing foreign governments in assisting them with collection of evidence against RJ Reynolds-Nabisco. Mr. Nieves indicates: Mr. Thompson has been cooperating with us in this matter for the past three years. The information that Mr. Thompson has <u>freely and voluntarily</u> provided to the investigative team has been very important to our understanding of the cigarette smuggling business and the RJR personalities involved. In no small part, the information that he has provided figures prominently in the complaint against RJR. <u>You should also know that Mr. Thompson has asked for nothing in return for his cooperation and we have every belief that his cooperation will continue</u>."

Mr. Nieves also indicates that his team, with their extensive backgrounds in the CIA (counter terrorism) and DEA, and Central Intelligence Agency, are quite familiar with the national security concerns that may arise when considering the granting of a waiver in such a case. On behalf of his firm, he states that he is "<u>quite comfortable in assuring you that over the course of the years we have come to know Mr. Thompson, we are agreed that he does not now or will not in the future pose a threat to our nation's security</u>".

Equally important, Mr. Nieves states that from a humanitarian stand point, they are concerned with Mr. Thompson's ability to bring unity back to his family now that his legal ordeal is over. There has been a substantial hardship on his family who are all U.S. citizens. Consequently, they support his waiver application so that he can occasionally travel to California with his U.S. citizen wife to visit his son and daughter-in-law. His absence has already created a hardship on the family and a great amount of stress. See Exhibit I.

### Kenneth C. Anderson, Special Counsel for the Washington D.C. Based Law Firm of Howrey Simon Arnold & White, LLP

Mr. Anderson was an attorney in the Antitrust Division in the United States Department of Justice for 16 years where he served as Chief Trial Counsel in a very large case, <u>U.S.</u> v. <u>AT&T</u>. He states that he came to know Mr. Thompson in connection with his work on a huge class action lawsuit Howrey Simon brought against the major tobacco companies on behalf of all tobacco growers and quota owners. RJR was one of the defendants. Mr. Anderson indicates that Mr. Thompson was very cooperative in the investigation stage and provided substantial information regarding illicit smuggling operations with RJR and others who were in involved in that matter. Mr. Anderson further states with respect to the issue of whether our national security would be compromised if a waiver is granted to Mr. Thompson: "it most

clearly would not be compromised in the slightest". He states that Mr. Thompson has "paid the price" and should now be allowed to participate in everyday life. "Not to grant his request for a waiver would constitute a grave injustice." See Exhibit J. Mr. Anderson fully supports the waiver application for Mr. Thompson so that Mr. Thompson can occasionally visit his son, daughter-in-law and future grandchild.

## George J. Mager, Jr., Attorney with Cox, Hodgman and Giarmarco, P.C.

Mr. Mager states that he has known Mr. Thompson and his wife, Kathy, and his son, Michael, for more than 30 years. He speaks highly of the family relationship and the hardship to Les and Kathy as well as their U.S. citizen son and daughter-in-law if Les is not permitted to visit his grandchild who will be born in the spring. He believes that Mr. Thompson will not abuse the privileges of a waiver and will honor the laws of the United States. See Exhibit K.

## Reverend Dwayne A. Adam p.p.

Reverend Adam knows Mr. Thompson and his family through ministry in the Church of St. Simon and St. Jude Parish in Belle River, Canada. He has kept in touch with Mr. Thompson for 23 years and indicates that Mr. Thompson is remorseful for his activity and has "become a better person". Reverend Adam believes Mr. Thompson is a family man who sincerely loves his only child and his daughter-in-law and that the entire family would benefit by allowing Mr. Thompson to visit them. Reverend Adam fully supports Mr. Thompson's application for a waiver. See Exhibit L.

## Fred H. Bartlit, Jr., Bartlit Beck Herman Palenchar & Scott LLP

Mr. Bartlit, an attorney handling both civil and criminal matters for over 40 years, also supports Mr. Thompson's application for waiver. Mr. Bartlit is a Senior Legal Counsel in a case by Canada against R. J. Reynolds.

Mr. Bartlit met Mr. Thompson while investigating R.J. Reynolds conduct in the smuggling of Canadian tobacco. He and his partners have spent substantial time with Mr. Thompson over the years and found Mr. Thompson to be "extremely helpful and cooperative". He notes that Mr. Thompson is "contrite, honest, decent, thoughtful, and genuine". He also believes that Mr. Thompson is rehabilitated from any wrongdoing and poses no threat to the security of the United States. Mr. Bartlit, like the other individuals who have written letters in support, feels that Mr. Thompson has endured great hardship and continues to do so being separated from his only child, Michael, who lives in California and supports a waiver so that Mr. Thompson will be able to visit his son, daughter-in-law and grandchild who will be born in the spring. See Exhibit M.

## Clara DeMatteis Mager, Attorney at Butzel Long

Ms. Mager is a shareholder and Immigration Practice Group Manager at Butzel Long P.C., a law firm of approximately 200 attorneys. She has known Mr. Thompson, his wife and their son, Michael, for over 30 years. She enthusiastically supports his application for a waiver

and believes that Mr. Thompson is rehabilitated and does not pose a threat to the security of the United States. As an immigration attorney of 17 years, Ms. Mager fully understands the criteria for granting a waiver application and the implications of granting a waiver to an unworthy applicant. She believes that Mr. Thompson is deserving of a waiver so that he may enter the United States to visit his son and daughter-in-law and be a part of his future grandchild's life. Depriving his son Michael and his daughter-in-law of Mr. Thompson's love and affection would be a hardship for Mr. Thompson and his family. Ms. Mager believes, based on her long-standing friendship with Mr. Thompson and her knowledge of immigration law, that he will not abuse the laws of our country nor will he pose a threat to the security of the United States. As importantly, Ms. Mager believes Mr. Thompson will return to Canada at the conclusion of his temporary visits. See Exhibit N.

## David H. Hill, C.M., Q.C., Perley-Robertson, Hill and McDougall, LLP

Mr. Hill has personally known Mr. Thompson for several years, including the time of Mr. Thompson's legal difficulties, conviction and incarceration and parole. He fully supports Mr. Thompson's request for a waiver to visit his son and daughter-in-law. Mr. Hill unequivocally recommends the waiver for Mr. Thompson. See Exhibit O.

## David T. Sweanor, B.A., J.D., Adjunct Professor, Faculty of Law and Faculty of Medicine, University of Ottawa

Mr. Sweanor has worked as a lawyer and policy expert on public health issues concerning tobacco for over 20 years. He has testified before committees of both the United States Senate the House of Representatives and contributed to reports of the Surgeon General and the National Cancer Institute.

Mr. Sweanor supports Mr. Thompson's application for a waiver and indicates that Mr. Thompson is an outstanding individual with great personal integrity who "got caught up in a corporate intrigue that is still unfolding". Mr. Thompson has fully acknowledged his role, was a model inmate while serving his time and is now fully rehabilitated and playing a key role in efforts of various government bodies and law enforcement agencies to pursue justice. He notes the devastation for Mr. Thompson's family during this ordeal and that Mr. Thompson is very close to his son as well as his daughter-in-law. In addition, Mr. Thompson's mother-in-law, a U.S. citizen, is in poor health and unable to leave the U.S. to see him. Therefore, Mr. Sweanor fully supports his application for a waiver. See Exhibit P.

## THE SERIOUSNESS OF THE OFFENSE

One of the Hranka factors is the seriousness of the criminal violation. We fully understand the seriousness of Mr. Thompson's prior conviction as does Mr. Thompson. In no way does he minimize his actions and, indeed, has acknowledged his culpability and tried to make amends. The crime, without undermining its seriousness, was not one that was linked to terrorists activities or a threat to national security. Nor was the crime one that hurt or maimed individuals. Mr. Thompson has completed all requirements as set forth by the Court for sentencing and has no other legal violations. Mr. Thompson is also very remorseful of all of

9

his wrongdoing and has done everything to demonstrate this fact and to evidence his rehabilitation. He has cooperated fully with law enforcement officials both in Canada and the United States as investigations continue into tobacco smuggling. He has no further violations of any sort with law enforcement in Canada and has tried to pull his life together as a model citizen.

## MR. THOMPSON HAS A VALID REASON TO REQUEST ENTRY INTO THE U.S.

This ordeal has been very strenuous for both Mr. and Mrs. Thompson as they try to move on with life. In addition to providing love and comfort to his wife, son and daughter-in-law, Mr. Thompson needs love and affection from them as well their confidence that he fully is fully rehabilitated and worthy of a waiver.

Mr. Thompson has a valid reason for entering the United States. As discussed in many of the letters attached to this application, the sole purpose for Mr. Thompson's proposed visits to the U.S. is simply to visit his only son, his daughter-in-law, and his future grandchildren. He does not intend to work in the United States nor does he intend to live here. At the conclusion of all authorized admissions, he will promptly return to Canada. He has showed by his past and present conduct since the incidence that he fully intends to abide by the laws of the Canada and United States. During the period prior to incarceration, the Court allowed him to travel to and from the United States and he always departed in a timely manner.

He would also like to visit his ailing mother-in-law with whom he is very close. She is a U.S. citizen living in Kansas and is too ill and elderly to make trips to Canada. His wife, son, mother-in-law, daughter-in-law, and future grandchildren are all U.S. citizens who reside in the United States and are unable to travel to Canada frequently to see Mr. and Mrs. Thompson. Mrs. Thompson is now living in Canada to be with her husband and to continue to support him and family.

## FAMILY SUPPORT

### Jamie L. Kuhneman-Thompson, Mr. Thompson's Daughter-in-Law

Jamie is married to Mr. Thompson's only child, Michael. She indicates that she is pregnant and is expecting their first child in the spring. The couple has been married for 10 years. She would like very much to have Mr. Thompson, as her unborn child's grandparent, to be a part of the family. She notes how close Mr. Thompson is to his son and what a wonderful father he is to Michael. She and Michael continue to experience extreme hardship by the separation and love and support of Mr. and Mrs. Thompson. Because Mr. Thompson cannot travel to the U.S., it has become equally a hardship for his wife, Kathy, who is a U.S. citizen, as she is also deprived of the love and companionship of her son and daughter-in-law. Mrs. Thompson also wants desperately to be part of her future grandchild's life. See Exhibit Q.

10

**Patricia Ann Burkeen, Mother-in-Law of Mr. Thompson**

Ms. Burkeen, a U.S. citizen living in Kansas, is Mr. Thompson's mother-in-law and fully supports his application for a waiver. Ms. Burkeen would also like Mr. Thompson to visit her as well as her daughter to provide family unity. She notes how close Mr. Thompson is to their son, Michael, and his wife. She does not believe Mr. Thompson would be a threat to the United States. His not being able to visit her and the family also poses a hardship for her as she has been ill and cannot travel. See Exhibit R.

**Michael J. Thompson, Mr. Thompson's Son**

Michael, Mr. and Mrs. Thompson's only child who is now a U.S. citizen, indicates that he is very close to his parents and dependant on them for direction and guidance, especially his father. He notes the closeness he has had with his father and his mother over the years. In fact, his father was Michael's Best Man at his wedding. He now resides in California and is married to Jamie, a U.S. citizen. He would like to have the ability to have his father visit, particularly when their first child is born in the spring. He implores the Department of Homeland Security to allow his father to occasionally visit him in the U.S. simply to be with the family and allow his father to put behind him the terrible ordeal which he has endured and for which his father is very remorseful. The separation from his father continues to be an undue hardship and Michael notes that it will escalate when their child is born. This is particularly true since Michael has no siblings or family in California. He and his wife try to maintain family unity but they do not have the money or the ability to travel frequently to Canada to see Mr. Thompson. See Exhibit S.

**Kathleen M. Thompson, Mr. Thompson's Wife**

Kathleen Thompson has stuck by her husband throughout this ordeal. Mrs. Thompson is a U.S. citizen by birth, residing in Canada but working in Detroit. As his wife and mother of their only child, Michael, she would like Les to be able to occasionally visit Michael and his wife in California. She fully believes that Mr. Thompson has assumed all responsibility for his actions and she notes that between the time of his arrest in February 1999, sentencing in December 1999, and surrendering himself to fulfill his sentence in February 2000, Mr. Thompson lived in Canada but traveled freely between Canada and the United States pursuant to Court permission as the Court did not believe that Mr. Thompson posed a risk to the United States. He always timely returned to Canada and fulfilled every aspect of his punishment. As Mr. and Mrs. Thompson try to repair the damage that has been done, they look forward to a life together with their very small but close family. Mr. Thompson is not requesting to live in the United States; he is only requesting to be able to occasionally visit his son and daughter-in-law and future grandchildren. See Exhibit T.

## CONCLUSION

Based on the foregoing, we respectfully request that Mr. Thompson be granted a waiver and allowed to occasionally visit his son, daughter-in-law, and mother-in-law in the United States. He does not pose a risk to the security of this country as evidenced by the many letters

by the United States and Canadian government authorities, professionals and personal friends. Mr. Thompson has a valid reason for entering the U.S. which is to visit his U.S. citizen son, daughter-in-law, future grandchildren and mother-in-law who all reside in the United States. Finally, Mr. Thompson acknowledges the seriousness of his prior violation. However, he has done everything possible to demonstrate his rehabilitation and adhere to the laws of Canada and the United States. He has always timely departed the United States and intends to do so at this time.

We respectfully request that he be allowed to enter the United States for the limited purpose as set forth herein.

Should you require any further information, please do not hesitate to contact me for a prompt response. Thank you in advance for your assistance in this matter.

Very truly yours,

VERCRUYSSE MURRAY & CALZONE

Dorothy Hanigan Basmaji

DBH/ap
Enclosures
cc:    Mr. Leslie Thompson (w/enc.)

12

**EXHIBIT LIST**
**APPLICATION FOR TEMPORARY ADMISSION**
**TO THE UNITED STATES**
**MR. LESLIE STEPHEN THOMPSON**

Exhibit 1:    Letter Brief in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit A.    Matter of Hranka § 212(d)(3) Proceedings A-20925982

Exhibit B:    Letter of Mr. Thompson re History of Events

Exhibit C:    Letter of Gregory A. West, Assistant U.S. Attorney, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit D:    Letter of Mr. Albert Fitchett, Jr., Resident Agent in Charge, U.S. Immigration and Customs Enforcement, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit E.    Letter of James H. Johnston, Director, Windsor/St. Clair Intelligence & Contraband, Canada Border Services Agency, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit F.    Letter of Gordon Bourgard, Senior General Counsel, Department of Justice Canada, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit G.    Letter of Marian Costaris, Acting Area Director, Correctional Service of Canada, in Support of Mr. Thompson's Temporary admission into the United States

Exhibit H.    Business Card of Sgt. Walter Spilkin, Royal Canadian Mounted Police

Exhibit I.    Letter of Robert J. Nieves, Member, BERG Associates LLC, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit J.    Letter of Mr. Ken Anderson, Howrey Simon Arnold & White, Special Counsel, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit K.    Letter of Mr. George J. Mager, Jr. Cox Hodgman & Giarmarco, P.C., in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit L.    Letter of Reverend Dwayne A. Adam in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit M.    Letter of Fred H. Bartlit, Jr., Bartlit Beck Herman Palenchar & Scott LLP, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit N.    Letter of Ms. Clara DeMatteis Mager, Butzel Long, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit O.    Letter of Mr. David H. Hill, C.M., Q.C. , in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit P.    Letter of David T. Sweanor, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit Q.    Letter of Jamie L. Kuhneman-Thompson, Mr. Thompson's Daughter-in-Law, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit R.    Letter of Patricia Ann Burkeen, Mr. Thompson's Mother-in-Law, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit S.    Letter of Michael J. Thompson, Mr. Thompson's Son, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit T.   Letter of Kathleen M. Thompson, Mr. Thompson's Wife, in Support of Mr. Thompson's Temporary Admission into the United States

Exhibit 2:   Identification Documents for Mr. Leslie Thompson

Exhibit 3:   RCMP Report with Fingerprints of Mr. Leslie Thompson

Matter of HRANKA
In Section 212(d)(3) Proceedings
A-20925982
Board of Immigration Appeals decision, April 6, 1978
16 I. & N. Dec. 491 (BIA 1978); Interim Decision #2644

**Editorial information: Annotation**

Order:  The appeal is sustained.

FURTHER ORDER:  The applicant for advance permission to enter as a nonimmigrant will be granted under such conditions as the District Director deems appropriate.

**syllabus**

(1) In an application for advance permission to enter as a nonimmigrant pursuant to section 212(d)(3) of the Act, there is no requirement that the applicant's reasons for wishing to enter the United States be `compelling.'

(2) An application under section 212(d)(3)(B) requires a weighing of at least three factors:  (1) the risk of harm to society if the applicant is admitted;  (2) the seriousness of the applicant's immigration law, or criminal law violation, if any;  and (3) the nature of the applicant's reasons for wishing to enter the United States.

(3) Upon application of the balancing test to the facts of this case, the applicant's previous deportation for having engaged in prostitution in April 1975, was held to have been outweighed by the fact that she has no other criminal or immigration law violations, she has demonstrated that she is rehabilitated, and she has a substantial reason for desiring a waiver under section 212(d)(3) in that she has many close relatives living across the border in the United States;  thus, the requested waiver should be granted.

**Counsel**

ON BEHALF OF APPLICANT:  Pro se

**Judges**

BY:  Milhollan, Chairman;  Maniatis, Appleman, Maguire, and Farb, Board Members

**Opinion**

**Opinion by**

BY:  Milhollan, Chairman;  Maniatis, Appleman, Maguire, and Farb, Board Members

**Opinion**

This is an appeal from a decision of the District Director of the Immigration and Naturalization Service in Detroit,

Michigan, dated August 9, 1977, denying the applicant's request for advance permission to enter the United States as a nonimmigrant visitor pursuant to section 212(d)(3)(B) of the Immigration and Nationality Act, 8 U.S.C. 1182(d)(3) (B). The appeal will be sustained.

The applicant is a 25-year-old native and citizen of Canada who is inadmissible to the United States because she was previously deported for having engaged in prostitution. See section 212(a)(12) of the Act, 8 U.S.C. 1182(a) (12).

Regardless of the fact that she is otherwise inadmissible, a nonimmigrant may be admitted into the United States temporarily in the discretion of the Attorney General. Congress provided for this procedure because it recognized that there are cases where the temporary admission of otherwise inadmissible aliens is desirable for humane reasons or for reasons of public interest. 1.

The District Director denied the application for a waiver of inadmissibility for two reasons. He concluded that insufficient time had elapsed since the applicant's deportation to permit a determination that she had been rehabilitated. He also found that there were no `compelling humanitarian... circumstances involved' in the applicant's desire to enter the United States.

The evidence in the record convinces us that the applicant has been rehabilitated. She was deported in April 1975. Her United States citizen mother informs us that the applicant has been holding down two jobs since September 1976, working between 60 and 70 hours a week. The applicant's mother also stated that her daughter had always been well-behaved until the time she began living with a certain man in Detroit. This man had a very negative influence upon her. She began using heroin and engaged in occasional acts of prostitution. She has had no contact at all with this man since June 1976, and has resumed living with her parents in Windsor, Ontario.

The statements of the applicant's mother impress us as being sincere and truthful. They are supported by a letter from the principal of the high school which the applicant attended. This man is a psychologist and a close friend of the applicant's family.

The applicant's reasons for desiring to enter the United States occasionally are stated by her mother as follows:

> Being a border town it is a little more difficult to go about the every day life if she is unable to cross into Detroit. She is trying to put the past behind her as she is very embarrassed and ashamed and every time she is invited out on a date and the date suggests going to Detroit to a show or dinner or ball game it is all brought back to her and is very embarrassing.

> As well as three uncles living in Detroit she has numerous cousins who are all marriageable age. She has already missed one of her cousins' weddings.

It is true that these reasons for wanting to enter the United States cannot be fairly characterized as `compelling.' However, there is no requirement that the applicant's reasons for wishing to enter the United States be `compelling.'

In deciding whether or not to grant an application under section 212(d)(3)(B), there are essentially three factors which we weigh together. The first is the risk of harm to society if the applicant is admitted. The second is the seriousness of the applicant's prior immigration law, or criminal law, violations, if any. The third factor is the nature of the applicant's reasons for wishing to enter the United States. In this case, the risk of harm to American society if the applicant is allowed to enter is very small. The applicant has no other criminal or immigration law violations. The fact that she has many close relatives living in Detroit is substantial reason for desiring a waiver. Balancing the three factors, we conclude that the requested waiver should be granted.

Footnotes

1.
S. Rep. No. 1137, 82nd Cong., 2nd Sess., 12;  H. Rep. No. 1365, 82nd Cong., 2nd Sess., 51 (1952).

Copyright 2003 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved.

**Les Thompson**
**12905 Riverside Drive E.**
**Tecumseh, Ontario**
**N8N 1A9**
**519.739.0526**

October 19, 2004

U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, DC

RE:    I-192 Application for Advance Permission
       to Enter as Non Immigrant

Dear Sir or Madam:

I have prepared a history of the past five years in order to establish a clear, factual picture of who I am and the circumstances which have created my current status. I have attempted to keep this history as short and concise as possible, but it's a complicated series of events.

My name is Leslie Thompson. I am 57 years old. I was born and raised in Tecumseh, Ontario, where my wife of 35 years and I currently reside. I grew up in Tecumseh and started my sales career here with RJR Macdonald (a subsidiary of RJ Reynolds-Nabisco) in 1978. My wife, Kathy, a US citizen, and I raised one child, Michael, who is married and currently resides in Santa Clara, California with his wife, Jamie.

My career with RJ Reynolds started slowly then picked up momentum in the 1980's. I was promoted and transferred with RJR five times during my career. The last promotion and move took place in March of 1993. This move was to the corporate office of RJR in Winston-Salem, NC. My role was Director of Sales for an export division of RJ Reynolds called Northern Brands International. In this position, I was responsible for the importation of Canadian cigarettes. This product was subsequently sold to licensed native distributors who resold the product to non-licensed importers who in turn re-entered Canada with these products thus avoiding high Canadian and provincial taxes and duties. Northern Brands was set up by RJ Reynolds-Nabisco solely for the purpose of circumventing the high Canadian tax system.

In 1997, an investigation of Northern Brands activities began in Syracuse, New York. In December, 1998, Northern Brands pled guilty to a procedural infraction and was fined $15 million. In March, 1999, I pled guilty (vis-à-vis a joint plea agreement between

Canada and the US) to one count of money laundering in the US and paid a fine and forfeiture of $125,000 and pled guilty to one count of fraud in Canada. Rather than continue to pursue the investigation, the US Attorney's Office in Syracuse, NY turned over their investigative material to the RCMP in Canada and the investigation continued resulting in current criminal charges against RJ Reynolds, JTI Tobacco (and various other entities) and 7 of its tobacco executives.

While I pled guilty to these charges and hold myself accountable for my actions, I feel it important to proffer the following information. During my tenure as Director of Sales for Northern Brands, I worked at RJ Reynolds head office and met regularly with company lawyers, both in the US and Canada, who assured me that Northern Brands was a gray market business – not illegal – it was a legal loophole. As I was to later discover, nothing could be further from the truth. Northern Brands generated incredible profits for RJ Reynolds – it made over $110 million in a three year period with a staff of three people. Northern Brands is the perfect example of corporate greed – how far a company will go to achieve sales and exceed shareholders' expectations.

In late November, 1998, I was encouraged by lawyers for Northern Brands to leave the United States and return to Canada where I would be "safe" until "things were sorted out". I returned to Canada in January, 1999. I did not leave secretly or illegally – there were no warrants for my arrest, merely an investigation at this point.

The following sequence of events is very involved and rather than try to explain everything that happened, I have prepared a simple timeline.

- Mid-February, 1999, I was arrested at the Ambassador Bridge and remanded to the custody of the US Marshall's office in Detroit where I was subsequently transferred to Syracuse, New York.

- March, 1999, I signed a joint plea agreement with the US and Canada. Upon filing of that plea agreement, Judge McAvoy, Chief US District Court Judge, Northern District of NY, Binghamton, NY allowed me to return home to Canada until my sentencing date of December 20, 1999.

- December 20, 1999 – US - sentenced to 78 months and was once again allowed by Judge McAvoy to return home to Canada until my self-surrender date of February 15, 2000.

- December, 1999 – Canada – received suspended sentenced.

- February 15, 2000 – self-surrender date, Fort Dix, NJ. In January and February of 2000, I met several times in Detroit with US Marshall's based in North Carolina who were conducting a grand jury investigation of RJ Reynolds. Because of my desire to continue to work with them, the US Marshall's office in North Carolina arranged for my transfer from Fort Dix to Butner, NC.

- From March, 2000 until leaving Butner, NC in June, 2001, I continued to meet with all lawyers and/or investigators requiring my assistance in their investigations of RJ Reynolds' role in tobacco smuggling.

- December, 2000 – Due to my cooperation with the US Attorney's Office in North Carolina, cooperation with the European Union, and the Department of Justice in Canada, the US Attorney's Office in Syracuse, NY, filed a downward motion reducing my sentence from 78 months to 57 months. Shortly afterwards, I applied for a treaty transfer to Canada, which transfer was granted in December, 2001.

- December 6, 2001 – Returned to Canada on an international treaty transfer and was placed in Millhaven Institution in Kingston, ON.

- January 11, 2002 – released from Millhaven and returned to Tecumseh, ON.

I paid a very high price for my stupidity and ignorance in unquestioningly following company directives. I take complete responsibility for my actions and have paid my debt to society and have re-started my life. I certainly could be bitter but I don't dwell in the past. Not only is it unproductive but it's not who I am. I'm an optimistic individual and I always look ahead, not behind me. Over the past year, I have formed a marketing/sales consulting business and my energy is directed to helping that company grow. My wife works in Detroit and between us, we have re-established our lives and have come through the last five years remarkably sane and well-adjusted.

As I write to you, I have just completed a 14-hour session with the Department of Justice in Canada providing further information in connection with their $1.5 billion civil lawsuit against RJ Reynolds, JTI Tobacco and others. I continue to work with global investigations and will be a significant witness as Canada's criminal and civil actions come to trial. Every time I meet with investigators and/or lawyers, it's not easy to re-live this nightmare, but I cooperate and assist because I feel it's my duty and obligation to do so. I'm committed to make many wrongs a right.

As a condition of my return to Canada, I agreed that I would not return to the US without a waiver, which is why I write to you today. My family and I have paid a very high price for my blind allegiance to RJ Reynolds. We are a small family and very close and my travel restrictions have caused all of us a great deal of pain. We have recently learned that my son and daughter-in-law will become parents in March, 2005. Just to mention this blessed event in our lives brings a smile to my face. To not be allowed to visit and be a part of my grandchild's life would be the severest punishment one could inflict upon me and my family.

When my plea agreement was entered in March, 1999, Judge McAvoy allowed me to leave the US and trusted that I would return for sentencing in December of that year, which I did. After sentencing, I was once again allowed to leave the United States and

trusted that I would self-report as instructed, which I did.  I'm a man of my word.  I pose no threat to the security of the United States.

My family has suffered enough and I ask that you grant my request for a waiver to visit the United States.

Very truly yours,

Leslie S. Thompson

U.S. OFFICIAL MAIL
PENALTY FOR
PRIVATE USE $300

UNITED STATES POSTAGE

$00.37⁰

02 1A
0004202639    NOV 16 2004
MAILED FROM ZIP CODE 13261

**U.S. Department of Justice**

*United States Attorney*
*Northern District of New York*

*100 South Clinton Street*
*P.O. Box 7198*
*Syracuse, New York 13261-7198*

Official Business
Penalty for Private Use $300

*Dorothy H. Basmaji*
*Vercruysse Murray & Calzone*
*31780 Telegraph Road, Suite 200*
*Bingham Farms, MI 48025*

48025+3409 29

U. S. Department of Justice

*United States Attorney*
*Northern District of New York*

---

*P.O. Box 7198*                                                    *315-448-0672*
*100 South Clinton Street*                                    FAX: *315-448-0689*
*Syracuse, New York 13261-7198*

November 16, 2004

U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, DC

Greetings:

    The purpose of this letter is to support Lesley Thompson's application to be paroled into the United States to permit him to visit his son and daughter-in-law in California. I am familiar with Mr. Thompson's situation inasmuch as I was the federal prosecutor responsible for his conviction. Several factors which you may wish to consider are set forth below:

    1.    Lesley Thompson was convicted of participating in a money laundering conspiracy based upon his role in assisting the RJ Reynolds Tobacco Company in smuggling cigarettes across the US Border into Canada. Mr. Thompson accepted responsibility for his conduct and agreed to cooperate to ensure that others involved in the scheme were held accountable.

    2.    He has since served his sentence and has returned to his home in Canada.

    3.    Lesley Thompson's wife, son, and daughter-in-law are US citizens. His son and daughter-in-law live in California where they are expecting the birth of their first child in March 2005. Lesley Thompson's request to enter the United States so that he can visit his son, daughter-in-law, and their new baby does not, in my opinion, pose a threat our national security.

    Although some recent cases have shown that funds generated through contraband cigarette trafficking have been diverted to support "Hezbullah", none of the funds involved in Mr. Thompson's underlying criminal activity were diverted in this manner.

U.S. Department of Homeland Security
November 16, 2004
Page 2


Additionally, I recall nothing in the pre-sentence report suggesting that Lesley Thompson's travel to the United States would pose a threat to our national security.

Accordingly, I recommend that his application be granted.

Very truly yours,

GLENN T. SUDDABY
United States Attorney

By:

Gregory A. West
Assistant U.S. Attorney

GAW/trm

U. S. Department of Justice

*United States Attorney*
*Northern District of New York*

---

P.O. Box 7198                                    315-448-0672
100 South Clinton Street                    FAX: 315-448-0646
Syracuse, New York 13261-7198

December 2, 1999

Hon. Thomas J. McAvoy
Chief U.S. District Court Judge
Federal Building, Second Floor
15 Henry Street
Binghamton, NY 13901

       Re:    <u>United States v. Leslie Thompson</u>

Dear Judge McAvoy:

      Leslie Thompson's sentencing is presently scheduled for December 20, 1999, at 10:00 a.m. in Binghamton, New York. For the reasons set forth below, we intend to make a substantial assistance departure motion on his behalf.[1] At your request, we will also provide the Court with additional specific information concerning Mr. Thompson's cooperation and assistance.

      Leslie Thompson has, in our opinion, provided "substantial assistance," even though he was the "last man standing." From the day of his initial debriefing, I am pleased to report that Leslie Thompson provided detailed information with refreshing candor. Since that time, he has spent hundreds of hours reviewing documents with the Royal Canadian Mounted Police, and he has provided an invaluable backdrop against which to evaluate the information and testimony provided by other RJR MacDonald personnel who will be witnesses in the Canadian case.

---

    [1] The Government's commitment to make this motion at the time of sentencing is, of course, conditioned upon Mr. Thompson's fulfilling his obligations under the Plea Agreement, including, but not limited to, paying the amount agreed to be forfeited, continuing to assist with ongoing investigations, and continuing to abide by the law, as well as the other terms and conditions of pretrial release.

Hon. Thomas J. McAvoy
Page 2
December 3, 1999

Based upon Mr. Thompson's substantial assistance in connection with the above-mentioned investigations, his forthrightness and candor, as well as the personal hardship which he has endured as a result of his decision to cooperate, we hereby recommend a downward departure pursuant to § 5K1.1 of the sentencing guidelines, thereby allowing the Court to accept the sentencing limitations contained in the plea agreement.

Very truly yours,

DANIEL J. FRENCH
United States Attorney

By

Gregory A. West
Assistant U.S. Attorney

GAW/ad
cc:    C. Andrew Pappas, Esq.





**U.S. CUSTOMS SERVICE**
721 MEDICAL CENTER DRIVE, SUITE 300
WILMINGTON, NC 28401

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE $300

Ms. Dorothy Basmaji
Vercruysse Murray & Calzone  PC
31780 Telegraph Road, Suite 200
Bingham Farms, MI  48025

4B0ZS+3403  23



U.S. Department of Homeland Security
721 Medical Center Drive, Suite 300
Wilmington, NC 28401

U.S. Immigration
and Customs
Enforcement

November 22, 2004

Dorothy Basmaji
Vercruysse Murray & Calzone PC
31780 Telegraph Road, Suite 200
Bingham Farms, MI 48025

Re: Leslie Stephen Thompson
File #: 044-149-056

Dear Ms. Basmaji:

This letter is in support of a Form I-92, "Application for Advance Permission to Enter as a Nonimmigrant" (Pursuant to Section 212(d)(3) of the Immigration and Nationality Act) for Leslie Stephen Thompson.   Mr. Thompson is submitting the entry waiver to assure himself an opportunity to visit his mother-in-law in Kansas, and his son, daughter-in-law and his grandchild in California.

Mr. Thompson was a cooperating government witness in a federal investigation conducted by the Office of the Resident Agent in Charge, United States Customs Service, Wilmington, NC.  Prior to and during his incarceration within the federal prison system, Mr. Thompson displayed an unprecedented level of cooperation and provided substantial assistance in the investigation.

Mr. Thompson's cooperation and his continued dialogue with federal investigators reflects positively upon his character and establishes that he does not pose a threat to the security of the United States. Based upon these facts, this office would not object to the approval of his application for admission into the United States.  If you have any questions or require additional information regarding this matter, please contact Special Agent Vallarie Mitchell-Morgan at (910)772-5840.

Best Regards,

Albert Fitchett, Jr.
Resident Agent in Charge

Canada Border
Services Agency

gence des services
frontaliers du Canada

| | |
|---|---|
| Your File | Votre dossier |
| Our File | Notre dossier |

U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, DC

September 28, 2004

RE: Leslie Stephen Thompson
I-192, Application for Advance
Permission to Enter as Nonimmigrant

I originally met Les Thompson at the request of The Department of Justice. As part of his plea agreement, Mr. Thompson was to cooperate with law enforcement officials. I met with Mr. Thompson and can honestly say the he cooperated completely with U.S., Canadian and European Law Enforcement Agencies. Mr. Thompson was relentless in researching and double checking information he possessed or had knowledge of. He would contact me on off hours with his ideas and questioning relevancy of his information and continuing research.

Through these constant meetings I go to know Les Thompson, the person. He never denied his role at R.J.R. and the duties he performed. Throughout this period, despite his relentless pursuit of providing information, his family remained his main concern. He hated the pressure that was placed on his wife and son. At the same time, they maintained extremely strong support for him.

I have maintained contact with Mr. Thompson and he still has worked in providing assistance to Provincial Agencies and RCMP.

I personally know the he finished his parole with absolutely no problems and really impressed his case officer.

I believe that Mr. Thompson deeply regrets his discretions and has gone the "extra mile" to cooperate with any law enforcement agency that required his assistance. I believe that because of his belief in his family and church that Mr. Thompson poses absolutely no threat of reoffending.

His son, who lives in California, is expecting their first child. I know that Les would like to be there.

James H. Johnston
Director, Windsor/ St. Clair Intelligence & Contraband
Canada Border Services Agency
2500 Ouellette, 4th Floor
Windsor, Ontario
N8X 1L4




Tax Law Services Section
Bank of Canada Bldg., East Tower
234 Wellington Street
Ottawa, Ontario
K1A 0H8

Section des Services du droit fiscal
Édifice Banque du Canada, Tour Est
234, rue Wellington
Ottawa, Ontario
K1A 0H8

Phone: (613) 952-9810
Fax:    (613) 946-7449

September 27, 2004

BY HAND

U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, D.C.

Dear Sir/Madam:

**Re:  Les Thompson**

I understand that Les Thompson seeks your approval to visit his family in California. I have known Les for 5 years and have no hesitation in supporting his application.

As a lawyer for the Canadian Department of Justice I met Les as he co-operated with authorities as Canada prepared to initiate legal proceedings against a number of tobacco companies in the RJR group.  I had a number of contacts with Les during this time, while he served his sentence in the United States, and then on his return to Canada. Those contacts have convinced me that Les is remorseful about the past and determined to conduct himself in an exemplary way today and in the future.

During this difficult time Les' singular concern was for the well-being of his family. Since his release, I have kept in touch with Les as he works hard to rebuild a good life in Canada with his wife Kathy. I understand that his married son Michael, who lives in California, is expecting a child, and that Les would like to be able to join Kathy in visiting his son, daughter-in-law, and grandchild. I do not believe that those visits would pose any risk to your country.

If you have any questions or if I can provide any other information I would be please to speak with you directly.

Yours truly,

Gordon Bourgard
Senior General Counsel

Correctional Service
Canada

Service correctionnel
Canada

Ontario Region                Région de l'Ontario

| | |
|---|---|
| Your file | Votre référence |
| Our file | Notre référence |

October 18, 2004

US Department of Homeland Security

To Whom It May Concern:

**RE: LESLIE THOMPSON**
       **DOB 1947/06/09**

I am happy to provide a reference for Mr. Leslie Thompson with respect to his efforts in gaining entry to the United States.

Mr. Thompson arrived at our federal penitentiary, Millhaven Institution, Kingston Ontario, via an international transfer from the United States on December 06, 2001. He was subsequently released on a Full Parole to Tecumseh, Ontario on January 11, 2002 where he resumed residency with his wife Kathy Thompson.

I supervised Mr. Thompson's parole for the entire period which was successfully completed August 06, 2004.

Throughout the supervision period, Mr. Thompson maintained a cooperative attitude and from all indications fulfilled his parole obligations without difficulty. He made significant efforts towards reintegrating into the community, seeking employment and re-establishing family relationships.

No criminal concerns have surfaced and Mr. Thompson has not come to the attention of law enforcement officials since his return to Canada. By all accounts, Mr. Thompson remains committed to leading a law abiding lifestyle and does not pose any risk issues.

....2

Canada

-2-

With respect to Mr. Thompson's current application for entry into the US, I am aware of his strong desire to maintain close relationships with his son Michael Thompson and wife Jamie Thompson, both of whom are American citizens residing in the State of California. Further, it is my understanding that subject's wife Kathy, also an American citizen, has close ties to her family members residing in the US.

Therefore, in light of Mr. Thompson's successful completion of his sentence in Canada and positive reintegration into the community, I support his efforts in maintaining family ties in the United States.

Please feel free to contact me if you require further information.

Yours truly,

Marian Costaris
Acting Area Director
Correctional Service of Canada
2090 Wyandotte St. East, 3rd Floor
Windsor, Ontario
Canada
N8Y 5B2
Tel: (519) 257-6826
Fax: (519) 257-6832

Due to an on-going criminal action filed by the Government of Canada against RJ Reynolds Tobacco, Japan Tobacco International and seven of its executives with respect to tobacco smuggling, the RCMP is unable to provide a written letter of support on my behalf.   I have worked closely with Sgt. Walter Spilkin of the RCMP in providing valuable information in their investigation. Sgt. Spilkin asked me to forward his business card to you and encourages you to follow-up with him personally by telephone.


Les Thompson



Royal Canadian          Gendarmerie royale
Mounted Police          du Canada

**Sgt. Walter Spilkin**
Customs and Excise          Des Douanes et de L'accise
Special Projects          Projets spéciaux
Toronto West Detachment          Detachement Toronto Ouest

Canadä

**Busi    Exposure Reduction Group Ass    s, LLC**

*Finding Hidden Risks, Charting A Safe Course*

28 September 2004

U. S. Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, D.C.

PRIVILEGED AND CONFIDENTIAL

Ref: Mr. Les Thompson

Dear Sir or Madam:

   BERG Associates LLC is a small consulting firm specializing in among other things, the support of civil-litigation cases in the U.S. Federal Courts. We write this letter on behalf of Mr. Les Thompson, who we have come to know over the course of the past three years. For your information the three members of our firm are:

Larry. C. Johnson – a former Central Intelligence Agency (CIA) analyst and former Deputy Director in the U.S. State Department's Office of Counter Terrorism.

John F. Moynihan - a former Drug Enforcement Administration (DEA) Intelligence Specialist dedicated to financial analytical support in developing money-laundering investigations worldwide.

Robert J. Nieves – retired from DEA as the Chief of International Operations. As DEA's principal representative to the Interagency and International Community (U.N., OAS, Interpol), Mr. Nieves was charged with formulating and implementing DEA's International Counter Drug and Financial Crime Strategies.

   We are currently engaged in supporting a matter before Judge Nicholas Garaufis, USDC, Eastern District of New York, involving cigarette smuggling and money laundering. In this case, BERG Associates is working with and representing foreign governments and assisting them in the collection of evidence against RJR Nabisco. <u>Mr. Thompson has been cooperating with us in this matter for the past three years. The information that Mr. Thompson has freely and voluntarily provided to the investigative team has been very important to our understanding of the cigarette smuggling business and the RJR personalities involved. In no small part, the information that he has provided figures prominently in the complaint against RJR. You should also know that Mr. Thompson has asked for nothing in return for his cooperation and we have every belief that this cooperation will continue.</u>

As is clear from our backgrounds in the CIA and DEA, we are quite familiar with the national security concerns that may arise when considering the granting of a waiver in a case such as Mr. Thompson's. That said, we are quite comfortable in assuring you that over the course of the years we have come to know Mr. Thompson, we are agreed that he does not now or will not in the future, pose a threat to our nation's security. Through our relationship, we have come to learn that Mr. Thompson recognizes the mistake that he made and in our view, is fully repentant and through his cooperation with this case, is demonstrating his willingness to make amends for his one indiscretion.

Lastly, but probably most importantly, we are concerned with Mr. Thompson's ability to bring unity back to his family now that his legal ordeal is over. Mr. and Mrs. Thompson have been residing in Canada and their son and daughter-in-law reside in California. This young couple is expecting their first child and the fact that Mr. Thompson has not been able to visit California, has created a hardship on the family and a great amount of stress. This hardship and the attendant stress will only increase once his grandchild is born.

In closing, we want to thank you for your attention to this matter. If we can be of any further assistance, please do not hesitate to call us immediately.

Sincerely,

Robert J. Nieves
Member, BERG Associates LLC
(703) 850-4579

2



1299 PENNSYLVANIA AVE., NW
WASHINGTON, DC 20004-2402
PHONE 202.783.0800
FAX 202.383.6610
A LIMITED LIABILITY PARTNERSHIP

KENNETH C. ANDERSON
SPECIAL COUNSEL
202.383.7303
andersonken@howrey.com

September 28, 2004

U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Services

> Re:    Leslie Thompson - I-192 - Application for Advance Permission to
> Enter as Nonimmigrant

Dear To Whom It May Concern:

My name is Kenneth C. Anderson.  For the past five years I have been employed as special counsel by the Washington, DC based law firm of Howrey Simon Arnold & White, LLP. Earlier in my career I was an attorney in the Antitrust Division of the United States Department of Justice for sixteen years where, among other things, I served as chief trial counsel in *United States v. AT&T*, was a section chief and handled numerous criminal investigations.

I came to know Les Thompson in connection with my work on a huge class action lawsuit Howrey Simon brought against the major tobacco companies on behalf of all tobacco growers and quota owners.  RJR was one of the defendants.  During the extensive discovery phase of the litigation I learned that the Department of Justice had undertaken an investigation of a Canadian subsidiary of RJR and other companies, which led me to discover that Les Thompson had been persuaded to negotiate a plea which resulted in his being incarcerated in the federal prison system.  Further inquiry led me to his wife Kathy who told me Les had been transferred to a federal prison in North Carolina so that he could more readily assist the Federal prosecutors in Raleigh who were conducting a grand jury investigation of RJR and others.

Through Kathy I learned that Les was willing to be interviewed by me so that I could more fully understand the illicit smuggling operations which RJR and others were involved in (for which Les had been prosecuted).  Les authorized Kathy to make several boxes of documents available to me prior to my interview of him in order that I might more fully understand the factual background.  I then spent several hours interviewing Les, who had been a senior corporate executive with a Canadian subsidiary of RJR, and found him to be extremely forthcoming and surprisingly free of bitterness (after all, he negotiated a plea deal at the advice of RJR's outside counsel who, at the time also represented him – whereupon RJR and its counsel unceremoniously abandoned him to his fate.)  I have neither seen nor communicated with Les since that interview, which I believe occurred in 2001 or 2002.

Les is what you would expect – a very decent, well spoken, intelligent former member of the corporate hierarchy who got caught up in an elaborate corporate sanctioned effort to avoid high duties on cigarettes through a series of complicated transfers of the product among different countries.  He, in my view, is the classic fall guy – RJR itself somehow managed to avoid

U.S. Department of Homeland Security
September 28, 2004
Page 2

prosecution.  So, now he is back in Canada living a typical member middle class lifestyle, troubling no one and certainly no threat to anyone.

As I understand the situation, Les and Kathy – who has stood steadfast with Les through all his trials and tribulations – have a son who lives in California.  The son's wife is expecting a child in March.  Naturally, Les very much wishes to travel with Kathy to visit his son and his family, but cannot do so unless he secures a waiver from the Homeland Security Department.

I assume that the issue of whether national security would somehow be imperiled by granting a waiver to Les.  It most clearly would not be compromised in the slightest.  The poor guy made a tragic mistake by going with the flow in the corporate suite – so far as I'm aware, his record both prior and subsequent to that mistake is clean.  In short, Les is the classic white collar criminal who paid the price.  He should now be permitted to participate in everyday life, such as visiting his son and grandchild.  Not to grant his request for a waiver would constitute a grave injustice in my view.

Very truly yours,

Ken Anderson

COX,
HODGMAN &
GIARMARCO, P.C.

Attorneys and Counselors at Law

Tenth Floor Columbia Center
101 West Big Beaver Road
Troy, Michigan 48084-5280

(248) 457-7000
Fax (248) 457-7001
www.chglaw.com

DETROIT • LANSING • TROY

☎ Direct Dial: (248) 457-7110
📧 E-Mail: gmager@chglaw.com

| | | | | |
|---|---|---|---|---|
| John B. Alfs | Joseph F. Dillon | Daniel J. Kelly | G. Gus Morris | Sean M. Walsh |
| Michael M. Antovski | Gregory J. Gamalski | J. Claibourne Kelly | Timothy J. Mullins | Linda M. Watson |
| Andrew T. Baran | Julius H. Giarmarco | Barry L. King | Kevin M. Nalu | Matthew S. Weaver |
| Mary Elizabeth Barnes | Kalman G. Goren | Salvatore J. LaMendola | Christopher J. Nelson | Robert B. Webster |
| Larry W. Bennett | Gilbert Gugni | Adam Levitsky | Timothy R. Noonan | Richard A. Wojewoda |
| Peter J. Bill | Bruce W. Haffey | Roy A. Luttimann | Joseph G. Odish | Marsha M. Woods |
| David A. Binkley | William H. Heritage, III | George J. Mager, Jr. | Joseph F. Page, III | Robin E. Yono |
| Basil M. Briggs | Stephen J. Hitchcock | Thomas J. McGraw | Ryan Lee Perry | James P. Zavell |
| Robert A. Bryant | William D. Hodgman | Brian J. McMahon | Dennis M. Rauss | |
| Thomas P. Cavanaugh | William L. Hooth | George D. Mercer | Robert Q. Romanelli | |
| Kenneth B. Chapie | William H. Horton | Charles Milne | Kenneth J. Sachs | |
| John C. Clark | Elise V. Iafrate | Bradley S. Mitseff | Michelle T. Thrasher | |
| Douglas C. Dahn | Paula Johnson-Bacon | Carl Mitseff | Thomas L. Treppa | Of Counsel |
| Randall A. Denha | Kaveh Kashef | Thomas J. Mohan | Paul G. Wakefield | Gilbert C. Cox, Jr. |

October 21, 2004

United States Department
of Homeland Security
Washington D.C.

Re:   **Leslie Thompson**

Dear Officer:

I have known Leslie Thompson ("Les") and his wife, Kathy, and son, Michael, for more than thirty years. Les is a very close friend and our families have enjoyed vacations together, and shared holidays, birthdays, weddings, anniversaries and other significant events. We have spent a great deal of time together and I believe I really know Les. He has always been a person whom I have admired and sought to emulate.

Les is a good husband and father. He has always been dedicated, loving and supportive of Kathy. They enjoy a close and loving relationship. Les is also very involved with his mom and brothers and sisters and their families in Canada and with Kathy's family in the U.S. He is always helping friends and family.

Les has been a great role model for Michael. He was always hard working at work and at home, but took time as Michael was growing up to be with his son and enjoy Michael's participation in baseball, hockey and other sports. He would often take Michael to sporting and other events that boys enjoy. As Michael grew older, they would cycle together. Michael learned from his father how to work hard, take care of a home and enjoy recreation. Today, Michael lives in California, a long way from his father, but he has carried his father's lessons with him. He works hard, takes good care of his home, and is a loving dedicated husband. He also finds time to teach young boys how to play hockey.

United States Department
of Homeland Security
October 21, 2004

They are very close to each other, father and son, and now Michael is about to become a father. Les will be a super grandfather. You can imagine the agony that both the father and son feel because Les will not be able to visit his grandchild.

Les and Kathy, and Michael and his wife, Jamie, will all suffer greatly if Les is not permitted to visit his grandchild in California. Les should be granted a waiver to allow him to visit his son, daughter-in-law and grandchild in the U.S.

If you witnessed the way Les cares for his family, the way he takes care of his home, the respect others have for him; if you experienced his personality and his character; you would realize that Les is the kind of person all of us want to have as a friend, confidant, and brother. He does not in any way pose a risk of harm to society. He is not a threat to our homeland security. He should be welcomed into our country.

I have been an attorney in the State of Michigan for thirty years, upholding the laws of Michigan and the United States and educating my clients about our laws and respect for them. On the basis of that experience, I know that Les will not abuse the privileges a waiver will provide him and that he will honor the laws of the United States. He is a gentle man, loving husband, dedicated father, and great friend who respects others and values relationships.

Please grant Les' request for a waiver.

Very truly yours,

George J. Mager, Jr.

/lae

# Communauté Paroissi
## de l'Annonciation
## Parish Community
### Pointe-aux-Roches, Ontario

c.p. 10,
(519) 798-3118

N0R 1N0
(Fax) 798-1076

September 30, 2004

U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, D.C.

To whom it may concern,

I have personally known Les Thompson throughout my 23 years of ministry in the priesthood. During the first four years of parish work, he along with his wife Kathy and their son Michael were members of the Catholic community of St. Simon & St. Jude Parish in Belle River, ON, Canada. The family attended church weekly and we often socialized. I came to know Les and his family quite well during those years and we developed a friendship.

Since those early years, I have been transferred twice and Les and his family have moved around as well. Nonetheless, we have always kept in touch and visited one another when possible.

When Les returned to Canada following his incarceration, he immediately began to put his life back together. Through the struggles and trials, I believe that he has become a better person. He is surrounded by a supportive and caring family and by a good number of friends.

Les and Kathy's son married an American citizen. They are now expecting their first child. The news has brought great excitement into the Thompson family. It has also been the cause for worry and suffering. Les and Kathy want to be part of their son, daughter-in-law and grandchild's life. That will be made difficult because of the restriction upon Les to cross the border.

Les is a family man who sincerely loves his only child, his wife and their unborn grandchild. I believe that the entire family would benefit by his freedom to visit one another without restrictions. I also know that he would not be a threat to the United States if the government were to approve a waiver.

Please feel free to contact me at the Parish Office of Annunciation Church in Stoney Point, ON, Canada at (519) 798-3118 should you require further information.

Sincerely,

Rev. Dwayne A. Adam

Rev. Dwayne A. Adam, p.p.

# BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
www.bartlit-beck.com

CHICAGO OFFICE

COURTHOUSE PLACE
54 WEST HUBBARD STREET
CHICAGO, IL 60610
TELEPHONE: (312) 494-4400
FACSIMILE: (312) 494-4440

DENVER OFFICE

1899 WYNKOOP STREET
8TH FLOOR
DENVER, CO 80202
TELEPHONE: (303) 592-3100
FACSIMILE: (303) 592-3140

WRITER'S DIRECT DIAL:
(303) 592-3136
fred.bartlit@bartlit-beck.com

September 29, 2004

U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, D.C.

To Whom It May Concern:

I write to support Les Thompson's waiver application so that he may visit the United States and in particular his family in California.

I have been a trial lawyer handling both civil and criminal matters for over 40 years and have a great deal of first-hand experience judging character.

I have known Les for 5 years. I first met him as I was investigating R.J. Reynolds' conduct in allegedly participating in the smuggling of Canadian tobacco. My partners and I have since spent substantial time with Les over the years. In our dealings with Les he has been extremely helpful and cooperative. He is contrite, honest, decent, thoughtful, and genuine. I trust Les completely and would gladly sponsor his visit(s) to the United States in any way, shape, or form. Les is rehabilitated from any wrongdoing and poses no threat to our country.

Les has endured great hardship and continues to do so. For example, his only child, Michael, lives in California and Les has been unable even to visit Michael and his new bride. Indeed, I understand that Michael is expecting his first child in the spring and it would be unfair and a great hardship to prevent him from visiting with his first grandchild at that time.

I respectfully urge you to grant Les' application and request to visit his family in California. Please let me know if you have any questions or if I can provide any other information.

Sincerely,

Fred Bartlit

Fred H. Bartlit, Jr.

# BUTZEL LONG
ATTORNEYS AND COUNSELORS

Clara DeMatteis Mager
313 225 7077
mager@butzel.com

Suite 100    150 West Jefferson
Detroit, Michigan 48226
T: 313 225 7000  F: 313 225 7080
butzel.com

October 12, 2004

United States Department
of Homeland Security
Washington, D.C.

    *RE:    Leslie Thompson*

Dear Officer:

    I am writing this letter in support of the I-192 Waiver filed by Mr. Leslie Thompson ("Les"). I am currently a shareholder and Immigration Practice Group Manager at Butzel Long, P.C., a law firm of approximately 200 attorneys. I have known Les, his wife, Kathy and their son, Michael, for over 30 years. During these 30 years, we have maintained a strong and active friendship. We have gone on numerous vacations together, have shared holidays, birthdays and anniversaries, and have spent a lot of time together.    I know Les very well and believe I am qualified to make the following statements.

- Les is a dedicated and supporting spouse, a loving and committed father, a truly outstanding friend and a tireless and supportive employee and co-worker.
- Les is very involved with his family and Kathy's family, compassionate to their needs, always lending a helping hand.
- Les does not pose a risk of harm to the society. His wife, Kathy, and their son Michael are U.S. Citizens and Les has the utmost respect for the United States.
- Michael and his wife, Jamie, live in California and are expecting their first child. Les and Kathy will be the best grandparents. They want to be involved and available to provide assistance, love and support.

    I know that if the waiver is not granted, Les and Kathy will suffer tremendously – not having the freedom to travel to California to see their grandchild, and visit their son and daughter-in-law.

    In my 17 years as an immigration attorney, I have not seen a more deserving applicant for a waiver. Les is a gentlemen, a great husband, a dedicated father, a truly wonderful friend, a supportive employee, a team player who respects life, the law and his relationships.

    Les has suffered greatly during the last five years. Kathy, Michael, Jamie and their families and friends have also suffered. During these difficult times, Les has maintained his

United States Departme
of Homeland Security
October 12, 2004
Page 2

belief in God and the hope that he will be permitted to travel to the U.S. – and to visit and share time, holidays and travel in the U.S. His home is in Canada. Michael, Jamie, their unborn child, Kathy's family and many many friends live in the U.S.

I sincerely ask that you give favorable consideration to Les' request for a waiver. I am certain that Les will not abuse the laws of the United States, does not pose a risk of harm and will return to Canada after his visits to the United States.

If you need further information, or wish to discuss this with me, please do not hesitate to contact me at (313) 570-8993 (cell); or (313) 225-7000 (office).

Very truly yours,

BUTZEL LONG, P.C.

Clara DeMatteis Mager

CDM/lkh

701508



**PERLEY-ROBERTSON, HILL & McDOUGALL LLP**

*Lawyers / Patent & Trade-Mark Agents*
*Avocats / Agents de brevets et de marques de commerce*

Reply to/Communiquez avec:
**David H. Hill, C.M., Q.C.**
(613) 566-2800 dhill@perlaw.ca

September 27, 2004                                          BY MAIL

United States Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, District of Columbia
U.S.A.

Dear Sir/Madam:

Re:    Leslie Stephen Thompson
       I-192 Application for Advance Permission to Enter as Non-Immigrant

I am writing in support of the above referred to application and, in particular, to indicate my belief in the character and integrity of Leslie Stephen Thompson.

I have known Mr. Thompson for several years, including during his legal difficulties, his conviction, incarceration and parole.   I understand that his parole terminated August 8, 2004.

Mr. Thompson has family residing in the United States and I am writing to support his request to allowed to enter the United States, particularly in order to visit his family.  I know, very directly, that Mr. Thompson places great importance on his family and that his inability to visit the United States puts a tremendous burden on his family.

I have no hesitation in recommending that Mr. Thompson be allowed to visit the United States.

Yours very truly,

David H. Hill, C.M.,Q.C.
3:gd

90 RUE SPARKS STREET, OTTAWA, ON, CANADA K1P 1E2 T: 613-238-2022, 1-800-268-8292 F: 613-238-8775 WWW.PERLAW.CA

INTERNATIONAL ALLIANCE / ALLIANCE INTERNATIONALE · COZEN O'CONNOR
ATLANTA – CHARLOTTE – CHICAGO – DALLAS – DENVER – LAS VEGAS – LONDON, U.K. – LOS ANGELES – NEW YORK – NEWARK
PHILADELPHIA – SAN DIEGO – SAN FRANCISCO – SEATTLE – WASHINGTON, DC – WICHITA – WILMINGTON

*David T. Sweanor B.A., J.D.*
*Adjunct Professor*
*Faculty of Law and Faculty of Medicine*
*University of Ottawa*
*dsweanor@uottawa.ca*
**1-613-799-0665**

Mailing address:   1890 Norwood Ave.
Ottawa, Ontario K1H 5K6
Canada

September 23, 2004

U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, DC

Dear Sirs:

> Re:  Leslie Stephen Thompson
> I-192, Application for Advance
> <u>Permission to Enter as Nonimmigrant</u>

I have worked as a lawyer and policy expert on public health issues concerning tobacco for over 20 years. My career has included work with the World Health Organization, World Bank, Pan American Health Organization, International Union Against Cancer, American Medical Association, American Cancer Society and numerous other international, regional, national and local organizations. Among other things I have testified before committees of both the US Senate and the House of Representatives and contributed to reports of the Surgeon General and the National Cancer Institute.

I have had the privilege of knowing Les Thompson for several years and am writing to support his application for permission to travel to the United States. I first met Mr. Thompson in 1999 when, as a result of research I was doing on tobacco smuggling I contacted him for information and assistance. From our first contact he has been open and honest and extremely helpful.

In my view Mr. Thompson is an outstanding individual with great personal integrity who got caught up in a corporate intrigue that is still unfolding. He acknowledged his role, was a model inmate while serving his time and is now fully rehabilitated and playing a key role in efforts of various government bodies and law enforcement agencies to pursue justice. He is a kind and generous man and certainly nothing but an asset in any place to which he would travel.

*Page 2 of 2*

What happened to Mr. Thompson over the past few years was personally devastating to him. But more than that, it was devastating to his family. He is very much a family man, dedicated to Kathy, the woman he married while they were both young and just starting out, and to his son Michael and daughter-in-law Jamie. He is also full of anticipation over the expected birth of his first grandchild.

The inability to travel to the United States is a great hardship for Mr. Thompson. The town where he grew up and where he currently lives is right next to Detroit. His wife Kathy is an American citizen who works in Detroit. His mother-in-law is in poor health and unable to leave the US to see him. Perhaps most importantly, Michael [Mr. Thompson's only child] lives and works in California. As a young couple early in their careers and with all the added time and energy that will soon be occupied by their impending parenthood, Michael and Jamie will have only infrequent opportunities to travel to see Mr. Thompson.

Allowing Mr. Thompson the opportunity to travel to the United States would remove a truly significant hardship from his life. It would also reinforce the family values that are so important in both our countries by allowing him to participate fully in the life of his family and allowing his family the benefit of his love and guidance.

Please do not hesitate to contact me should you have any questions.


Yours sincerely,


David T. Sweanor

October 18, 2004

U.S. Customs and Border Protection
Department of Homeland Security
International Bridge Plaza
Sault Ste. Marie, MI  49783

Attention:  Officer Roger Koistinen

Dear Officer Koistinen:

> Re:    Leslie Stephen Thompson
>        I-192, Application for Advance
>        Permission to Enter as Nonimmigrant

My name is Jamie Thompson and I am not only Leslie Thompson's daughter-in-law, but his friend as well. I am married to Les' only child, Michael Thompson. I am originally from North Carolina where Michael and I met and began dating on the campus of Western Carolina University in September 1994. In September 1997, Michael and I moved to Santa Clara, California where we currently reside.

Please allow me to get right to the point. I have many, many reasons to ask you to grant Les entry into the United States, but in this letter I will only focus on what I consider the most pertinent. I am four months pregnant with what Michael and I believe will be Les and Kathy Thompson's only grandchild. Michael and I have been a couple for over ten years and have desperately wanted to start a family for many years now. Most couples delay this due to financial reasons, but our delay has been due to the fact that Les is not able to enter the US. You can only imagine how difficult of a decision this has been for us not knowing whether or not Les will be allowed visitation in California.

Michael and his parents are extremely close and both Les and Kathy have very much made me feel a part of their very tight-knit family. Les is a wonderful husband, father, son, and friend. I have no doubt that he will be the proudest grandfather in the world. I dream of that day in March 2005 when Michael can exit the (US hospital) delivery room and look BOTH his mother and father in the eyes and say, "IT'S A…"!!!

Thank you for your time and consideration.

Sincerely,

Jamie L. Kuhneman-Thompson
1690 Civic Center Drive, #607
Santa Clara, CA  95050
408.423.9162

October 8, 2004


U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, D.C.

        RE:    Leslie Stephen Thompson
                12905 Riverside Drive E., Tecumseh, ON, Canada
                I – 192, Application for Advance
                Permission to Enter as Nonimmigrant

Dear Sir or Madam:

I am writing to you as the mother – in – law of Leslie Thompson and in support of his Application for Advance Permission to Enter as Nonimmigrant.

Les' parole was fulfilled in August 2004.

Les' son and daughter – in – law live in California and are expecting their first child. Les is extremely close to both his son and daughter – in – law. Not being allowed to be present for his first grandchild's birth would be a terrible disappointment.

Les has always treated me with the utmost respect. He has never given me any reason to question his genuineness and commitment to his family as well as mine. Les is a valued member of this family.

Les is not and has never been a danger to the United States. Please grant my request and allow Les to enter the United States as a nonimmigrant.

Sincerely,

*Patricia A. Burkeen*

Patricia Ann Burkeen
10204 W. 80th St. #45
Overland Park, KS
66204

October 18, 2004

U.S. Customs and Border Protection
Department of Homeland Security
International Bridge Plaza
Sault Ste. Marie, MI  49783

Attention:  Officer Roger Koistinen

Dear Sir;

> RE:    Leslie Stephen Thompson
>        I-192, Application for Advance Permission
>        To Enter as Nonimmigrant

I am writing to you as the only child of Leslie Thompson and in support of his
Application for Advance Permission to Enter as Nonimmigrant.  Allowing my father to
travel to the United States would dramatically change my life for the better and allow my
parents, and my wife and I to again function as a real family.

As an only child, I am very close to my parents and dependent on them for direction and
guidance, especially my father.  My father and I have always shared a special bond and
when I married in 1999, he was my best man.  No matter what activities I've pursued in
my life, whether it involved sports or school, he's always been there for me with support
and guidance.  Like most kids, I spent my formative years in hockey rinks, and on
baseball, soccer and lacrosse fields.  My father was and is my biggest fan and never
missed a game no matter where it was held.  I still play competitive hockey and my father
is the first person I call with game results.  I want to share this important part of my life
with my father.  I want to see him in the stands watching me play.

When my fiancée and I moved to California after graduating from university, it was a
difficult decision to leave our families but a decision that was made with the knowledge
that my parents would visit often, which they did until February 2000 when my father
was incarcerated.

Since my father's release from prison in 2002, he has not been allowed to cross the US
border.  Given that both my wife and I work long hours in the technology field and have
limited vacation time, my father's inability to visit creates an incredible hardship on us.
The only time we can spend with him is when we have the time to travel to Canada.  This
puts great stress on all of us, but more importantly, it is a great burden on my father as he
bears the guilt of knowing that we should be sharing times together and we are unable to.
Also there is considerable stress on my wife and I since any spare time and money we
have are spent traveling to Canada.  The result is that I am lucky to see my father twice a

year for a few days each trip. At this time in our lives we need to be spending more together, not less.

Since my father's last visit in 1999, my wife and I have built a life in California. We purchased a townhouse in Santa Clara, have made great friends and have become involved in our community as volunteers and participate in local athletics. We want to share the life we have created in California with my father. Since my father's release from prison in 2002, my mother has visited twice, and although my father encourages her to visit more often, she doesn't because it is very hard for all of us to enjoy a visit when the only way to make my father a part of the visit is through the telephone. A visit isn't the same when one parent is missing.

My father is approaching 60 and I'm 31. My father is very important to me and he won't be here forever. I want him in my life as much as possible. We are a family that has stuck together through a difficult seven years. My father did not spend two years in what some people refer to as "Club Fed" – he had a difficult incarceration. I lived in fear for his life every day of those two years in prison. Now that the nightmare of his incarceration is over, my family simply wants to be together. Allowing my father to visit the US would allow that to happen and it would take a guilty burden off my father's shoulders. He has suffered enough through this ordeal and deserves to spend time with his small family.

Finally, and most importantly, my wife and I are expecting our first child and my parents' first grandchild in March. We are very happy for this blessing, but without my father having the ability to visit us in California, there is a dark cloud hanging over all of us. I cannot imagine the scenario of having a child in California and my father not being able to visit. My father is the personification of a family man and I want him in my child's life. To deprive my father of the ability to be an active participant in his grandchild's life would be the ultimate sacrifice for him to make.

California is where we made our home and allowing my father to visit us would make all the difference in the world to us. Not allowing my father to visit essentially gives my parents, my wife, me and our unborn child a continued prison sentence.

In closing, I would like to thank you for reviewing this application.

Very truly yours,

Michael J. Thompson
1690 Civic Center Drive #607
Santa Clara, California, USA
Mobile - 408.591.5956
Home - 408.423.9162

October 15, 2004


U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Services
Washington, DC

      Re:    Leslie Stephen Thompson
              12905 Riverside Drive E., Tecumseh, ON, Canada
              I-192, Application for Advance
              Permission to Enter as Nonimmigrant

Dear Sir or Madam:

I am writing to you as the wife of Leslie Thompson and in support of his Application for Advance Permission to Enter as Nonimmigrant.

When Les was transferred from the United States to Canada in January, 2002 vis-à-vis a treaty transfer, one of the most difficult conditions he had to accept was that he would be unable to visit the United States without obtaining a waiver. As soon as Les's parole was fulfilled (August, 2004), we sought a lawyer and began the I-192 process.

I am a U.S. citizen living in Tecumseh, Ontario, Canada, working in Detroit, MI. Our only child, Michael, and daughter-in-law, Jamie, both U.S. citizens, live in California. We are a small family and very close. In 1999, Les was Michael's best man at his wedding and they are as close as a father and son can be. When Jamie came into our lives, she became a vital part of our closely knit group and quite frankly, the daughter we never had. We have recently learned we are to become grandparents in March, 2005.

During Les's incarceration, he never felt sorry for himself – certainly if he did he never let it show to his family. His one and only concern was for Michael, for Jamie and for me – how we were coping, how we were getting through the day, that we were staying strong and looking to the future. It was his positive attitude, humor, and zest for life that got all of us through those difficult years.

From the time of his arrest (February, 1999 – Detroit, MI) until his sentencing in December, 1999 (Binghamton, NY), and surrendering himself to fulfill his sentence (February, 2000 – Fort Dix, NJ), Les lived in our marital home in Tecumseh, ON. He traveled freely between Canada and the United States during that time period. By allowing his movement between the countries, the court did not feel there was a risk of flight, and certainly no threat to the United States by his presence. Les is not, has never been, nor will ever be, a danger to the United States.

Page Two
October 15, 2004

All of my extended family lives in the United States.  My mother who lives in Kansas has colon cancer and is unable venture far from home and consequently has not seen Les since his release from prison.  Les and my mother do not have the stereotypical son-in-law/mother-in-law relationship.  They have always had great respect for each other and enjoy each other's company.  They communicate frequently via e-mail and telephone and I know that each of them feels a deep loss that they cannot visit with each other.

When someone asks Les whether he is bitter about having spent two years in prison, his response is always the same, and surprising.   He feels to be bitter about that period of his life is unproductive and that he has to take the positives from that experience and move forward with his life.  Les doesn't dwell on what has been, but only looks to the future.  An extremely vital, important part of our family's future is Les's ability to travel to the United States.  For Les not to be a part of his grandchild's life would be the ultimate sacrifice for our family.  Our family, especially Les, has suffered enough.  I ask that you grant this waiver.

Very truly yours,

Kathleen M. Thompson
12905 Riverside Drive E.
Tecumseh, ON
N8N 1A9



ALIEN REGISTRATION RECEIPT CARD
PERSON IDENTIFIED BY THIS CARD IS ENTITLED TO RESIDE PERMANENTLY AND WORK IN THE U.S.

IR1 NYC 940603 574  4181438055

A1USA044149056<01<9407<<<<<<<
4706090M0407137<<<<<<BF62D6205
THOMPSON<<LESLIE<STEPHEN<<<<<<







Ontario

of the Registrar General
au du registraire général

Certified
A True
Photostatic
Print
of a Record

Photocopie certifiée
conforme d'un document

on file at the
se trouvant dans les dossiers du

Office of the Registrar General
Ontario, Canada

Bureau du registraire général
(Ontario) Canada

Registration Number:
Numéro d'enregistrement:   1947

Date issued:
Date de délivrance:   Dec 20 1993

93343554-01 -2
PAGE 1 OF 1

# REGISTRATION OF A LIVE BIRTH

No. 044234

1. PLACE OF BIRTH:
City, Town or Village of ... WINDSOR, ONT.
County or District of ... ESSEX COUNTY
Street or road ... HOTEL DIEU HOSP.

1. PRINT FULL NAME OF CHILD ... LESLIE STEPHEN THOMPSON
4. Date of birth ... JUNE 9 19 47

1. Sex of child ... MALE
5. Rank in X on the proper word ... 7th

2. Was this a premature birth? ... No

8. PRINT full name ... FATHER ... ROY STEPHEN THOMPSON
9. Permanent residence ... 14.86 ALBERT RD.
10. Citizenship ... CANADIAN
11. Racial Origin ... SCOTCH
13. Birthplace ... BELLEVILLE ONT.

MOTHER ... JOSEPHINE PROSKIE
14.56 ALBERT RD.
CANADIAN
POLISH
SASKATCH CANADA

16. Permanent residence ... HOUSE WIFE

21. Name and post office address of Informant ... Roy S. Thompson, 1486 Albert Rd, West.
24. Name of doctor, nurse or other person in attendance at birth or who saw child ... Dr. G. George Windsor, Ont.

— CERTIFIED COPY —
NOT VALID WITHOUT ALL PAGES

Edward J. Kelly

Deputy Registrar General
Registraire générale adjointe.



CANADA
PROVINCE OF ONTARIO
*PROVINCE DE L'ONTARIO*

Toronto Region
(Region / Région)

Information of .. Corporal A. Garry DOYLE .................
*Dénonciation de:*

. Royal Canadian Mounted Police .................

. Peace Officer ................ .......... The informant says
(occupation / profession)                                *Le dénonciateur*

that he/she believes on reasonable grounds that
*déclare qu'il a des motifs raisonnables de croire*

(1)     that
        *que*    Leslie THOMPSON (DOB: 1947-06-09)

XX XX XX XX XX XX XX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX XX XX XX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

Between January 1, 1991 until December 31, 1996, at the City of Toronto and the City of Cornwall
and elsewhere in the Province of Ontario and the City of Montreal and elsewhere in the Province
of Quebec, and elsewhere in Canada, in the City of Niagara Falls, and in the Town of Massena,
in the State of New York and in the City of Winston Salem, in the State of North Carolina and
elsewhere in the United States of America and on the Island of Puerto Rico, United States
Protectorate and in the Country of Aruba in the Dutch Antilles and in the City of Geneva, and
elsewhere in the Country of Switzerland and elsewhere, unlawfully did conspire with others to
commit the indictable offence of fraud by agreeing to deal in cigarettes and fine cut tobacco
in a manner which fradulently deprived Her Majesty the Queen in Right of Canada, Her Majesty the
Queen in Right of Ontario, and Her Majesty the Queen in Right of Quebec of revenue of a value
exceeding five thousand dollars ($5,000.00) contrary to the Criminal Code of Canada.

(Long Form – One or More Accsd.                                          (Continued on Page 2 within
*Formule complète – Un ou plusieurs acc.)*                                *(Suite à la page 2 ci-incluse*

CC 0935 (rev. 05/93)



OFFICE FOR DISABILITY ISSUES    OFFICE DES AFFAIRES DES PERSONNES HANDICAPÉES
INFORMATION SERVICE FOR BARRIER FREE COURTS    SERVICE D'INFORMATION SUR LES TRIBUNAUX A ACCES FACILE
1-800-387-4456    1-800-387-4456

APPEARANCES - ADJOURNMENTS

| Date / Date | Accused / Accusé(e) | Appears Adjournment (Remand to) Comparution Ajournement (Renvoi) | Parties Consent Consentement des parties | Bail and/or other Action Cautionnement et/ou autre mesure | Fails to Appear Omet de comparaître | Bench Warrant Mandat d'arrestation | Discretion Discrétion | Estreat Confiscation |
|---|---|---|---|---|---|---|---|---|
| FEB 19 2000 | Thompson | | | DISPOSED | | | | |

| Date / Date | Clerk / Greffier | Reporter / Sténographe | For Crown / pour la Couronne | For Accused / pour l'accusé(e) |
|---|---|---|---|---|
| | Trudeau | Macdonald | Berstein | Code M. ... WSC |

CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL COPIE AUTHENTIQUE CERTIFIÉE ET CONFORME À L'ORIGINAL

AUG 2000

CLERK OF THE COURT ONTARIO COURT OF JUSTICE GREFFIER DE LA COUR COUR DE JUSTICE DE L'ONTARIO

Accused/Accusé(e)

Notice Given Under H.T.A. Avis en vertu du Code de la route

Z 154(3) Impnd.

No. of Information/*N° de la dénonciation*
**10000723**

Return Date of Summons/*Sommation rapportée le*
19

# INFORMATION Against/*DÉNONCIATION visant*

Leslie THOMPSON (DOB: 1947-06-09)
12905 Riverside Drive East
Tecumseh, Ontario.

**ADDRESS**
*ADRESSE*

## CHARGE/ACCUSATION

Conspiracy to Commit Fraud
Section 465(1)(*d*) C.C.C.

☐ Summons
*Sommation*

☐ Warrant
*Mandat*

☒ Arrest
*Arrestation*

☐ Reportable M.V.
Offence (H.T.A. 184)
*Rapport V.M. (Code
de la route 184)*

☐ CVOR No. (Commercial Vehicles Only)
*Numéro vu.co. (véhicules utilitaires seulement)*

| Sex *Sexe* | Birth Date/*Date de naissance* Day/*Jour* Month/*Mois* Year/*Année* | Was defendant owner? *Le défendeur était-il propriétaire?* |
|---|---|---|
| X | | ☐ Yes/*Oui* ☐ No/*Non* |

Driver's Licence Number/*Numéro du permis de conduire*

Plate No. *Numéro de plaque*

☐ Involves an Accident
*Infraction reliée à un accident*

Informant
*Dénonciateur*

A. Garry DOYLE, Cpl.

Date Sworn
*Date où a été dénoncé*

Officer
*Agent/Agente*  R.C.M.P.

No *N°*  #31970

Div.
*Div.*  "O"

Dist.
*Dist.*  Toronto West

Court Region *Région où a été dénoncé*



CC 0935 (rev 05-93)      A-4

FOR IDENTIFICATION PURPOSES ONLY – AUX FINS DE L'IDENTIFICATION SEULEMENT

| Do not write in shaded areas.<br>Forward completed form to:<br><br>Commissioner, RCMP<br>Attention: Identification Services<br>    Directorate, Civil Section<br>PO Box 8885<br>Ottawa, Ontario<br>K1G 3M8 | Ne pas écrire dans les zones ombrées.<br>Transmettre la formule dûment remplie<br>à l'adresse suivante:<br>Le commissaire de la G.R.C.<br>À l'att. de la Direction du service de<br>l'identité judiciaire, Section des affaires civiles<br>C.P. 8885<br>Ottawa(Ontario)<br>K1G 3M8 | AFIS–S.A.I.D.<br><br><br>Bar Code – Barre-code |
| --- | --- | --- |

| | Thumb–Pouce | Index | Middle–Médius | Ring–Annulaire | Little–Auriculaire |
| --- | --- | --- | --- | --- | --- |
| RIGHT DROITE | | | | | |
| LEFT GAUCHE | | | | | |

IF ANY FINGERPRINT IS NOT RECORDED, GIVE REASON – IF AMPUTATED, DEFORMED OR INJURED, GIVE DATE
S'IL MANQUE UNE EMPREINTE, DIRE POURQUOI – EN CAS D'AMPUTATION, DE DÉFORMATION OU DE BLESSURE, DONNER LA DATE

FOUR FINGERS TAKEN TOGETHER–IMPRESSION SIMULTANÉE DES QUATRE DOIGTS

LEFT THUMB–POUCE GAUCHE          RIGHT THUMB–POUCE DROIT

| Signature of Person Fingerprinted<br>Signature de la personne dactyloscopiée<br><br>LESLIE S. THOMPSON | Signature of Official Taking Fingerprints<br>Signature du préposé aux empreintes<br><br>CST. Sarah TIFFIN #50494 | Date<br>Y–A  M  D–J<br>2004 10 06 |
| --- | --- | --- |

Surname(include former names, maiden name, etc.)–Nom de famille(y compris noms utilisés précédemment, nom de jeune fille, etc.)

THOMPSON

ORIGINAL



U.S. DISTRICT COURT — N.D. OF N.Y.
FILED
FEB 2 5 1999
AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk — Syracuse

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA                    Criminal Action No.
                                                 99-CR-93 (NAM)
        v.

LESLIE THOMPSON,
a/k/a LES THOMPSON,
                                             I N D I C T M E N T
            Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THE GRAND JURY CHARGES that at all times material herein:

1.     The St. Regis Mohawk Indian Reservation, also known as Akwesasne,
was located in the Northern District of New York.  The St. Lawrence River and the
international boundary between the United States and Canada pass through the
Reservation.

2.     Canadian-brand tobacco products were smuggled from the United
States to Canada through the Reservation in order to avoid the payment of Canadian
duties and taxes.

3.     The tobacco products were then sold for cash on the Canadian "black
market."

4.    The Canadian currency from these sales was thereafter converted to U.S. dollars which were deposited at financial institutions in the United States so that participants in the scheme could purchase additional Canadian-brand tobacco products.

## COUNT ONE

### THE ORIGINAL CONSPIRACY TO ENGAGE IN FINANCIAL TRANSACTIONS IN FURTHERANCE OF A SCHEME TO DEFRAUD THE UNITED STATES AND CANADA

Beginning on or about January 1, 1992, the exact date being unknown to the grand jury, and continuing up to at least October 26, 1996, in the Northern District of New York, and elsewhere, the defendant, **LESLIE THOMPSON**, and other persons, both known and unknown to the grand jury, did knowingly and intentionally combine, conspire, confederate and agree to commit an offense against the United States under Title 18, United States Code, Section 1956(a)(1)(A)(i), that is, to conduct, and attempt to conduct, financial transactions, affecting interstate and foreign commerce, which, in fact, involved the proceeds of specified unlawful activity, that is, a wire fraud scheme to defraud the United States and Canadian governments of revenue, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the financial transaction represented proceeds of the scheme to defraud the United States and Canadian governments of revenue, with the intent to promote the carrying on of this specified unlawful activity.

2

## THE SPECIFIED UNLAWFUL ACTIVITY

A.    It was a part of this conspiracy and scheme to defraud that the defendant and his coconspirators would supply Canadian-brand tobacco products from the R.J. Reynolds companies to individuals operating warehouses at the St. Regis Mohawk Indian Reservation in the Northern District of New York.

B.    It was a further part of the scheme that individuals who purchased these Canadian-brand tobacco products at the St. Regis Mohawk Indian Reservation in the Northern District of New York would thereafter cause these tobacco products to be smuggled from the United States into Canada where they were sold on the "black market" to avoid the payment of Canadian taxes and duties.

C.    It was further part of the scheme that, from time to time, the defendant's coconspirators would falsely represent that the Canadian-brand tobacco products would be exported from the United States, when in truth, and in fact, these Canadian-brand tobacco products were transported in interstate commerce to warehouses at the St. Regis Mohawk Indian Reservation in the Northern District of New York, thereby evading the payment of taxes due to the United States.

D.    It was further part of the scheme that Canadian currency (funds) generated by the scheme would be converted into United States currency which was utilized to conduct financial transactions promoting the scheme, including payments for the purchase of additional Canadian-brand tobacco products.

3

E.    It was a further part of the scheme to defraud that the tobacco products to be utilized in the smuggling scheme would be purchased through interstate and international telephone calls, facsimile, and wire transmissions.

## OVERT ACTS

In furtherance of the conspiracy and to effect the objects and purposes thereof, the following overt acts, among others, were committed or caused to be committed by the defendant, and other conspirators, in the Northern District of New York and elsewhere:

1.    On or about March 25, 1992, **LESLIE THOMPSON** met with Larry Miller, Lewis Tavano, and Robert Tavano at the Como Restaurant in Niagara Falls, New York.

2.    On or about April 8, 1992, **LESLIE THOMPSON** began selling Canadian-brand tobacco products of R.J.R. Macdonald, Inc. to Larry Miller, Robert Tavano, and Lewis Tavano who were then doing business as LBL Importing, Inc.

3.    At various times during the course of the conspiracy **LESLIE THOMPSON's** coconspirators caused Canadian-brand tobacco products purchased from R.J.R. Macdonald to be delivered to warehouses at the St. Regis Mohawk Indian Reservation.

4.    At various times during the course of the conspiracy **LESLIE THOMPSON** caused Larry Miller to purchase bank drafts from the Jefferson National

4

Bank in Massena, New York as payment for the Canadian-brand tobacco products being purchased from R.J.R. Macdonald, Inc. and delivered to warehouses at the St. Regis Mohawk Indian Reservation in the Northern District of New York.

5.    At various times during the course of the conspiracy Larry Miller caused individuals to transport payments from the Northern District of New York to **LESLIE THOMPSON** in Canada.

6.    At various times during the course of the conspiracy Larry Miller conducted financial transactions at the Jefferson National Bank in Massena, New York in order to wire transfer payments to the R.J.R. Macdonald company in Canada as payment for the Canadian-brand tobacco products being purchased from R.J.R. Macdonald and delivered to warehouses at the St. Regis Mohawk Indian Reservation.

*[handwritten annotation: Money was NEVER wired to RJR Macdonald in Canada but in fact Miller had cheques drop off in Canada to myself or subordinate Ferga Rowheim or in one case my secretary and I. Miller courier at the Ramada Inn on Dixie Rd in Mississauga, on a number of occasional a Miller courier fle ...]*

7.    In or about February of 1993 **LESLIE THOMPSON** began selling Canadian-brand tobacco products to Larry Miller, Bob Tavano and Lewis Tavano through Northern Brands International, Inc., ("NBI") doing business in Winston-Salem, North Carolina.

*[handwritten annotation: In a number of occasions the cheques were taken to the Royal Ban Toronto and deposited under the direction of Derek Wallace on Paul Carbo the CEO or in Derek's case a financial director.]*

8.    At various times during the course of the conspiracy, **LESLIE THOMPSON**'s coconspirators caused Canadian-brand tobacco products purchased through NBI to be delivered to warehouses at the St. Regis Mohawk Indian Reservation.

5

9.    At various times during the course of the conspiracy **LESLIE THOMPSON**, and those acting at his direction, caused Larry Miller, doing business as LBL Importing, Inc., to wire transfer payment for the Canadian-brand tobacco products purchased from NBI and the R.J. Reynolds Tobacco Company, which manufactured Canadian-brand tobacco cigarettes in Puerto Rico.

10.    On or about July 28, 1993 **LESLIE THOMPSON**, and those acting at his direction, caused Larry Miller to instruct the Durham's Currency Exchange to wire transfer $355,680 to NBI as payment for Canadian-brand tobacco products delivered to warehouses at the St. Regis Mohawk Indian Reservation.

11.    At various times during the course of the conspiracy **LESLIE THOMPSON**, and those acting at his direction, caused Larry Miller to instruct the Newberry State Bank and the First National Bank of Manistique to wire transfer payments to NBI as payment for Canadian-brand tobacco products delivered to warehouses at the St. Regis Mohawk Indian Reservation.

12.    At various times during the course of the conspiracy **LESLIE THOMPSON**, and those acting at his direction, caused Larry Miller to instruct the First National Bank of Northern New York to wire transfer payments to NBI as payment for the Canadian-brand tobacco products being purchased from the R.J. Reynolds International Tobacco Company, doing business as NBI, and delivered to warehouses at the St. Regis Mohawk Indian Reservation.

6

13.    At various times during the course of the conspiracy **LESLIE THOMPSON** did solicit and receive gratuities from Larry Miller.

All in violation of Title 18, United States Code, Section 1956(h).

## THE GRAND JURY FURTHER CHARGES:

### COUNT TWO

**THE PINE PARTNERSHIP CONSPIRACY TO ENGAGE IN FINANCIAL TRANSACTIONS IN FURTHERANCE OF A SCHEME TO DEFRAUD CANADA**

Beginning on a date unknown to the grand jury, but prior to October 20, 1993, and continuing up to at least June 24, 1997, in the Northern District of New York, and elsewhere, the defendant, **LESLIE THOMPSON**, and other persons, both known and unknown to the grand jury, did knowingly and intentionally combine, conspire, confederate and agree to commit an offense against the United States under Title 18, United States Code, Section 1956(a)(1)(A)(i), that is, to conduct, and attempt to conduct, financial transactions, affecting interstate and foreign commerce, which, in fact, involved the proceeds of specified unlawful activity, that is, a wire fraud scheme to defraud the United States and Canadian governments of revenue, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the financial transaction represented proceeds of the scheme to defraud the United States and Canadian governments of revenue, with the intent to promote the carrying on of this specified unlawful activity.

7

## THE SPECIFIED UNLAWFUL ACTIVITY

A.      It was a part of this conspiracy and scheme to defraud that the defendant and his coconspirators would supply Canadian-brand tobacco products from the R.J. Reynolds companies to individuals operating warehouses at the St. Regis Mohawk Indian Reservation in the Northern District of New York.

B.      It was a further part of the scheme that individuals who purchased these Canadian-brand tobacco products at the St. Regis Mohawk Indian Reservation in the Northern District of New York would thereafter cause these tobacco products to be smuggled from the United States into Canada where they were sold on the "black market" to avoid the payment of Canadian taxes and duties.

C.      It was further part of the scheme that the defendant's coconspirators would falsely represent that the Canadian-brand tobacco products would be exported from the United States, when in truth, and in fact, these Canadian-brand tobacco products were transported in interstate commerce to ware-houses at the St. Regis Mohawk Indian Reservation in the Northern District of New York, thereby evading the payment of taxes due to the United States.

D.      It was further part of the scheme that Canadian currency (funds) generated by the scheme would be converted into United States currency which was utilized to conduct financial transactions promoting the scheme, including payments for the purchase of additional Canadian-brand tobacco products.

8

E.    It was a further part of the scheme to defraud that the tobacco products to be utilized in the smuggling scheme would be purchased through interstate and international telephone calls, facsimile, and wire transmissions.

<u>OVERT ACTS</u>

In furtherance of the conspiracy and to effect the objects and purposes thereof, the following overt acts, among others, were committed or caused to be committed by the defendant, and other conspirators, in the Northern District of New York and elsewhere:

1.    On or about October 20, 1993, **LESLIE THOMPSON** began selling Canadian-brand tobacco products to Lewis Tavano and Robert Tavano, d/b/a Pine Partnership, which Canadian-brand tobacco products were delivered to warehouses on the St. Regis Mohawk Indian Reservation.

2.    At various times during the conspiracy, **LESLIE THOMPSON**, and those acting at his direction, caused Lewis and Robert Tavano to utilize the Marine Midland Bank in Niagara Falls, New York to prepare checks and wire transfer payments to NBI (and Doron Yakir) as payment for the Canadian-brand tobacco products which were being delivered to warehouses at the St. Regis Mohawk Indian Reservation for sale in furtherance of the scheme.

3.    At various times during the course of the conspiracy **LESLIE THOMPSON,** and those acting at his direction, caused Lewis and Robert Tavano to

9

instruct Fleet Bank in Massena, New York to wire transfer payments to NBI and the R.J. Reynolds International Tobacco Company as payment for the Canadian-brand tobacco products which were being delivered to warehouses at the St. Regis Mohawk Indian Reservation for sale in furtherance of the scheme.

4.    At various times during the course of the conspiracy, **LESLIE THOMPSON,** and those acting at his direction, caused Lewis and Robert Tavano to instruct the Key Bank in Massena, New York to wire transfer payments to NBI (and the R.J. Reynolds Tobacco Company) as payment for Canadian-brand tobacco products which were being delivered to warehouses at the St. Regis Mohawk Indian Reservation for sale in furtherance of the scheme.

5.    At various times during the course of the conspiracy **LESLIE THOMPSON** did solicit and receive gratuities from Lewis Tavano and Robert Tavano.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE -- I

### THE GRAND JURY FURTHER CHARGES:

The allegations of Count One of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(1).

The defendant,

10

LESLIE THOMPSON,

had interests in personal property involved in the violation of 18 U.S.C. § 1956 charged in Count One and in property traceable to such property. All such interests, wherever located and in whatever names held, are therefore subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 982(a)(1). Such interests include, but are not limited to:

    (1)    $72,679,800.00 in United States currency.

If any of the property described above as being subject to forfeiture pursuant to Title 18, United States Code, Section 982 as a result of any act or omission of the defendant--

    (1)    cannot be located upon the exercise of due diligence;

    (2)    has been transferred or sold to, or deposited with, a third person;

    (3)    has been placed beyond the jurisdiction of the court;

    (4)    has been substantially diminished in value; or

    (5)    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1) to seek forfeiture of any other property of said defendant up to the value of said property listed above as being subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982.

11

## FORFEITURE -- II

**THE GRAND JURY FURTHER CHARGES:**

The allegations of Count Two of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(1).

The defendant,

**LESLIE THOMPSON,**

had interests in personal property involved in the violation of 18 U.S.C. § 1956 charged in Count Two and in property traceable to such property.  All such interests, wherever located and in whatever names held, are therefore subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 982(a)(1).  Such interests include, but are not limited to:

    (1)    $15,500,749.00 in United States currency.

If any of the property described above as being subject to forfeiture pursuant to Title 18, United States Code, Section 982 as a result of any act or omission of the defendant--

    (1)    cannot be located upon the exercise of due diligence;

    (2)    has been transferred or sold to, or deposited with, a third person;

    (3)    has been placed beyond the jurisdiction of the court;

    (4)    has been substantially diminished in value; or

(5)    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1) to seek forfeiture of any other property of said defendant up to the value of said property listed above as being subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982.


Dated:        February _25_, 1999                    _Wendy J. Mulcahy_
                                                     Grand Jury Foreperson  _Deputy_


Thomas J. Maroney
United States Attorney


By:    Gregory A. West
       Assistant U.S. Attorney
       Bar Roll No. 501530


n:\udd\gwest\tobacco\indictm.les


13





# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**UNITED STATES OF AMERICA**

v.

**LESLIE THOMPSON,**
**a/k/a LES THOMPSON,**

Defendant.

Criminal Action No.
99-CR-93 (TJM)

Vio:   18 USC § 1956(h)
[Felony]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLEA AGREEMENT UNDER RULE 11 OF THE
## FEDERAL RULES OF CRIMINAL PROCEDURE

### 1.   INTRODUCTION

1.1   The United States of America, by and through its attorney, Thomas J.

Maroney, United States Attorney for the Northern District of New York, by Gregory A.

West, Assistant U.S. Attorney, and **LESLIE THOMPSON**, the defendant herein by Mark

Hulkower, Esq., his attorney, hereby enter into the following Plea Agreement regarding the

disposition of certain criminal charges against **LESLIE THOMPSON** as hereinafter

specified:

1.2    In return for the consideration set forth in this Plea Agreement, and having been advised of his right to proceed to trial in this matter, **LESLIE THOMPSON** agrees to enter a plea of guilty to Count One of Indictment 99-CR-93 by admitting that he is guilty of violating 18 U.S.C. § 1956(h) as charged therein, i.e., conspiring to conduct financial transactions affecting interstate commerce with the proceeds of "specified unlawful activity," that is, a wire fraud scheme to defraud Canada of tax revenue, which financial transactions were intended to promote this underlying criminal activity.

## 2. ADMISSIBILITY OF STATEMENTS

2.1    **LESLIE THOMPSON**, by his signature hereto, acknowledges his right to remain silent and expressly waives that right. **LESLIE THOMPSON** further acknowledges his right to the assistance of counsel, which he has obtained; said counsel by his signature hereto having witnessed and approved this Plea Agreement.

2.2    The parties agree that any statement made by the defendant in connection with the signing of this Plea Agreement and the entry of any plea, and any statements made by the defendant to federal agents or federal attorneys after this Plea Agreement is signed, shall be admissible and/or useable against the defendant in any proceeding (including any criminal prosecution of the defendant) if the defendant breaches this Plea Agreement. In addition, if the defendant breaches this agreement, the defendant specifically waives any protection he might have under Rule 11(e)(6)(C) and (D) of the Federal Rules of Criminal Procedure and Rule 410(3) and (4) of the Federal Rules of Evidence.

2

### 3.  THE DEFENDANT'S ADMISSION OF GUILT

#### 3.1    Waiver of the Defendant's Right to Stand Trial

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, and that he has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, and the right to compulsory process for the attendance of witnesses to testify in his defense.  The defendant further understands and agrees that by pleading guilty he waives or gives up those rights, and there will be no trial.

3.2    The defendant understands that upon pleading guilty the Court may ask him questions about the offense to which he has pleaded guilty, and any answers he gives under oath, on the record and in the presence of defense counsel may later be used against him in a prosecution for perjury or making false statements.

#### 3.3    Factual Basis for the Plea

The defendant, **LESLIE THOMPSON**, is pleading guilty because he is in fact guilty of the charges contained in Count One of Indictment 99-CR-93.  In pleading guilty to this charge, the defendant acknowledges that, if he elected to go to trial, the United States would prove, beyond a reasonable doubt, all of the facts set forth in paragraph 3.4, and further acknowledges that those facts would support his conviction for participating in the conspiracy charged in Count One of Indictment 99-CR-93.  The defendant also specifically admits the following facts as true, and declares these facts to be true under the penalties of perjury pursuant to Title 28, United States Code, Section 1746:

3

3.4    Statement of Relevant Facts

A.    **LESLIE THOMPSON** used interstate and international telephone calls and facsimile transmissions to sell tractor trailer loads of Canadian-brand cigarettes which were shipped to foreign trade zones and ultimately delivered, by coconspirators, to warehouses operated by customers of Larry Miller, Lewis Tavano and Robert Tavano at the St. Regis Mohawk Indian Reservation in the Northern District of New York from January 1, 1992 until October 26, 1996.

B.    The defendant knew that some customers of Larry Miller, Lewis Tavano and Robert Tavano sold the cigarettes to other participants in the scheme who smuggled the cigarettes from the United States into Canada, where they were sold on the Canadian "black market" in order to defraud the Canadian government of tax revenue.

C.    **LESLIE THOMPSON** understood, and tacitly agreed with his co-conspirators, that Canadian currency from the "black market" sale of the cigarettes would be exchanged for U.S. currency or bank credit in order to purchase bank drafts and cashier's checks, and to make interstate wire transfers in order to purchase additional cigarettes and promote the underlying scheme, which defrauded the United States and Canada of tax revenue.

D.    In furtherance of this Agreement, **LESLIE THOMPSON** caused Larry Miller, Lewis Tavano and Robert Tavano to utilize financial institutions doing business in interstate and foreign commerce to conduct numerous financial transactions affecting interstate commerce from January 1, 1992 until October 26, 1996, the sum total of which is

4

set forth in Forfeiture Allegation I of Indictment 99-CR-93, which is incorporated by reference here, and the allegations of which the defendant admits in their entirety.

3.5    The defendant, **LESLIE THOMPSON**, hereby acknowledges that he has fully discussed the charges set forth in Count One of Indictment 99-CR-93 with his attorney, Mark Hulkower, Esq., and is nonetheless prepared to enter this plea of guilty, including any possible legal or factual defenses to this charge.

### 4.    THIS IS A CONDITIONAL PLEA PURSUANT TO RULE 11(e)(1)(C) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

4.1    It is expressly understood and agreed between the United States and the defendant, **LESLIE THOMPSON**, that this plea shall be entered conditionally pursuant to Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure, whereby the parties have agreed that the Court should impose a term of imprisonment no longer than 84 months.

4.2    It is further expressly understood and agreed that the Court is neither a party to, nor bound by this Agreement. The Court may accept or reject the Agreement or defer a decision until it has had an opportunity to consider the Presentence Report prepared by the United States Probation Office. If the Court rejects the provision of this agreement calling for no more than an 84-month term of incarceration, defendant shall be permitted to withdraw his guilty plea pursuant to Rule 11(e)(4) of the Federal Rules of Criminal Procedure.

5

## 5.    THE DEFENDANT UNDERSTANDS THE CONSE-
## QUENCES OF PLEADING GUILTY

The defendant has been informed and understands that there are certain consequences of pleading guilty; and defense counsel, by signing this Plea Agreement, affirms that he has fully informed the defendant concerning the consequences of pleading guilty, including those consequences set forth in paragraphs 3.1 and 3.2, as well as the following paragraphs:

5.1    The defendant understands that the maximum jail sentence authorized by the statute(s) to which a plea is to be entered is twenty years in jail.

5.2    The defendant understands that the possible maximum fine in connection with Count One of Indictment 99-CR-93 is $500,000 or twice the amount of the underlying financial transactions.

5.3    The defendant further understands that upon his failure to pay any fine imposed, he may be charged interest and penalties at the applicable statutory rates. The defendant also understands that the fine must be paid immediately and that such interest begins to accrue from the date of sentence.

5.4    The defendant understands that a special assessment will be made against him pursuant to Title 18, United States Code, Section 3013 in the amount of $100.00, which must be paid immediately after sentencing. However, in order to facilitate the collection of said assessment, the defendant hereby agrees that pursuant to this Plea Agreement, he will provide a certified check or money order in the amount of $100.00 payable to the "United

6

States District Court," which shall be delivered to the United States District Court prior to sentencing.

5.5    The defendant understands that his sentence will include financial conditions, and upon willful failure to pay the same or a failure to make sufficient bona fide efforts to pay the same, incarceration may be imposed by the Court. However, a failure based on inability will not be deemed willful.

5.6    The defendant understands that he may be ordered by the Court, as a part of his sentence, to pay the cost of probation supervision and/or incarceration, depending upon his financial assets and liabilities.

5.7    The defendant has been informed that under certain circumstances a term of supervised release may be added to any sentence by the Court. The defendant further understands that, in addition to imposing any other penalty on him, the sentencing Court may require him to serve a term of supervised release of up to three (3) years, to begin at the expiration of any term of imprisonment imposed upon him, pursuant to Title 18, United States Code, Section 3583. It is understood that, should **LESLIE THOMPSON** be placed on a term of supervised release and subsequently violate any of the conditions of that release before the expiration of such term, he may be: (a) sentenced to up to three (3) years imprisonment in addition to any prison term previously imposed upon him, and in addition to the statutory maximum term of imprisonment set forth above; and, (b) sentenced to an additional term of supervised release.

7

5.8    The defendant understands that any one or more combinations of the above sentences are possible, such as a fine and a jail term.

5.9    The defendant understands that he is pleading guilty to a felony offense and as a result, may suffer certain civil disabilities by having a felony conviction.

## 6. AGREEMENTS MADE BY THE UNITED STATES

6.1    If the defendant fulfills all the obligations of this Plea Agreement, the Government agrees to dismiss the charges set forth against **LESLIE THOMPSON** in Count Two and Forfeiture Allegation II of Indictment 99-CR-93 and not to further criminally prosecute the defendant in the Northern District of New York for (i) any act or offense that he may have committed on or before February 24, 1999 relating to or arising from smuggling tobacco into Canada and conducting financial transactions promoting this scheme as alleged in Superseding Indictment 99-CR-93; (ii) any act or offense arising out of his employment by the R.J. Reynolds Tobacco Companies prior to February 24, 1999.  This Plea Agreement does not, however, foreclose any prosecution for an act of murder, attempted murder, an act of physical violence against the person of another, or any conspiracy to commit any such act of violence.

6.2    The United States agrees that based upon Defendant **LESLIE THOMPSON**'s guilty plea entered in connection with this Plea Agreement, that if he fully complies with the terms of this Plea Agreement, his statements and/or testimony will not be used by the United States Attorney's Office to prosecute him in connection with other potential charges, except

those related to murder, attempted murder, an act of physical violence against the person of another, or conspiracy to commit any such act of violence. This Office further agrees not to share any information provided by LESLIE THOMPSON pursuant to this agreement (except information related to murder, attempted murder, an act of physical violence against the person of another, or conspiracy to commit any such act of violence) with any Canadian law enforcement agency or any other Canadian or United States prosecuting authorities, except upon their agreement to be bound by the provision of this subparagraph or with the defendant's consent.

6.3     The United States agrees not to oppose the defendant's request for a three-level Acceptance Of Responsibility adjustment in accordance with United States Sentencing Guidelines § 3E1.1, provided that the defendant continues to demonstrate acceptance of responsibility for his offense and continues to fulfill his obligations under this Plea Agreement until, and including, the day of sentencing.

## 7.    NO THREATS OR PROMISES

7.1     It is expressly understood that there are no promises or inducements of any kind which have caused the defendant to enter a plea of guilty, other than those set forth in this Plea Agreement. Furthermore, the defendant, **LESLIE THOMPSON**, and his attorney, Mark Hulkower, acknowledge that the defendant is entering into this Plea Agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the Government and the defendant, or his attorney, and without promise or

benefit of any kind (other than the concessions contained in this Plea Agreement); and without threats, force, intimidation, or coercion of any kind. Finally, the defendant acknowledges that no Assistant United States Attorney, nor any other representative of the Government, has made any threat or promise to induce him to plead guilty. He is pleading guilty because he is in fact guilty.

7.2    It is expressly understood that this document contains the entire Plea Agreement and that no additional promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement and none shall be entered into unless in writing and signed by all parties.

## 8.    COOPERATION

8.1    The defendant shall truthfully disclose all information with respect to the activities of himself and/or others, and shall fully cooperate in the investigation of such activities, in connection with all matters about which the United States Attorney's Office or any designated United States or foreign law enforcement officer requires or requests his assistance, and, further, the defendant shall truthfully testify before any grand jury and at any trial or at any other court proceeding with respect to any matters about which the United States Attorney's Office or any designated law enforcement officer may request his testimony.

8.2    The defendant shall at all times give complete, truthful, and accurate information and testimony. He shall neither attempt to protect any person who has been

10

involved in criminal activity nor shall he falsely implicate anyone in criminal activity. In accordance with U.S.S.G. § 1B1.8(a), at 28 (Nov. 1994), any self-incriminating information provided by the defendant pursuant to this Plea Agreement will not be used against him in determining the applicable Guideline range, except as provided in § 1B1.8(b) or as may be otherwise provided in this Plea Agreement.

8.3     The defendant agrees that his sentencing may be postponed until after the disposition of related cases herein, in that the defendant's cooperation is a factor important to the sentencing determination.

8.4     The defendant shall not commit any further crime whatsoever.[1]     If the defendant commits any further crime, whether or not charged or convicted of same, the portion of this Plea Agreement regarding the defendant's cooperation shall be null and void.

8.5     At the Government's request, the defendant agrees to undergo a polygraph examination relating to statements and/or testimony he provides.

8.6     The defendant further agrees that if, in the good-faith judgment of the United States Attorney for the Northern District of New York, he gives false, incomplete, or misleading information or testimony, or if he otherwise violates any provision of this Plea Agreement, said Plea Agreement shall be null and void and the defendant shall thereafter be subject to prosecution for any criminal violation of which the United States has knowledge,

---

[1] The term "crime" as used herein shall not be construed to include petty offenses or motor vehicle offenses which do not involve physical injury or property damage.

11

premised upon information furnished to it by the defendant, and such information may, and will, be used against him.

8.7     The defendant agrees that the determination as to whether his statements and/or testimony is truthful and complete shall be within the sole discretion of the United States Attorney. If it is determined in good faith that any statements or testimony provided by the defendant are not truthful and complete, then this Plea Agreement will be deemed null and void. If, in the judgment of the United States Attorney for the Northern District of New York, the defendant violates the terms of this Plea Agreement by giving false, incomplete or misleading information, by withholding information, or by committing another crime (whether or not charged or convicted of the same), the defendant understands and agrees that:

a.     Defendant shall not be permitted to withdraw his plea;

b.     All statements made by Defendant **LESLIE THOMPSON** to the United States or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after the execution of this Plea Agreement, shall be admissible in evidence in any and all criminal proceedings hereafter brought against him; and

c.     The defendant shall assert no claim under the United States Constitution, any statute, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after the execution of this Plea Agreement, or any leads derived therefrom, should be suppressed. By signing this Plea Agreement, Defendant **LESLIE THOMPSON** waives any and all rights in the foregoing respects.

12

    d.    Defendant shall be sentenced without regard to the limitations set forth in this Plea Agreement, other than the statutory maximum penalties.

    e.    Defendant shall be sentenced on the basis of all information provided in accordance with this Plea Agreement, i.e., U.S.S.G. § 1B1.8 -- entitled "Use of Certain Information" -- shall not preclude the Court from considering any information supplied by the defendant to the United States in making its sentencing determination.

    f.    Defendant can be prosecuted for any and all criminal violations of which the Government is aware and all information supplied by the defendant in accordance with the terms of this Plea Agreement may be used against him.

8.8    This Plea Agreement is not conditioned upon any particular outcome at the trial of any pending indictments.  If charges or an indictment should be brought against any individuals as a result of Defendant **LESLIE THOMPSON**'s cooperation, this Plea Agreement is **not** conditioned upon any particular outcome of any such charges or indictment.  This Plea Agreement is conditioned **solely** on the defendant providing complete and truthful cooperation as set forth above.

8.9    This Plea Agreement does not extend to any crimes which may be committed by the defendant following the date of this Plea Agreement.  Should it be determined that the defendant has violated any local, state or federal law following the date of this Plea Agreement, then this Plea Agreement shall be deemed null and void and the defendant shall thereafter be subject to prosecution as provided herein.[2]

---

[2] This shall not be construed to include petty offenses or motor vehicle offenses which do not involve physical injury or property damage.

13

## 9.    SUBSTANTIAL ASSISTANCE

9.1    At or before the time of sentencing, the United States will advise the Court of any assistance provided by **LESLIE THOMPSON** in the ongoing investigations into smuggling, money laundering and public corruption, and related criminal activity within the Northern District of New York, Canada, and elsewhere, or in the prosecution of another person who has committed a criminal offense.  The United States may, but shall not be required to, make a motion requesting the Court to depart from the sentencing range called for by the Guidelines in the event he provides "substantial assistance."  The decision to make a motion for a departure under the Sentencing Guidelines based upon the defendant's assistance shall rest in the sole discretion of the United States Attorney for the Northern District of New York.

9.2    It is understood and agreed that a motion for a departure shall not be made, under any circumstances, unless **LESLIE THOMPSON**'s cooperation is deemed "substantial" by the United States Attorney.  The United States has made no promise, express, implied, or otherwise, that it will move for a departure based upon **LESLIE THOMPSON**'s "substantial assistance."  Further, no promise has been made that a motion will be made for departure even if **LESLIE THOMPSON** complies with the terms of the Plea Agreement in all respects, but has been unable to provide "substantial assistance."

9.3    The United States agrees to consider the totality of the circumstances, including but not limited to the following factors, in determining whether, in the assessment of the United States Attorney, **LESLIE THOMPSON** has provided "substantial assistance"

14

to federal, state and/or Canadian law enforcement agencies which would merit a Government

request for a downward departure from the applicable Guideline sentencing range:

a.    Law Enforcement Agency's evaluation of the significance and usefulness of any assistance rendered by **LESLIE THOMPSON**;

b.    the truthfulness, completeness, and reliability of any information or testimony provided by **LESLIE THOMPSON**;

c.    the nature and extent of **LESLIE THOMPSON**'s assistance;

d.    any hardship suffered or any danger or risk of harm to **LESLIE THOMPSON** or his family resulting from any assistance provided by him; and

e.    the timeliness of any assistance provided by **LESLIE THOMPSON**.

9.4    It is further understood that should the Government decide to make a motion for downward departure from the Guidelines or the statutory minimum, the Government's position as to the extent of such downward departure is a matter within the sole discretion of the Office of the United States Attorney for the Northern District of New York.

9.5    It is understood that even if a motion for departure is made by the Government, based upon **LESLIE THOMPSON**'s perceived "substantial assistance," the final decision as to how much, if any, reduction in sentence is warranted because of that assistance, rests solely with the District Court.

9.6    It is further understood that if the defendant, a citizen of Canada, complies fully and completely with the terms and conditions of this Plea Agreement, and in the judgment of the United States Attorney, provides "substantial assistance," the United States Attorney for the Northern District of New York will not, after the defendant has completed

15

24 months of his prison sentence in the United States, oppose or impede his request for a prison transfer under the 1977 bilateral treaty between the United States and Canada, the 1983 Multilateral Convention in the Transfer of Sentenced Persons, or any other treaty that may become applicable when the application is made or pending. Based on discussions between counsel for **LESLIE THOMPSON** and the United States Attorney's Office for the Northern District of New York, it is anticipated that **THOMPSON** will be eligible for, and will receive, a transfer, and the United States Attorney's Office for the Northern District of New York will do nothing to impede that process after he has served twenty-four (24) months of his prison sentence in the United States. It is further understood that this agreement cannot guarantee a transfer, as this determination rests within the discretion of other agencies of the United States and Canadian governments.

## 10.    FORFEITURE

10.1    Defendant **LESLIE THOMPSON** admits that the money laundering conduct charged in Count One of Indictment 99-CR-93, to which he is pleading guilty, involved the laundering of $72,679,800.00, derived from the charged unlawful scheme to defraud the United States and Canada of tax revenue. Defendant admits to the allegations set forth in Forfeiture Allegation I and acknowledges that the entire sum of $72,679,800.00 is thereby forfeitable to the United States, pursuant to 18 U.S.C. § 982, and agrees to entry of a forfeiture judgment personally and solely against him in an amount which reflects the "kickbacks", benefits and gratuities he received as a result of his participation in the scheme

16

(hereinafter referred to as his "forfeitable assets"), which amount shall be mutually determined (before sentencing) by his lawyers and the United States following his full compliance with the financial disclosure requirements set forth below.

    a.    Defendant hereby forfeits all of his right, title and interest of any nature in any and all forfeitable assets, subject to forfeiture pursuant to 18 U.S.C. § 982, in the possession or control of defendant or his nominees or agents.

    b.    Defendant hereby agrees to forfeit the "kickbacks," benefits, and gratuities (forfeitable assets) which he received as a result of his participation in the scheme, the precise amount of which shall be determined before sentencing in the manner set forth above, in full satisfaction of his $72,679,800.00 forfeiture liability.

    c.    Defendant **LESLIE THOMPSON** agrees to execute any and all documents necessary to forfeit to the United States of America the forfeitable assets he received as a result of his participation in the scheme, and substitute assets as appropriate.

    d.    Defendant agrees to relinquish any claim he may have to assets held at any time in the name of Kathleen Thompson, Michael Thompson, and/or any other nominee or third party necessary to effect the agreed forfeiture.

    e.    In the event that any successful claim is made by any third party to the assets described herein and in Forfeiture Allegation I, defendant agrees to forfeit substitute assets equal in value to the assets transferred to any third party as a result of such claim. Defendant further agrees that forfeiture of substitute assets as authorized herein, and pursuant to 21 U.S.C. § 853(p), shall not be deemed an alteration of the defendant's sentence.

17

Forfeiture of the defendant's assets, including substitute assets if necessary, shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

    f.  Defendant agrees that he will cooperate with the Government by taking whatever steps are necessary to determine the amount subject to forfeiture, including the execution of all documents necessary to permit the release of financial information, and the defendant's submission to a polygraph examination

    g.  Defendant knowingly and voluntarily waives his right to a jury trial on the forfeiture of assets. Defendant knowingly and voluntarily waives all constitutional, legal and equitable defenses to the forfeiture of all forfeitable assets, up to the amount of his forfeiture liability, in any proceeding. Defendant agrees to waive any jeopardy defense or claim of double jeopardy, whether constitutional or statutory, and agrees to waive any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of assets by the United States.

    h.  Defendant agrees to submit to a polygraph examination on the issue of assets if it is deemed necessary by the United States. Defendant will further consent to provide full and complete financial disclosure concerning his assets and financial interests, including completion of IRS Form 433-A, and will not oppose depositions of third parties designated by the United States on the subject of the defendant's assets and financial interests. Defendant acknowledges that the Government may, in its discretion, institute civil or administrative forfeiture proceedings against all forfeitable assets and agrees not to contest

any such forfeiture proceedings. Any breach of this paragraph of the Agreement, the determination of which is within the sole discretion of the United States Attorney's Office for the Northern District of New York, will be treated as a breach of the entire Agreement and will result in the use of all provided statements and information against the defendant for any purpose, including sentencing.

      i.    Defendant understands and acknowledges that the government is relying upon defendant's representations in entering into this Plea Agreement. Defendant agrees to, and does hereby grant, convey and deed to the United States of America, all of his right, title and interest in forfeitable assets (and substitute assets, if applicable) in which he has an interest up to the value of his liability as set forth above. This includes property in which defendant's interest may not be of record, and property to which title is or may be in the name of a third party. Defendant agrees to execute all documents and to perform all acts requested by the United States to effectuate the transfer of defendant's right, title and interest of any such property to the United States, including, but not limited to, execution of any deed, certificate of title, or other document. It is the intent of the parties that this agreement constitutes a contract which creates rights enforceable by the United States to effectuate the conveyance to the United States of forfeitable assets in which defendant may have an interest.

      j.    Defendant further agrees that none of the forfeited property shall be returned to him, nor shall he assert any claim to the forfeited property in the event that the

United States Attorney determines, in his sole discretion, that the defendant has breached this Agreement.

k.    Defendant further agrees that he shall not reacquire the forfeited property, directly or indirectly, through nominees, family members, friends or associates.

## 11.    SENTENCING

11.1    The United States and the defendant, **LESLIE THOMPSON**, agree that each reserves all respective rights (a) to inform the Probation Office preparing the presentence investigation report of all relevant facts and circumstances, (b) to address the Court at the time of sentencing, including presenting testimony and evidence, and proffers of testimony and evidence to the extent permitted in any case, and (c) to recommend a specific sentence.

11.2    The parties stipulate and agree that the offense of conviction should be scored pursuant to U.S.S.G. § 2S1.1(a) with a base offense level of 23, an adjustment of 12 additional levels because the currency involved more than $60,000,000 for a total offense level of 35. It is understood, however, that the above agreement to stipulate cannot and does not bind the sentencing Court, which may make independent factual findings and reject any or all stipulations presented by the parties. Further, it is understood that this agreement to stipulate on the part of the United States is based on the evidence and information that it possesses as of the date of this Plea Agreement, and is subject to the proviso that, if the United States obtains or receives additional evidence or information prior to sentencing which it determines to be credible and materially in conflict with any stipulation agreed to

20

herein, the United States shall no longer be bound by such stipulation. A subsequent determination that any stipulation is not binding on the Court or the United States shall not be the basis for the withdrawal of a plea of guilty by **LESLIE THOMPSON** and shall not release either the United States or **LESLIE THOMPSON** from any other portion of this Plea Agreement, including any other stipulation agreed to herein. To the extent this stipulation does not address any factor (such as Role in the Offense pursuant to U.S.S.G. § 3B1.1) potentially affecting the Sentencing Guideline range applicable to the defendant, **LESLIE THOMPSON**, the United States Attorney's Office, the defendant, and his attorney expressly reserve their rights to advocate, in their sole and unfettered discretion, how any such factor affects the applicable Sentencing Guideline range.[3]

11.3    Because Northern Brands International, Inc. paid a $5 million fine and forfeited $10 million based in part upon the defendant's conduct, because the defendant has agreed to forfeit all of his ill-gotten gain (see ¶ 10.1 supra), and because financial penalties may be imposed by the Canadian government, the United States will not seek restitution or a fine.

11.4    Both parties reserve the right (i) to oppose a sentence outside of the Guideline range; (ii) to advise the sentencing Court and the Probation Office of any information of a factual nature, favorable or otherwise, relevant to sentencing; (iii) to take a position concerning the criminal history classification of the defendant pursuant to Guideline 4A1.1;

---

[3] The parties specifically reserve their right to advocate their respective positions relative to **THOMPSON**'s role in the offense and other factors not subject to our stipulation.

and (iv) to provide a Victim Impact Statement as well as documentation and testimony concerning the losses sustained by the victim.

11.5    The sentence to be imposed upon **LESLIE THOMPSON** is within the sole discretion of the sentencing judge.  The United States Attorney's Office will, however, inform the sentencing judge and the Probation Office of (1) this Plea Agreement, (2) the full nature and extent of the defendant's cooperation with the United States Attorney's Office, and (3) all other information in the possession of the United States Attorney's Office relevant to sentencing.  If, after having reviewed all of this information, the Court cannot impose a sentence of no more than 84 months, as agreed by the parties, **LESLIE THOMPSON** shall be permitted to withdraw his guilty plea as provided by Rule 11(e)(4) of the Federal Rules of Criminal Procedure.

## 12.    AGREEMENT CONCERNING FINANCIAL DIS- CLOSURE AND TAX RETURNS

12.1    The defendant agrees to fully disclose his assets and will:

a.    submit an original personal financial statement (Probation Form 48A) to the Chief United States Probation Officer as provided and directed by the Probation Department and provide a copy of the same to the U.S. Attorney's Office within seven days of the entry of his guilty plea.  The defendant further agrees that he will represent that such disclosures and Financial Statements are complete, accurate, and truthful; and

b.    The defendant shall also provide whatever privacy waivers and verification of financial condition that may be requested by the United States of America, (including a polygraph examination to be conducted by an examiner selected by the Government) to satisfy the United States Attorney that he has no hidden assets which have not been disclosed.

22

c.    The defendant will submit to an examination under oath, and agrees to permit the United States Attorney's Office to inspect and copy all financial documents and information provided to the United States Probation Office.

12.2    The defendant, **LESLIE THOMPSON**, certifies that he has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations such as fines, special assessments, forfeitures, costs and the like which may be imposed upon him by the Court.  In addition, **LESLIE THOMPSON** understands that a violation of this paragraph may be considered a breach of the Plea Agreement.

12.3    The defendant agrees, consents and waives any objection to any and all information concerning this case being furnished to the Internal Revenue Service and to the Civil Section, Tax Division, Department of Justice, for the purpose of determining and collecting any applicable taxes and interest and penalties related thereto.

## 13.    DISTRICTS BOUND

13.1    The defendant understands and agrees that this Plea Agreement is limited to the United States Attorney's Office for the Northern District of New York and cannot bind any other federal, state or local prosecuting authorities.  The United States Attorney's Office for the Northern District of New York will, however, bring this Plea Agreement to the attention of such other prosecuting authorities if so requested.  The United States Attorney's Office is not, however, aware of any other pending investigations involving **LESLIE THOMPSON** within the United States.

23

The defendant certifies that he has read this 25-page Plea Agreement, that he fully understands and accepts the terms thereof.

_____    Date:  March 25, 1999
**LESLIE THOMPSON**, Defendant


I have read the above and explained it to my client, who advises me that he understands and accepts its terms.

_____    Date:  March 25, 1999
Mark Hulkower, Esq.
Counsel for Defendant

gwest\tobacco\pleaagr.lt                          25

13.2   The defendant, **LESLIE THOMPSON**, further understands and agrees that this Plea Agreement was reached without regard to any civil or administrative matters that may be pending or may arise regarding **LESLIE THOMPSON**, except as expressly stated in ¶ 9.6 supra.

## 14.  MOTION TO WITHDRAW OR SET ASIDE THE PLEA

14.1   The defendant agrees and understands that he may not withdraw his plea of guilty solely because he does not like the Presentence Report, because he is dissatisfied with the sentence that he receives (provided that the sentence does not exceed 84 months), or because the Court fails to follow any recommendation made by the United States.

14.2   The defendant understands and agrees that if, at any time, before sentence he makes a motion to set aside his guilty plea and conviction, the United States will have the absolute right to prosecute the defendant for crimes not charged against him with respect to which the United States agreed to forego prosecution in consideration of the entry of such plea of guilty.

Dated:       March 25, 1999                THOMAS J. MARONEY
                                           United States Attorney
                                           Northern District of New York
                                           P.O. Box 7198
                                           100 South Clinton Street
                                           Syracuse, New York  13261-7198

                            By: _____
                                           Gregory A. West
                                           Assistant U.S. Attorney
                                           Bar Roll No. 501530

24

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK



| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | PRESENTENCE INVESTIGATION REPORT |
| vs. | ) | |
| | ) | |
| Leslie Thompson | ) | Docket No.: 5:99CR00093-001 |
| a.k.a. Les Thompson | | Indictment |

**Prepared For:**     Honorable Thomas J. McAvoy
                      Chief U.S. District Judge

**Prepared By:**      Matthew L. Brown
                      Senior U.S. Probation Officer
                      (315)448-0711

**Assistant U.S. Attorney**                    **Defense Counsel**
**Gregory A. West**                            **Andrew Pappas** (Retained)
P.O. Box 7198                                  224 Harrison Street, Suite 500
Syracuse, New York 13261                       Syracuse, New York 13202
(315)448-0672                                  (315)472-4481

**Sentence Date:**     December 20, 1999 at Binghamton, New York

**Offense:**  **Count 1:**     **Conspiracy to Commit Money Laundering**
                               **18 U.S.C. § 1956(h)**
                               **20 years imprisonment, $500,000 fine**

**Release Status:**    Secured Bond. (The defendant was held in Federal custody from February
                       24, 1999 to March 25, 1999, for a total of 30 days.)

**Detainers:**         None

**Codefendants:**      None

**Related Cases:**     See pages 3 and 4

CONFIDENTIAL - PROPERTY OF U.S. COURTS
The presentence report is a Confidential Court
Document which is exempt from the Federal
Freedom of Information Act and the Privacy Act. It
should not be copied or disseminated outside your
agency without the permission of the Court.

**Date Report Prepared:** October 18, 1999        **Date Report Revised:**

## Identifying Data:

| | |
|---|---|
| **Birth Name:** | Leslie Stephen Thompson |
| **Date of Birth:** | June 9, 1947 |
| **Place of Birth:** | Windsor, Ontario, Canada |
| **Age:** | 52 |
| **Race:** | White, Non-Hispanic |
| **Sex:** | Male |
| | |
| **SSN:** | 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 |
| **FBI No.:** | 164885KB6 |
| **USM No.:** | 25701-039 |
| **PACTS No.:** | NNY 3705 |
| **Canadian Social Insurance No.:** | 423-013-374 |
| | |
| **Education:** | Some College |
| **Dependents:** | One (spouse) |
| **Citizenship:** | Canadian |
| | |
| **Legal Address:** | 12905 Riverside Drive, East |
| | Tecumseh, Ontario, Canada N8N 1A9 |
| | (519)739-0526 |
| | |
| **Aliases:** | None |

## RELATED CASES

Larry Miller (97-CR-199-001) - Entered a plea of guilty to Count 3 of the Superseding Indictment. Sentencing pending.

Robert J. Tavano, Sr. (97-CR-199-002) - Entered a plea of guilty to Count 5 of the Superseding Indictment.  Sentencing pending.

Lewis Tavano (97-CR-199-003) - Entered a plea of guilty to Count 5 of the Superseding Indictment. Sentencing pending.

Nick Miller (97-CR-199-004) - Entered a plea of guilty to Count 1 of the Superseding Indictment. Sentencing pending.

Victoria Glines (97-CR-199-005) - Entered a plea of guilty to Count 1 of the Superseding Indictment.  Sentencing pending.

Tim Glines (97-CR-199-006) - Entered a plea of guilty to Count 1 of the Superseding Indictment. Sentencing pending.

Richard Rancati (97-CR-199-007) - Entered a plea of guilty to Count 1 of the Superseding Indictment.  Sentencing pending.

Doron Yakir (97-CR-199-008) - Fugitive.

John Fountain, a.k.a. "Chick" (97-CR-199-009) - Entered a plea of guilty to Count 2 of the Superseding Indictment.  Sentencing pending.

Rex Seitz (97-CR-199-010) - Entered a plea of guilty to a single count misdemeanor Information. Sentencing pending.

Fabian Hart (97-CR-199-011) - Entered a plea of guilty to a single count felony Information. Sentencing pending.

Gail Hart (97-CR-199-012) - Case dismissed.

Loran Thompson (97-CR-199-013) - Entered a plea of guilty to Count 2 of the Superseding Indictment.  Sentencing pending.

Charles White, a.k.a. "Buck" (97-CR-199-014) - Entered a plea of guilty to a single count felony Information.  Sentencing pending.

Larry Thompson, a.k.a. "LT" (97-CR-199-015) - Entered a plea of guilty to a single count felony Information. Sentencing pending.

Dana Leigh Thompson, a.k.a. Dana Leigh Bush (97-CR-199-016) - Case dismissed.

Sheila Loran (97-CR-199-017) - Entered a plea of guilty to a single count felony Information. Sentencing pending.

David Mainville (97-CR-199-018) - Entered a plea of guilty to a single count felony Information. Sentencing pending.

Anthony Laughing (97-CR-199-019) - Entered a plea of guilty to Counts 2 and 7 of the Superseding Indictment. Sentenced to 96 months imprisonment.

Robert Browning (97-CR-199-020) - Entered a plea of guilty to Count 6 of the Superseding Indictment. Sentencing pending.

L. David Jacobs (97-CR-199-021) - Entered a plea of guilty to Count 7 of the Superseding Indictment. Sentencing pending.

Northern Brands International, Inc. (98-CR-561-001) - Entered a plea of guilty to Customs Fraud. On December 22, 1998 sentenced to pay a $5,000,000 fine and $200 Special Assessment, and ordered to forfeit $10,000,000.

4

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.  On March 25, 1999, the defendant entered a plea of guilty to Count 1 of a two-count Indictment. At all times material to the Indictment: 1) The St. Regis Mohawk Indian Reservation (Reservation), also known as Akwesasne, was located in the Northern District of New York. The St. Lawrence River and the international boundary between the United States and Canada pass through the Reservation; 2) Canadian-brand tobacco products were smuggled from the United States to Canada through the Reservation in order to avoid the payment of Canadian duties and taxes; 3) The tobacco products were then sold for cash on the Canadian "black market;" and 4) The Canadian currency from these sales was thereafter converted to U.S. dollars which were deposited at financial institutions in the United States so that participants in the scheme could purchase additional Canadian-brand tobacco products.

2.  From January 1, 1992 to at least October 26, 1996, in the Northern District of New York, the defendant and other persons conspired to conduct and attempt to conduct financial transactions affecting interstate and foreign commerce which involved the proceeds of specified unlawful activity, that is, a wire fraud scheme to defraud the United States and Canadian governments of revenue, in violation o f 18 U.S.C. § 1343, knowing the property involved in the financial transactions represented proceeds of the scheme to defraud the United States and Canadian governments of revenue, and with the intent to promote the carrying on of this specified unlawful activity. As part of the conspiracy and scheme to defraud: 1) The defendant and his coconspirators supplied Canadian-brand tobacco products from the R.J. Reynolds companies to individuals operating warehouses at the Reservation; 2) Individuals who purchased these Canadian-brand tobacco products at the Reservation caused the tobacco products to be smuggled from the United States into Canada where they were sold on the "black market" to avoid the payment of Canadian taxes and duties; 3) From time-to-time, the defendant's coconspirators would falsely represent the tobacco products would be exported from the United States, when in truth, the tobacco products were transported in interstate commerce to warehouses at the Reservation, thereby evading the payment of taxes due to the United States; 4) Canadian currency generated by the scheme would be converted into United States currency which was utilized to conduct financial transactions promoting the scheme, including payments for the purchase of additional Canadian-brand tobacco products; and 5) The tobacco products to be utilized in the smuggling scheme were purchased through interstate and international telephone calls, facsimile, and wire transmissions.

3.  The following overt acts were committed in furtherance of the conspiracy: 1) On March 25, 1992, the defendant met with Larry Miller, Lewis Tavano, and Robert Tavano at the Como Restaurant in Niagara Falls, New York; 2) On April 8, 1992 the defendant began selling Canadian-brand tobacco products of R.J.R. Macdonald, Inc. to Miller and the Tavanos who were then doing business as LBL Importing, Inc.; 3) At various times during the course of the conspiracy Thompson's coconspirators caused Canadian-brand tobacco products

5

purchased from R.J.R. Macdonald to be delivered to warehouses at the Reservation; 4) The defendant caused Miller to purchase bank drafts from the Jefferson National Bank in Massena, New York as payment for the Canadian-brand tobacco products which were purchased from R.J.R. Macdonald, Inc. and delivered to warehouses at the Reservation; 5) Miller caused individuals to transport payments from the Northern District of New York to Thompson in Canada; 6) Miller conducted financial transactions at the Jefferson National Bank in Massena, New York in order to wire transfer payments to the R.J.R. Macdonald company in Canada as payment for the Canadian-brand tobacco products which were purchased from R.J.R. Macdonald and delivered to warehouses at the Reservation; 7) In February 1993, Thompson began selling Canadian-brand tobacco products to Miller and the Tavanos through Northern Brands International, Inc. (NBI) doing business in Winston-Salem, North Carolina; 8) Thompson's coconspirators caused Canadian-brand tobacco products purchased through NBI to be delivered to warehouses at the Reservation; 9) Thompson, and those acting at his direction, caused Miller, doing business as LBL Importing, Inc., to wire transfer payment for the Canadian-brand tobacco products purchased from NBI and the R.J. Reynolds Tobacco Company, which manufactured Canadian-brand tobacco cigarettes in Puerto Rico; 10) On July 28, 1993, Thompson, and those acting at his direction, caused Miller to instruct the Durham's Currency Exchange to wire transfer $355,680 to NBI as payment for Canadian-brand tobacco products delivered to warehouses at the Reservation; 11) Thompson, and those acting at his direction, caused Miller to instruct the Newberry State Bank and the First National Bank of Manistique to wire transfer payments to NBI as payment for Canadian-brand tobacco products delivered to warehouses at the Reservation; 12) Thompson, and those acting at his direction, caused Miller to instruct the First National Bank of Northern New York to wire transfer payments to NBI as payment for the Canadian-brand tobacco products being purchased from the R.J. Reynolds International Tobacco Company, doing business as NBI, and delivered to warehouses at the St. Regis Mohawk Indian Reservation; and 13) At various times during the course of the conspiracy Thompson solicited and received gratuities from Miller.

4.    The defendant admits to Forfeiture Allegation I, relating to Count 1, contained in the Indictment. The government seeks forfeiture of any interest the defendant has in any property obtained in relation to Count 1 of the Indictment including, but not limited to, $72,679,800 in U.S. currency.

5.    The defendant is named in Count 2 and Forfeiture Allegation II of the Indictment. It is expected the government will move to dismiss these counts at sentencing. Count 2 charges the same offense detailed in Count 1, conspiracy to commit money laundering, however the overt acts relate specifically to Thompson's business dealings with Robert and Lewis Tavano and their tobacco wholesaling business, Pine Partnership. In Forfeiture Allegation II, the government seeks forfeiture of any interest the defendant has in any property obtained in relation to Count 2 of the Indictment including, but not limited to, $15,500,749 in U.S. currency.

6.    The defendant has entered into a written plea agreement. The parties entered into a plea agreement pursuant to Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure, which

provides that the defendant will be subject to a fixed term of imprisonment of no longer than 84 months, upon approval of the Court. If the defendant fulfills all of his obligations under the agreement, the government agrees to move to dismiss the charges set forth against him in Count 2 and Forfeiture Allegation II of Indictment 99-CR-93. The government will not further criminally prosecute him in the Northern District of New York for any act or offense that he may have committed on or before February 24, 1999 relating to or arising from smuggling tobacco into Canada and conducting financial transactions promoting this scheme as alleged in Indictment 99-CR-93. The government will also not criminally prosecute him for any act or offense arising out of his employment by the R.J. Reynolds Tobacco companies prior to February 24, 1999.

7.  The defendant agrees to cooperate. At or before the time of sentencing the government will advise the Court of any assistance provided by the defendant and may, but shall not be required to, make a motion requesting the Court to depart from the sentencing range called for by the guidelines in the event he provides "substantial assistance." Further, it is understood that if the defendant, a Canadian citizen, complies fully with the terms and conditions of the plea agreement and provides substantial assistance, the government will not, after Thompson has completed 24 months of his prison sentence in the United States, oppose or impede his request for a prison transfer under the 1977 bilateral treaty between the United States and Canada, the 1983 Multilateral Convention in the Transfer of Sentenced Persons, or any other treaty that may become applicable when the application is made or pending.

8.  The defendant admits the money laundering conduct charged in Count 1 of the Indictment involved the laundering of $72,679,800. He agrees to the entry of a forfeiture judgment personally and solely against him in an amount which reflects the "kickbacks," benefits, and gratuities he received as a result of his participation in the scheme. This amount shall be mutually determined (before sentencing) by his lawyers and the government following his full compliance with the agreed upon financial disclosure requirements. The defendant also agrees to relinquish any claim he may have to assets held at any time in the name of Kathleen Thompson, Michael Thompson, and/or any other nominee or third party necessary to effect the agreed forfeiture.

9.  The defendant and the government stipulate to the following guideline calculations: 1) The offense of conviction should be scored pursuant to U.S.S.G. §2S1.1 with a base offense level of 23, and an adjustment of 12 additional levels because the value of the funds was more than $60,000,000; and 2) A three-level adjustment for acceptance of responsibility, under U.S.S.G. §3E1.1, is warranted.

10. The government agrees not to seek a fine or restitution from the defendant because Northern Brands International, Inc. (Docket No. 3:98CR00561-001) paid a 5 million dollar fine and forfeited $10 million based in part upon the defendant's conduct, the defendant agrees to forfeit all of his ill-gotten gain, and financial penalties may be imposed on the defendant by the Canadian government.

11.    On February 24, 1999, the defendant was arrested in Detroit, Michigan, pursuant to a warrant and Indictment filed in the Northern District of New York. On February 25, 1999, he made his initial Court appearance in the Eastern District of Michigan. He was detained and ordered removed to Syracuse, New York. On March 2, 1999, Thompson made his initial Court appearance in the Northern District of New York, and his detention was continued. On March 25, 1999, following his plea of guilty to the instant offense, he was released on a bond secured by his home located at 12905 Riverside Drive, East, Tecumseh, Ontario, Canada.

**The Offense Conduct**

12.    The following historical overview and description of the instant offense is based on interviews of the Assistant U.S. Attorney and case agents, as well as a review of the supporting documentation provided by the government.

13.    The Saint Regis Mohawk Indian Reservation (Akwesasne Territory) straddles the international border between the United States and Canada. Although the Territory is only six miles wide and five miles long, its geography is unique because part of the Territory lies within the state of New York, and the remainder of the Territory falls within the provinces of Ontario and Quebec, Canada. The St. Lawrence River runs through the Territory. The river is especially narrow in this region and passage across the river is relatively easy throughout the year. The area is a haven for smugglers because there are numerous unguarded river crossings, and the Mohawks move freely on the Territory from one country to the other. Additionally, for years there has been no active law enforcement presence in the area due to armed confrontations fueled by racism and distrust. Law enforcement agencies in the Northern District of New York report that contraband of every type, including tobacco and alcohol pass freely between the United States and Canada through this portion of the border.

14.    High tobacco taxes in Canada during the late 1980s fueled an explosive growth of sales of tobacco on the black market in the early 1990s. In 1985 there was virtually no contraband tobacco for sale in Canada. By 1993, as the result of continuous tax increases that raised the price of a package of cigarettes to more than $4.25 in many parts of Canada, approximately one-third of all cigarettes purchased in Canada were purchased on the black market. In response to losing an estimated billion dollars in tax revenue because of cigarettes sold on the black market, the Canadian government, in February 1994, made massive tax cuts on cigarettes. As a result of these tax cuts, the profit for smugglers on contraband cigarettes decreased significantly. This caused smuggling groups to begin to ship contraband alcohol, a more profitable commodity, from the United States to Canada. Although some of the early alcohol smuggling involved "export only" liquor, on which no federal excise tax was paid, most of the smuggling organizations soon elected to purchase wholesale liquor (U.S. tax paid) in order to avoid scrutiny by federal law enforcement agencies.

15.    The Superseding Indictment names 21 defendants who took part in the tobacco and alcohol smuggling operations. (The charges against two of the defendants have since been

8

dismissed.) In general, some of the defendants, who were suppliers, purchased tobacco and alcohol products from legitimate tobacco companies and distilleries. The suppliers sold their products to other defendants, who acted as distributors, and operated warehouses located on the Akwesasne Territory. The suppliers and distributors arranged for the products to be shipped, via tractor-trailer, to the warehouses on the Territory. The distributors would then sell the products to buyers who would arrange for the products to be smuggled into Canada, through the Territory, and later sold on the black market. The distributors paid the suppliers in Canadian money for their respective shipments. The buyers paid the distributors in Canadian money as well. The suppliers and distributors then laundered the proceeds of the sales of tobacco and alcohol products through various financial institutions in the Northern District of New York and Canada. Some of the financial institutions were under the control of other coconspirators. The Canadian money was exchanged for U.S. currency, cashier's checks or transferred, by wire transfer, to accounts controlled by coconspirators. The U.S. currency would then be used to finance the purchase of more tobacco and alcohol products destined to be distributed on the Canadian black market. The coconspirators sought to hide the sale of tobacco and alcohol products and subsequent financial transactions by failing to file the proper Internal Revenue Service forms.

### The Tobacco and Alcohol Smuggling Trade

16.    During the late 1980s, Mohawk entrepreneurs began to introduce slot machines and develop Las Vegas-style gambling at various business establishments on the Akwesasne Territory. When repeated seizures of the slot machines and state misdemeanor prosecutions were shown to be an inadequate deterrent, the Federal Bureau of Investigation (FBI) and the New York State Police began a series of investigations which culminated in the attempted execution of search warrants on June 20, 1989. Their attempt to search Anthony Laughing's gambling establishment, Tony's Vegas International (TVI), and the Bear's Den, a restaurant owned by Eli Tarbell, ended with an armed confrontation between the authorities and members of a paramilitary group known as the "Warriors Society." Although Laughing was arrested, the resulting stand-off did not end the illegal gambling, but instead caused the conflict between the Warriors and anti-gambling groups on the Territory to escalate to the point where arsons, beatings, drive-by shootings and nightly firefights were common occurrences in this small community. The confrontations continued until May 1, 1990 when two Mohawk men were shot and killed. On May 2, 1990 the New York State Police re-established control of the Reservation with an overwhelming show of force, and the gambling establishments were finally closed.

17.    During the next two years, cigarette smuggling emerged as the most lucrative business in the region. Anthony Laughing had been involved in the cigarette smuggling business for many years prior to 1992. In fact, he utilized the proceeds from his smuggling activities to finance his casino, TVI. Larry Miller, at one time, was employed as a truck driver by Tideline International Tobacco. He worked his way into the tobacco trade by overseeing tractor-trailer load deliveries of cigarettes to distributors on the Territory, including Laughing, on behalf of Tideline. Miller was able to identify Tideline's suppliers and customers, and used this knowledge to eventually replace Tideline as the supplier to the Territory.

18.  In 1992, Miller and Lewis and Robert Tavano started LBL Importing Inc., in Niagra Falls, New York. (Miller knew Lewis Tavano as a sports bookmaker in Las Vegas.) LBL was used to purchase tobacco in Canada from such tobacco companies as RJR McDonald Tobacco Company, Imperial Tobacco Products and Philip Morris Tobacco Company. The cigarettes were legitimately shipped to the United States and stored in bonded warehouses. Through LBL, Miller and the Tavanos took possession of the cigarette shipments after they paid the required U.S. taxes and duties. They would then make arrangements for the cigarettes to be trucked to the Territory where they were purchased and stored by a warehouse operator. Many of the former casino owners opened warehouses where they stockpiled Canadian-brand cigarettes which were resold by the case to individuals who smuggled them into Canada for sale on the black market. Fabian Hart, Sheila Loran, Loran Thompson, Larry Thompson and Charles White are codefendants who operated warehouses.

19.  By the fall of 1993, Miller and the Tavanos ended their business relationship due to a disagreement over money. Miller continued to operate LBL. The Tavanos formed Pine Partnership, and competed with Miller in the smuggling business. In the early 1990s cigarettes were the primary commodity smuggled into Canada by the conspiracy. After the Canadian government repealed many of the taxes on cigarettes in 1994, the demand for black market cigarettes decreased, as did the smugglers' profits. In order to increase their profits, members of the conspiracy, initially the Tavanos and later Larry Miller, devised a scheme to divert shipments of non-taxed cigarettes, intended for export to the Republics of Russia and Estonia, to the Akwesasne Territory for later distribution on the Canadian black market. Northern Brands International, Inc. (NBI), doing business primarily in North Carolina, sold cigarettes manufactured in Canada by R.J.R. Macdonald Tobacco Company. Between August 1994 and June 1995, NBI aided and abetted members of the conspiracy in diverting 26 truck loads of cigarettes. Each load contained approximately 1,000 cases of cigarettes. The cigarettes were purchased by coconspirators through NBI from RJR McDonald Tobacco Company, and trucked from Canada into the United States and held in bonded warehouses. Because the cigarettes were intended for export overseas, the co-conspirators were exempt from paying Internal Revenue Service taxes, approximately $120,000 per load. The cigarettes were eventually diverted to the Akwesasne Territory. Coconspirators smuggled the cigarettes into Canada using the same means as had been previously established.

20.  After the Canadian government repealed many of the taxes on cigarettes in 1994, Miller and the Tavanos found it much more lucrative to smuggle alcohol, usually Canadian whiskey, vodka and rum. (Coconspirators had smuggled liquor earlier in the conspiracy, but they did not do so in the same volume as with cigarettes.) The process by which liquor was smuggled from the United States into Canada was virtually identical to that used to smuggle cigarettes. Miller and the Tavanos purchased truck loads of liquor from distilleries, such as A. Bowman Distillery and Frank-lin Distillers, or from companies who held a Bureau of Alcohol, Tobacco and Firearms' Basic Wholesalers Permit, such as Lion Wines and Spirits, Inc.; Prime Wines and Spirits, Inc.; Royal Med Importers; and Cactus Clearing Company. The liquor would be trucked onto the Territory, sold to the warehouse owners, and then sold to buyers who would smuggle the product into Canada to be sold on the black market.

21.  On December 11, 1995, Larry Miller's children, Nick Miller and Victoria Glines, and Glines' husband Timothy Glines, formed VTN. Like LBL Importing Company and Pine Partnership, VTN purchased tobacco and alcohol products to sell to warehouse operators on the Reservation. Larry Miller provided the financial resources to his children to start VTN. The company utilized the same sources to purchase tobacco and alcohol as had been used by Larry Miller. They sold tobacco and alcohol products to the same warehouse operators on the Territory as had been used by Larry Miller and the Tavanos.

### The Money Laundering Scheme

22.  When suppliers, such as Larry Miller and the Tavanos, sold cigarettes and liquor to warehouse operators, they were paid in Canadian currency. When warehouse operators sold the cigarettes and liquor to buyers, who would later smuggle the contraband into Canada and sell it on the black market, they were paid in Canadian currency. Members of the conspiracy utilized several financial institutions to exchange, or launder, the Canadian currency for U.S. currency, cashier's checks or wire transfers. The financial institutions utilized in the laundering process in the Northern District of New York include Jefferson National Bank, Northern Currency Exchange, Commercial Exchange Services, and First National Bank of Northern New York. (Bank's outside the Northern District of New York were also utilized, including the First National Bank of Manistique and the Bluewater Currency Exchange). The smuggling business generated hundreds of thousands of dollars in Canadian currency each week, and the cash flow and resultant currency exchange business became a major source of banking revenue in the area. The volume of cash generated from the smuggling activity was confirmed when agents, through the use of search warrants, seized bank records related to Larry Miller's business, LBL Importing, and the Tavanos' business, Pine Partnership. Bank records reflect, during a ten month period between October 1993 and August 1994, over six million dollars was deposited into LBL business accounts. Records reflect, during a two year period between September 1993 and September 1995, over 30 million dollars was deposited into Pine Partnership accounts. The bank reviews also showed numerous wire transfers from Pine Partnership accounts to businesses and individuals identified as entities who assisted in the purchase and shipping of Canadian-brand tobacco and alcohol.

23.  The government indicates John Fountain was an integral part of the conspiracy's money laundering operation. He provided an armored car service, Fountain Security Services, to collect Canadian currency from coconspirators, and deliver it to the various financial institutions for exchange. From February 1994 through 1996, he operated a currency exchange business, Northern Currency Exchange, where the proceeds of coconspirators' smuggling operations were exchanged. He also arranged for funds to be wire transferred on behalf of coconspirators in exchange for Canadian currency. After the proceeds of the smuggling activity had been exchanged through financial institutions, the money was used by Miller, the Tavanos, and others to purchase more tobacco and alcohol, and the smuggling cycle, ending with the sale of tobacco and alcohol on the Canadian black market, continued. In the forfeiture allegations contained in the Superseding Indictment, the government seeks forfeiture of a total of $687,453,593.22, which the government alleges is the amount of

money laundered in the conspiracy as it relates to Counts 2, 3 and 5 of the Superseding Indictment.

24.    The defendant was employed in the sales division of R.J.R. Macdonald, a subsidiary of R.J.R. Nabisco, based in Toronto, Canada, for 22 years ending in April 1999. Beginning in 1992, Thompson was assigned by company officials to oversee the sale of Canadian-brand tobacco, manufactured in Canada, to members of the smuggling conspiracy, specifically Larry Miller and Robert and Lewis Tavano. In February 1993, Northern Brands International, Inc. (NBI), a subsidiary of R.J.R. Nabisco and R.J. Reynolds Tobacco International, was created and based in Winston-Salem, North Carolina. NBI was created to market Canadian-brand tobacco products in the United States. The company employed only three people. Thompson was one of the three and held the position of Regional Director. The government's evidence shows NBI's primary customers were members of the tobacco smuggling conspiracy including Miller and the Tavanos. In his position, the defendant oversaw the sale of Canadian-brand tobacco, manufactured in Canada, Puerto Rico, and Winston-Salem, North Carolina, to Miller and the Tavanos. The defendant reported directly to Stan Smith, the Vice President of Sales Marketing in Canada, and later the Chief Operations Officer, at R.J.R. Macdonald. The government indicates, from the beginning, it was made very clear to the defendant, by his superiors, the sale of tobacco products to Miller and the Tavanos was extremely lucrative for the company, and he was to do all that he could to continue and expand their business dealings. (The defendant recalls during the five-year period the offense was committed, he had access to a $1.6 million entertainment budget targeted specifically towards customers, such as Miller and the Tavanos, who purchased tobacco products which would later be smuggled into Canada.)

25.    In his position as Regional Director, the defendant was in charge of the day-to-day operation of NBI, along with customer relations and market forecasting. He had regular communication with Miller and the Tavanos. He attended meetings and vacationed with them. He arranged the process by which NBI would be paid for tobacco sold to coconspirators. Payments were made with bank drafts delivered to the defendant in Canada, or, most frequently, wire transfers from various banks (Jefferson National Bank, Newberry State Bank, First National Bank of Manistique, and First National Bank of Northern New York) or Durham's Currency Exchange. The government relates the defendant and Stan Smith also received "kickbacks" directly from Miller and the Tavanos. The government indicates they have no way of accurately assessing the total amount of "kickbacks" paid to the defendant and Smith. However, the government speculates the "kickbacks" may have been in excess of $500,000. These "kickbacks" included cash and gifts, such as Rolex watches.

26.    The government's evidence reveals from January 1, 1992 to October 26, 1996, the total amount of money laundered by the defendant, through his position with R.J.R. Macdonald and NBI, is $88,180,549.

## Victim Impact

27.    The victim in this case is society.

## Adjustment for Obstruction of Justice

28.    The probation officer has no information to suggest that the defendant impeded or obstructed justice.

## Adjustment for Acceptance of Responsibility

29.    The defendant has entered a plea of guilty and accepts responsibility for his offense. He agrees with the government's version of his role in the offense. He emphasizes high ranking company officials were well aware of the large market for Canadian-brand tobacco products that was created by smuggling activity. He states his job was to expand sales in this market as much as possible. He admits, while he was following the orders of his superiors, he benefitted greatly from his relationship with coconspirators such as Miller and the Tavanos.

## Offense Level Computation

30.    The 1998 edition of the Guidelines Manual has been used in this case.

Count 1 - Conspiracy to Commit Money Laundering

31.    **Base Offense Level:** The United States Sentencing Commission Guideline for violation of 18 U.S.C. § 1956(h) is found in U.S.S.G. §2S1.1 and calls for a base offense level of 23 when the transaction is designed to promote the carrying on of specified unlawful activity.                                23

32.    **Specific Offense Characteristic:** The government's evidence reveals the amount of money laundered by the defendant and coconspirators from January 1, 1992 to October 26, 1996 is $88,180,549. Accordingly, the offense level is increased by 12 levels because the amount of the laundered funds is more than $60,000,000 but not more than $100,000,000. U.S.S.G. §2S1.1(b)(2)(M).                    +12

33.    **Victim-Related Adjustments:** None.                              0

34.    **Adjustments for Role in the Offense:** None.                      0

35.    **Adjustments for Obstruction of Justice:** None.                   0

36.    **Adjusted Offense Level (Subtotal)**                               35

37.  **Adjustment for Acceptance of Responsibility:** The defendant clearly demonstrates acceptance of responsibility for his offense. Pursuant to U.S.S.G. §3E1.1(a), the offense level is reduced two levels.                                                      -2

38.  The defendant timely notified authorities of his intention to enter a plea of guilty. Pursuant to U.S.S.G. §3E1.1(b), the offense level is reduced one additional level.    -1

39.  **Total Offense Level:**                                                            **32**

40.  **Chapter Four Enhancements:** None.                                                 0

41.  **Total Offense Level:**                                                            **32**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

42.  The records of the following criminal history databases, police agencies and courts were checked for information about the defendant: New York State Division of Criminal Justice Services; National Crime Information Center; and Royal Canadian Mounted Police. There appear to be no prior convictions of the defendant.

### Criminal History Computation

43.  The total of the criminal history points is 0. According to the sentencing table at U.S.S.G. Chapter 5, Part A, 0 criminal history points establish a Criminal History Category of I.

### Pending Charges

44.  The defendant has charges pending in Canada related to his conduct in the instant Federal offense. The Probation Office is awaiting information from the government which will detail the specifics of the charges. The defendant indicates the Canadian charges will most likely be disposed of after he is sentenced for the instant offense.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

45.  The defendant, age 52, is the oldest child born to the marital union of Roy Thompson and Josephine Kroskie Thompson. The defendant's father died in 1989, at the age of 64, of a liver-related illness. The defendant's mother, age 74, lives in Tecumseh, Ontario, Canada, and is retired from a career in the general retail industry. The defendant indicates his parents divorced when he was about 15 years old. He states he lived with his mother and did not have as much contact with his father as he would have liked. The defendant has five siblings. Mary Ellen Therrien, age 50, lives in Tecumseh, Ontario, and is not employed outside the home. Margaret Gallagher, age 48, lives in Bell River, Ontario, and is not employed outside the home. Thomas Thompson, age 46, lives in Windsor, Ontario, and is

14

employed as an engineer. David Thompson, age 43, lives in North Bay, Ontario, and owns a farm. Christine Bryans, age 38, lives in Calgary, Alberta, and is employed as a medical secretary.

46.    Records reflect the defendant was born in Windsor, Ontario. He is a Canadian citizen. Thompson states he was raised in Tecumseh, Ontario. He reports, with the exception of his parents' divorce, he enjoyed a stable upbringing. He notes he continues to maintain a close relationship with his mother and siblings. The defendant's sister, Mary Ellen Therrien, was interviewed, and confirms the specifics of his personal background. She describes her brother as loving, responsible, loyal, ambitious, and energetic. She states he has always been close with his mother and siblings. She is disappointed that he was prosecuted for the instant offense because she believes the company by which he was employed misled him.

47.    Records reveal on October 3, 1969 the defendant married Kathleen Burkeen Thompson in Tecumseh, Ontario. They have one child, Michael Thompson, age 25, who lives in Santa Clara, California, and is employed in the computer marketing industry. The defendant's wife, age 49, is a U.S. citizen. She is employed as a secretary by a construction company in Detroit, Michigan. The defendant's wife was interviewed. She describes her husband as a strong, honorable, gentle, kind, forgiving, and generous individual. She advises they have a wonderful marriage. She remains very supportive of him.

48.    Following their marriage in 1969, the defendant and his wife lived in Windsor, Ontario until 1983. The defendant states his employment led to relocations to Toronto, Ontario, until 1988; London, England, until 1990; back to Toronto, until 1993; Winston-Salem, North Carolina, until 1998; and then to their present address in Tecumseh, Ontario. The defendant advises they purchased their current home, located at 12905 Riverside Drive, East, Tecumseh, Ontario, in February 1999 for $269,000.

## Physical Condition

49.    The defendant stands 5 feet, 9 inches tall, and weighs 169 pounds. He has brown eyes and grey hair. He reports no history of serious physical illnesses or injuries.

## Mental and Emotional Health

50.    The defendant indicates he has never been evaluated and/or treated by a psychiatrist or a psychologist for any mental or emotional health problems.

## Substance Abuse

51.    The defendant reports no use of illegal drugs. He states he first used alcohol when he was 18 years old. He describes himself as a "social" user of beer and wine. He indicates he has never used alcohol on a regular basis. The defendant's wife and sister have never been concerned about Thompson's use of alcohol.

15

### Education and Vocational Skills

52.    The defendant states he graduated from St. Anne's High School, in Tecumseh, Ontario, in 1963. He notes he took some business courses at St. Clair College, in Windsor, Ontario, but did not earn a degree. He reports he also took many employment-related, business courses during his career with R.J.R. Macdonald.

### Employment Record

53.    Records confirm the defendant was employed by R.J.R. Macdonald (which is owned by R.J.R. Nabisco) from January 30, 1978 through April 16, 1999. He initially worked as a sales representative. He last held the position of Director - North American Duty Free, which the defendant describes as a Regional Director. For most of his career he worked in Canada. From 1993 until his termination, he worked for Northern Brands International, Inc., a subsidiary of R.J.R. Nabisco and R.J. Reynolds Tobacco International, Inc., based in Winston-Salem, North Carolina. Company records reveal he was terminated for "Misconduct (conduct constituting conflict of interest and violation of company policy)." He was placed on administrative leave with pay beginning in June 1998 due to the instant offense. At the time of his termination, his annual salary was $111,220 plus performance bonuses. The defendant recalls in 1998 he received a bonus of about $47,000.

54.    The defendant reports from 1970 to 1977 he was employed by Standard Brands, in Toronto, Ontario. The company manufactured and sold items such as dog food, peanuts and margarine. He states he worked as a sales representative.

55.    The defendant indicates he would like to find other employment in sales, but outside the tobacco industry. He is currently unemployed and has no plans to seek employment until the instant offense is disposed of.

### Military

56.    The defendant reports he served a 2½ year enlistment in the Canadian Navy ending when he was 20 years old. He states he was stationed on an aircraft carrier, and he was trained as a marine engineer.

### Financial Condition: Ability to Pay

57.    The defendant has submitted a certified personal financial statement and copies of tax returns and other documentation. A credit check has also been completed. The following is a list of assets held jointly by the defendant and his wife and their liabilities:

### Assets

#### Cash

Checking Account (U.S. currency)                                    1,000.00

| | |
|---|---:|
| Checking Account (Canadian currency) | 3,000.00 |
| Savings Account (U.S. currency) | 10,500.00 |
| Savings Account (Canadian currency) | 10,000.00 |
| Mutual Funds (U.S. currency) | 18,600.00 |
| Mutual Funds (Canadian currency) | 25,000.00 |
| Retirement Account (Canadian currency) | 109,900.00 |
| **Subtotal:** | **$178,000.00** |

**Unencumbered Assets**

| | |
|---|---:|
| Rolex watch | 1,800.00 |
| **Subtotal:** | **$1,800.00** |

**Equity in Other Assets**

| | |
|---|---:|
| 12905 Riverside Drive, East, Tecumseh, Ontario (home - valued at $269,000) | 169,000.00 |
| **Subtotal:** | **$169,000.00** |

| | |
|---|---:|
| **TOTAL ASSETS:** | **$348,800.00** |

**Unsecured Debts**

| | |
|---|---:|
| None | $0.00 |
| **TOTAL UNSECURED DEBT:** | **$0.00** |

| | |
|---|---:|
| **NET WORTH:** | **$348,800.00** |

58.  The defendant provided copies of the U.S. Individual Income Tax Returns he and his wife jointly filed for the years 1996 through 1998. Their adjusted gross income was $122,048, $134,686, and $171,478 for each year, respectively. The defendant's salary was $116,309, $129,085, and $161,532 for each year, respectively.

59.  The defendant is currently unemployed. His attorney is retained. The sole source of income, aside from the assets listed above, is the defendant's wife's employment as a secretary. The following chart details the defendant's family's monthly income and expenses:

**Monthly Cash Flow**

**Income**

| | |
|---|---:|
| Spouse's Net Salary | 1,840.00 |

| | |
|---|---:|
| **TOTAL INCOME:** | $1,840.00 |
| | |
| **Necessary Living Expenses** | |
| Property Mortgage | 1,300.00 |
| Food | 400.00 |
| Utilities | 550.00 |
| Telephone | 200.00 |
| Life Insurance | 70.00 |
| Car Insurance | 145.00 |
| Cable | 60.00 |
| Transportation | 1,000.00 |
| Homeowners Insurance | 80.00 |
| Clothing/Dry Cleaning | 245.00 |
| Entertainment | 200.00 |
| Health Club | 40.00 |
| Newspaper/Magazine | 20.00 |
| Medical bills | 75.00 |
| Charities/Churches | 100.00 |
| Gifts | 100.00 |
| Family Assistance to mother-in-law | 200.00 |
| **TOTAL EXPENSES:** | $4,785.00 |
| | |
| **NET MONTHLY CASH FLOW:** | ($2,945.00) |

60.    Based on the above information, it appears the defendant has the ability to pay a fine.

## PART D. SENTENCING OPTIONS

### Custody

61.    **Statutory Provisions:** On Count 1, the maximum term of imprisonment is 20 years, pursuant to 18 U.S.C. §§ 1956(a)(1) and (h). This offense is a Class C felony. 18 U.S.C. § 3559(a)(3).

62.    **Guideline Provisions:** Pursuant to U.S.S.G. Chapter 5, Part A, based on a Total Offense Level of 32 and a Criminal History Category of I, the guideline range for imprisonment is 121 to 151 months.

63.   In Zone D, the minimum term shall be satisfied by a sentence of imprisonment.  U.S.S.G. §5C1.1(f).

**Impact of Plea Agreement**

64.   The parties entered into a plea agreement pursuant to Rule 11(e)(1)(C) of the Federal Rules of Criminal Procedure, which provides that the defendant will be subject to a fixed term of imprisonment of no longer than 84 months.  The government agrees not to seek a fine or restitution from the defendant because Northern Brands International, Inc. (Docket No. 3:98CR00561-001) paid a 5 million dollar fine and forfeited 10 million dollars based in part upon the defendant's conduct, the defendant agrees to forfeit all of his ill-gotten gain, and financial penalties may be imposed on the defendant by the Canadian government.

**Supervised Release**

65.   **Statutory Provisions:**  If a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years, pursuant to 18 U.S.C. § 3583(b)(2).

66.   **Guideline Provisions:**  The guideline range for a term of supervised release is at least two years but not more than three years, pursuant to U.S.S.G. §5D1.2(a)(2).  If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to U.S.S.G. §5D1.1(b).  Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to U.S.S.G. §5D1.1(a).

**Probation**

67.   **Statutory Provisions:**  The defendant is eligible for not less than one nor more than five years probation by statute, pursuant to 18 U.S.C. § 3561(c)(1).  The offense is a felony, so one of the following should be imposed as a condition of probation: a fine, restitution, or community service.

68.   **Guideline Provisions:**  The applicable guideline range is in Zone D of the Sentencing Table.  The defendant is not eligible for probation, pursuant to U.S.S.G. §5B1.1(a).

**Fines**

69.   **Statutory Provisions:**  On Count 1, the maximum fine is $500,000, pursuant to 18 U.S.C. § 1956(a)(1) and (h).

70.   **Guideline Provisions:**  The fine range for the instant offense is from $17,500 to $500,000, pursuant to U.S.S.G. §5E1.2(c)(4).

71.   A special assessment of $100 is mandatory, pursuant to 18 U.S.C. § 3013 and U.S.S.G. §5E1.3.

<u>Restitution</u>

72.   **Statutory Provisions:**  Restitution is not an issue in this case.

<u>Forfeiture</u>

73.   **Statutory Provisions:**  Pursuant to 18 U.S.C. § 982(a)(1), the defendant shall forfeit to the United States all right, title, and interest in the following:  The defendant agrees to the entry of a forfeiture judgment personally and solely against him in an amount which reflects the "kickbacks," benefits, and gratuities he received as a result of his participation in the scheme. This amount shall be mutually determined (before sentencing) by his lawyers and the government following his full compliance with the agreed upon financial disclosure requirements.  The defendant also agrees to relinquish any claim he may have to assets held at any time in the name of Kathleen Thompson, Michael Thompson, and/or any other nominee or third party necessary to effect the agreed forfeiture.

74.   **Guideline Provisions:**  Pursuant to U.S.S.G. §5E1.4, forfeiture is to be imposed on a convicted defendant as provided by statute.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

75.   The government will advise the Court of the nature and extent of the defendant's cooperation prior to sentencing, and may, but will not be required to make a motion pursuant to U.S.S.G. §5K1.1, if the defendant provides substantial assistance.

76.   The probation officer has no information concerning the offense or the offender which may warrant a departure from the sentencing guidelines.

Respectfully submitted,

PAUL W. DEFELICE
Chief U.S. Probation Officer

MATTHEW L. BROWN
Senior U.S. Probation Officer

Reviewed by:

KATHRYN A. WARNER
Deputy Chief U.S. Probation Officer

January 16, 2007

*Re-sent*
*January 30/07*

Bob –

Thanks for your offer of assistance.  Considering the depth and strength of the letters in support of the waiver, it is beyond my comprehension that more than two years after filing, we are still waiting and waiting for word.

In a last effort before Christmas to get some word on the status of the waiver, Les spoke with his lawyer in late November and received the same response we have received since April, 2005 – *the file is in Washington for an FBI background check.*

In January, 2006, our lawyer was told the one-year mark "raised flags", however, it is now a year after the flags were supposedly raised and still we wait. There's a site I visit (basically people like me hashing out the frustrations of waiting for a waiver), and I can tell you unequivocally that Les's wait is extraordinarily long and out of the norm.

Our frustration grows with each passing event we cannot participate in with our son, daughter-in-law and granddaughter.  The next event we're due to miss is our granddaughter's second birthday in early March.

As you can see, going through these documents and reading the multitude of letters of support and kind words for Les has tripled my frustration level today.

We're at the point we believe Les's waiver application (large, I'm sure in comparison to most) has ended up in the corner of someone's desk gathering dust and how it could be overlooked is way beyond my comprehension.

Thanks for your assistance.

Les and Kathy Thompson

RETAIN THIS COPY FOR YOUR RECORDS.

**FedEx** Express
US Airbill

FedEx Tracking Number  8528 2059 0851

Form 0200  Sender's Copy

**1 From** Please print and press hard.
Date 8/16/07
Sender's Name David Thompson  Phone 248 641 2456
Company Navigant Consulting
Address 5445 Corporate Dr Ste 340
City Troy  State MI  ZIP 48098

**2 Your Internal Billing Reference** Bob Droptejdar

**3 To**
Recipient's Name Bob Nieves  Phone 703 850 4579
Company Berg Associates
Address 2300 M. Street NW, Ste 800
City Washington  State DC  ZIP 20037-1434

**4a Express Package Service** Packages up to 150 lbs.
FedEx Priority Overnight
X FedEx Standard Overnight
FedEx First Overnight
FedEx 2Day
FedEx Express Saver

**4b Express Freight Service** Packages over 150 lbs.
FedEx 1Day Freight
FedEx 2Day Freight
FedEx 3Day Freight

**5 Packaging**
X FedEx Envelope
FedEx Pak
FedEx Box
FedEx Tube
Other

**6 Special Handling**
SATURDAY Delivery
HOLD Weekday
HOLD Saturday
Does this shipment contain dangerous goods?
X No
Yes As per attached Shipper's Declaration
Yes Shipper's Declaration not required
Dry Ice

**7 Payment** Bill to:
X Sender
Recipient
Third Party
Credit Card
Cash/Check
FedEx Acct. No. 2869 5287 6
Total Packages  Total Weight  Total Declared Value $ .00

**8 Sign to Authorize Delivery Without a Signature**

467

# VERCRUYSSE MURRAY & CALZONE

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS

Robert M. Vercruysse
Gregory V. Murray
David B. Calzone
Bernice McReynolds
Daniel J. Bernard
Dorothy Hanigan Basmaji
Susan Hartnus Hiser
Debra Auerbach Clephane
James E. Roach
Patricia Bordman
Ann M. Nicklas
William E. Altman
Gary S. Fealk
Kathleen Saenz Poppenger
Jesse Goldstein

SUITE 200, 31780 TELEGRAPH ROAD
BINGHAM FARMS, MI  48025-3469

Telephone
248-540-8019

Facsimile
248-540-8059

Website
www.vmclaw.com

Retired:
Virginia F. Metz

April 29, 2008

Mr. Thomas K. Ragland
Magio & Kattar
11 Dupont Circle NW
Suite 775
Washington, D.C. 20036

**Re:    Leslie Thompson**

Dear Mr. Ragland:

I am the attorney who prepared the application for a waiver for Leslie Thompson which was received by the Department of Homeland Security on January 7, 2005.  Over the course of the more than three years that this matter has been pending, I have contacted the Department of Homeland Security at the International Bridge Plaza in Sault St. Marie, Michigan, numerous times regarding the status.  Since August 24, 2005, when I started to keep a record, I called Customs and Border Protection ("CBP") on at least 18 occasions.  There was generally a few months between each call as suggested by CBP.   On virtually every communication, I was advised that CBP was waiting for the name checks to be returned.   On March 28, 2007, I was advised that CBP had not received any information regarding the name check and therefore CBP would resubmit a request again.  This was confirmed by CBP on April 6, 2007, when I was advised that a request for an FBI name check was resubmitted  that day.  My most recent conversation with CBP was on January 7, 2008, and I was again advised that CBP was waiting for the name check. On April 17, 2008,  I sent an e-mail correspondence to CBP requesting the status of this matter but have not received a response.

April 29, 2008
Page 2

_____

       Should you require any further information, please do not hesitate to contact me for a prompt response.

       Kind regards.

                   Very truly yours,

            VERCRUYSSE MURRAY & CALZONE

             Dorothy Hanigan Basmaji

DHB/ap
Enclosures
86540-001

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Leslie Stephen THOMPSON | W. Ralph BASHAM, Emilio T. GONZALEZ, Michael CHERTOFF, Robert S. MUELLER |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Thomas K. Ragland<br>MAGGIO & KATTAR<br>11 Dupont Circle, NW, Suite 775<br>Washington, DC 20036<br>(202) 483-0053 | Jeffrey Taylor<br>C/O Civil Process Clerk<br>U.S. Attorney for the District of Columbia<br>555 4th Street NW<br>Washington, DC 20530 |

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

◉ 2 U.S. Government Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

◉ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. §1361; 28 U.S.C. §1331; 5 U.S.C. §555(b) and §702. Complaint to compel Defs. to adjudicate Plaintiff's appl. for a waiver of inadmissibility

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | DEMAND $ _____ | Check YES only if demanded in complaint |
|---|---|---|---|
| | | JURY DEMAND: | YES ☐  NO ☒ |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 5/22/2008   SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.